Gregg M. Galardi
David B. Hennes
Michael S. Winograd
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

*Proposed Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Gawker Media, LLC,[1] | Case No. 16-11700 (SMB) |
| Debtor. | |
| Gawker Media, LLC, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 16-_____  (    ) |
| Meanith Huon, Ashley Terrill, Teresa Thomas, Shiva Ayyadurai, Terry Gene Bollea, Charles C. Johnson, and Got News LLC, | |
| Defendants. | |

## <u>COMPLAINT</u>

Gawker Media, LLC, the debtor and debtor in possession in the above-captioned

chapter 11 cases ("<u>Gawker Media</u>" or the "<u>Debtor</u>", and together with parent Gawker Media

Group, Inc. ("<u>GMGI</u>") and affiliate Kinja, Kft. ("<u>Kinja</u>"), the "<u>Company</u>") by and through its

undersigned attorneys, allege for its complaint and claims for relief against Defendants Meanith

---

[1] The last four digits of the taxpayer identification number of the Debtor, Gawker Media, LLC are 0492. The Debtor's corporate headquarters is located at 114 Fifth Avenue, 2d Floor, New York, New York 10011.

Huon, Ashley Terrill, Teresa Thomas, Shiva Ayyadurai, Terry Gene Bollea, Charles C. Johnson, and Got News LLC (collectively, the "Adversary Action Defendants") as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding commenced by the Debtor, pursuant to sections 105(a) and 362(a) of title 11 of the United States Code, Rule 7001(7) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable hereto by Bankruptcy Rule 7065, seeking injunctive relief and/or extension of the automatic stay.  Specifically, Debtor seeks an order (1) enjoining, pending the termination of the automatic stay applicable to the Debtor, (A) the following existing lawsuits against the Debtor: (i) *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.); (ii) *Huon v. Denton, et al*., No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.); (iii) *Ashley Terrill v. Gawker Media, LLC, et al.,* No. 16-CV-00411 (S.D.N.Y.); (iv) *Teresa Thomas v. Gawker Media, LLC, et al.*, No. 16-CV-09519 (Or. Multnomah Cty. Cir. Ct.); (v) *Ayyadurai v. Gawker Media, LLC, et al.*, No. 16-CV-10853 (D. Mass.); and (vi) *Charles C. Johnson, et al. v. Gawker Media, LLC, et al.*, No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (collectively, the "Actions"), as against certain non-debtor parties who are also parties to the Actions, including (i) Nick Denton, the Company's founder and the current President and Chief Executive Officer of GMGI and President of Gawker Media, and (ii) certain current or former employees of the Company, (the "Individual Defendants," and collectively with Mr. Denton, the "Non-Debtor Third Parties"), and (B) any Adversary Action Defendant from taking further action in the Actions and from taking further action in any other existing litigation or filing further claims against Mr. Denton or any Individual Defendant where the conduct alleged was in the course of, and within the scope of, Mr. Denton's or the Individual Defendant's employment with the Debtor, absent approval of this

Court; and/or (2) extending the automatic stay imposed by section 362(a) of the Bankruptcy Code to stay the Actions as against Mr. Denton and the Individual Defendants.

2.      The Adversary Action Defendants assert liability against the Debtor as well as against one or more of Mr. Denton and the Individual Defendants.

3.      The Actions are stayed as against the Debtor by section 362(a) of the Bankruptcy Code.  The Actions likewise should be enjoined or otherwise stayed as against Mr. Denton and the Individual Defendants because if the Actions are allowed to proceed they will significantly interfere with or otherwise impair the Debtor's efforts to reorganize, including specifically the Debtor's plan to sell substantially all of the Debtor's assets to preserve value for distribution to creditors.  In effect, if allowed the proceed, the Actions will (i) give rise to indemnification claims against the Debtor, which would have to be paid from funds that would otherwise be available to the Debtor for the administration of its estate and the distributions to creditors; (ii) have a chilling effect on the Debtor's employees and, as a result, on the Debtor's ability to continue to generate revenue on an ongoing basis; (iii) be a significant burden and distraction on Mr. Denton and other key personnel, who would be forced to devote their time and attention to the Actions (and in the case of Mr. Denton, even a consequent personal bankruptcy) rather than the reorganization process; and (iv) be prejudicial to the Debtor in its own defense of the Actions, and even subject it to collateral estoppel.

4.      By motion filed contemporaneously herewith (the "Motion"), the Debtor seeks entry of an order (i) preliminarily enjoining the Actions as against Mr. Denton and the Individual Defendants pending termination of the automatic stay in those Actions, and/or (ii) extending the automatic stay to stay the Actions as against Mr. Denton and the Individual Defendants.  By separate Motion filed contemporaneously herewith (the "TRO Motion"), the

Debtor seeks a temporary restraining order directing that, pending the Court's hearing and ruling on Debtor's Motion: (1) the Action captioned *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea Litigation") be temporarily restrained and enjoined as against (A) Mr. Denton, and (B) A.J. Daulerio, the Debtor's former editor-in-chief; (2) Defendant Terry Gene Bollea be temporarily restrained and enjoined from taking further action in Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio, or from otherwise seeking to enforce any judgment entered in the Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio; and (3) the automatic stay imposed by section 362(a) of the Bankruptcy Code be hereby extended to stay the Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio.

5.      The relief sought by the Debtor is critical to its ability to preserve the assets and value of the Debtor's estate, for the benefit of present and future creditors and to eventually implement a plan of reorganization.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      Venue in this District is proper pursuant to 28 U.S.C. § 1408.

8.      This adversary proceeding is initiated under Bankruptcy Rule 7001(7), and the relief requested herein may be ordered pursuant to Bankruptcy Rule 7065 and sections 105(a) and 362(a) of the Bankruptcy Code.

## THE DEBTOR

9.      On June 10, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is currently operating its

businesses and managing its assets as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The factual background regarding the Company, its business operations, its capital and debt structure, and the events leading up to the filing of this chapter 11 case is set forth in detail in the First Day Declaration filed contemporaneously with the voluntary petition.

10. Gawker Media is a wholly-owned subsidiary of GMGI, a privately-held online media company. Gawker Media operates seven distinct media brands with corresponding websites under the names *Gawker*, *Deadspin*, *Lifehacker*, *Gizmodo*, *Kotaku*, *Jalopnik*, and *Jezebel* (the "Websites"). Kinja, another wholly-owned subsidiary of GMGI, holds the intellectual property licenses for the Websites. *Gawker* is the most well-known brand and Website. However, the Company's six other brands identified above represent approximately 85% of its revenues. The Company's commercial flagship is *Gizmodo*, a technology news brand and website, and the Company's video game, sports, how-to and automotive properties (*Kotaku*, *Deadspin*, *Lifehacker*, and *Jalopnik*) are also leaders in their categories. The Company also licenses its web content internationally to third parties that run similar websites based on the Company's brands, such as *Gizmodo en Espanol*, *Gizmodo Australia*, *Kotaku Australia*, and *Lifehacker Australia*.

11. The Company's various Websites cover, among other things, news and commentary on current events, politics, pop culture, sports, cars, fashion, productivity, technology and video games. The Websites have a collective global readership of over 90 million readers (approximately 50 million in the United States), generally in the age range of 18 to 34 years old. The Debtor is recognized as the only digital media company to grow to scale and viability with minimal external investment. Between 2012 and 2015, the Company

experienced a compound annual growth rate of approximately 24%, with revenue in 2015 of approximately $49.9 million.  The Company's business is run from leased offices at 114 Fifth Avenue in New York, New York.  The Company also leases *de minimis* office space in other cities for certain employees, including through "WeWork", a co-working office space rental company.

12.    The following provides a description of the Company's media brands and the corresponding Websites:

- **Gizmodo:** *Gizmodo.com* was the first brand launched by the Company, covering consumer electronics and other technology as well as science and science fiction, and natural and man-made wonders.  Gizmodo is the Company's commercial flagship, with a strong appeal to blue-chip technology and automotive advertisers. Its exclusives, on subjects from the iPhone to the hidden bias in news provided by social media, are drivers for technology conversation.  The website has approximately 19.7 million readers in the U.S. and over 35 million readers globally.  Approximately 25 staff members at Gawker Media work on the Gizmodo brand.

- **Deadspin:** *Deadspin.com* focuses on bringing sports fans stories that may not make it to more mainstream sports news.  The property is best known for exclusives about sports stars, and Deadspin's coverage has broadened to include male lifestyle coverage.  The website has approximately 12 million readers in the U.S. and over 13 million readers globally.  Approximately 16 staff members at Gawker Media work on the Deadspin brand.

- **Gawker:** *Gawker.com* is the most popularly known of the Company's brands. From its origin as a Manhattan-centric media blog, it has grown into a national news operation focused on politics and culture.  The website has approximately 11.7 million readers in the U.S. and over 14 million readers globally. Approximately 13 staff members at Gawker Media work on the Gawker brand.

- **Jezebel:** *Jezebel.com* is focused on providing media for, by and about women.  It began as a counter to more typical women's magazines, bringing an intelligent perspective to celebrity, politics and culture.  Jezebel is home to one of the group's most active reader communities.  The website has approximately 9.5 million readers in the U.S. and approximately 13 million readers globally. Approximately 14 staff members at Gawker Media work on the Jezebel brand.

- **Lifehacker:** *Lifehacker.com* focuses readers on how to improve their personal productivity and their lives, whether through a new app or a new method of

meditation. Explanatory articles, and the reader discussions they spark, contribute to Lifehacker's reputation as a definitive reference site. The website has approximately 15.6 million readers in the U.S. and over 27 million readers globally. Approximately 25 staff members at Gawker Media work on the Lifehacker brand.

- **Kotaku:** *Kotaku.com* injects intelligent cultural criticism and a playful spirit to the entertainment industry's largest and newest category, the video game. As well as reviewing games and other interactive entertainment, Kotaku covers discussion on the politics of video game communities. The website has approximately 7.5 million readers in the U.S. and over 13 million readers globally. Approximately 14 staff members at Gawker Media work on the Kotaku brand.

- **Jalopnik**: *Jalopnik.com* provides a forum for auto enthusiasts in digital media. Covering new models, industry news, car culture and motorsports, it aims to inject humor and candor into this media category. The *Jalopnik Film Festival*, sponsored the last two years by a major auto company, is one of the Company's marquee annual events. In video, the brand has made an impact with *Neat Stuff In Cool Cars*, an unconventional approach to car testing, and *Jason Drives*, in which a mad genius writer goes for a spin in the weirdest cars on the planet. The website has approximately 7.5 million readers in the U.S. and over 10 million readers globally. Approximately 10 staff members at Gawker Media work on the Jalopnik brand.

13.     The Company's primary source of revenue is selling advertising space on its Websites. Its advertising business builds on the high level of engagement of the brands' readership. The Company's programs for clients include sponsored discussions, licensing of testimonials, events which bring invited readers access to new shows and products, and media generated by those events.

14.     The Company has five key departments:  sales, technology, editorial, legal, and operations. The head of each department reports to Mr. Denton. Each of the Company's Websites has its own "editor-in-chief," all of whom report to the Company's Executive Editor, John Cook. Daily editorial decisions are made by the editors-in-chief and Mr. Cook, with input from Mr. Denton, and major editorial decisions are made by a three-person committee consisting of Mr. Cook, Mr. Denton, and the Company's general counsel.

15.     The Websites' individual editors-in-chief manage editorial staff, including writers, who generate content for the Websites.  Other key roles at the company include the executive editor for feature pieces, the manager of publishing partnerships, the executive managing editor, the director of the Debtor's editorial labs, the art direction department, and the video direction department.  These individuals provide services across the Websites and brands.

## THE NON-DEBTOR THIRD PARTIES

### Nick Denton

16.     The Company had a humble beginning as a single blog written and published by one individual out of his New York City apartment:  Nick Denton.  Mr. Denton founded the Company in 2002, at which time he employed only two writers, who were paid out of his own pocket.  Since its inception, the Company has grown to 125 writers at its peak, with the seven U.S. websites described above and a collective international readership of over 90 million readers.

17.     With Mr. Denton at its helm, the Company has grown continuously.  It earned approximately $6,000 per month at the end of its second year.  Having weathered the recession of 2008-2009, it generated over $4,000,000 in revenue per month in 2015.  This dramatic growth trajectory is attributable to the vision and forward thinking of Mr. Denton, who has seen the Company through from its inception to its globally recognized status, and without whom there simply would not be a *Gawker* brand.

18.     Mr. Denton's background includes an education in politics, philosophy, and economics, which he studied while attending Oxford University.  There, he was first exposed to the publishing world, working as the editor of the university's magazine.  After

beginning his career as a journalist with the *Financial Times*, he went on to co-write a book about the collapse of the U.K.'s Barings Bank called *All That Glitters* in 1997.

19.    In 2002, the same year that he launched *Gawker*.com, Mr. Denton taught a class at the Berkeley University Graduate School of Journalism called "Freedom of the Press: Political Change and the Media in Hungary."   His personal views on the free press have been cast into the public eye throughout the litigation captioned, *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (the "Bollea Litigation"), which is the precipitating cause of the Debtor's chapter 11 case.   In fact, last year, he blogged about the threat to free speech his Company faced as a result of the litigation, writing that, "[t]he free press is prized in theory, constitutionally protected in this country and elsewhere because of its value to society – and unpopular with public figures who are exposed or embarrassed by its work.   As a business, media carries the usual risks, vulnerable to recession and changes in technology, and a special danger, which Gawker Media is still facing."

20.    In addition to founding the Company, Mr. Denton currently serves as the President and Chief Executive Officer of GMGI and the President of Growth Media.   In that capacity, he is responsible for developing, communicating, and implementing the Company's go-forward business strategy and vision, soliciting guidance and advice from the board of directors, and managing the operations and resources of the Company.   He is also a substantial shareholder in GMGI, holding approximately thirty percent of its stock.   GMGI, in turn, wholly owns Growth Media.

21.    The head of each of the Company's five main departments reports to Mr. Denton, which results in a structure whereby every single employee of the Company reports, either directly or indirectly, to Mr. Denton.

22.     Mr. Denton makes significant editorial decisions in consultation with Heather Dietrick, the Company's General Counsel, and John Cook, its Executive Editor.  He is charged with final decision-making authority in the Company's technology and sales departments.  Every week, the Company's Chief Technology Officer reports directly to Mr. Denton, at which time Mr. Denton makes major decisions with respect to the Websites' format and design.  He is responsible for hiring department heads and setting overarching sales, advertising and marketing strategies.

23.     Furthermore, Mr. Denton is instrumental and central to the spirit of the Company's operations.  He has significant creative input and editorial oversight over the Company's various publications, and his unique vision for the brands informs their forward trajectory.

24.     Ultimately, Mr. Denton is the face of the Company's business.  Indeed, in consultation with outside sources, he is responsible for handling the Company's public relations.  He maintains significant industry contacts and relationships.  For this reason, potential acquirers have approached Mr. Denton directly to express their interest in the Company.

25.     In the Bollea Litigation (discussed in detail below), the Plaintiff, Terry Gene Bollea, also known as Hulk Hogan, sued Gawker Media for publishing a report, commentary, and accompanying video excerpts involving the Plaintiff's extramarital affair.  The jury awarded $140.1 million to the Plaintiff.  Mr. Denton is jointly and severally liability on $115 million of the judgment with an additional $10 million worth of punitive damages assessed against him separately.  Notwithstanding the threat imposed by the Bollea Litigation, Mr. Denton has continued to impart his firm adherence to free press upon his employees, making it a core value of the Debtor's business.  He has written about his company that:

Being a tight community of free writers, independent as a company and committed to putting out the real story, Gawker Media can bear a higher level of uncertainty than most.  I believe it's more likely than not that we emerge tested and stronger, clear in our responsibility to readers and the value of our writers' profession.  Without someone actually having the gumption to fight these cases, journalists might as well resign themselves to a role as liaisons for PR people and stenographers for celebrities.

26.    It is Mr. Denton's commitment to free press that has propelled his Company — once described as a "stenographer for celebrities" — into a place where honest news and commentary thrive, reporting on current events, politics (especially prescient in an election year), popular culture, sports, women's issues, and technology.  Mr. Denton is uniquely suited to have the overarching role of imparting his vision on the Debtor's business and directing the forward path of his company.

### The Individual Defendants

27.    Each of the Individual Defendants is a current or former employee of the Company and is a co-defendant in one or more of the Actions by virtue of his or her employment with the Company.  The Individual Defendants include the following individuals:

- *John Cook.*  John Cook, the Executive Editor of Gawker.com, has been employed by the Debtor since October 2010 (except for a brief period between March 2014 and January 2015).

- *A.J. Daulerio.*  A.J. Daulerio, the former editor-in-chief of Gawker.com, was employed by the Debtor until January 2013.

- *Gabrielle Darbyshire.*  Gabrielle Darbyshire, formerly the Chief Operations Officer of Gawker Media, was a founding member of the Debtor.  Ms. Darbyshire was employed by the Debtor from January 2008 through June 2013.

- *Greg Howard.*  Greg Howard is a former writer for Deadspin.com.  Mr. Howard was employed by the Debtor from February 2014 until March 2016.

- *JK Trotter.*  JK Trotter is a writer for Gawker.com. Mr. Trotter has been employed by the Debtor since August 2013.

- ***Sam Biddle*.**  Sam Biddle, a senior writer at *Gawker.com*, has been employed by the Debtor since August 2010.

## THE ACTIONS

28.    As of the Petition Date, there were numerous lawsuits pending across the United States involving Gawker Media, relating to activities and events prior to the Petition Date.  Among those lawsuits are the Actions, each of which involves claims against not only Gawker Media, but also against one or more of Mr. Denton and the Individual Defendants.  The Actions include:

- ***Bollea v. Gawker Media, LLC, et al.***, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "<u>Bollea Litigation</u>")

    Gawker Media, Nick Denton, and AJ Daulerio are defendants in this lawsuit for invasion of privacy, right of publicity, intrusion upon seclusion, intentional infliction of emotional distress, and violations of Florida's wiretap statute arising from publication of a report and commentary and accompanying video excerpts involving Plaintiff's extramarital affair, a tape depicting it, and Plaintiff's sex life and public persona more generally.  A Florida jury awarded $140.1 million to the Plaintiff.  Mr. Denton and Mr. Daulerio are each jointly and severally liability on $115 million of the judgment.  An additional $10 million of punitive damages was assessed against Mr. Denton separately, and an additional $100,000 of punitive damages was assessed against Mr. Daulerio separately.  The bond to stay execution of the judgments pending appeal is $50 million for each of the Bollea Litigation defendants.  The court has refused to reduce the cash bond and denied Gawker Media's request to post stock or alternative collateral in lieu of the bonds.  As of June 10, 2016, the judgments in the Bollea Litigation became available for execution.

- ***Huon v. Denton, et al.***, No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.) (the "<u>Huon Litigation</u>")

    Gawker Media, Nick Denton and Gabrielle Darbyshire are defendants in this suit, which asserts causes of action for defamation and related torts arising from an article published by Gawker and from third-party user comments posted on Gawker's website.  The article at issue reported on plaintiff's filing of a lawsuit against another publisher, Above the Law, over its report about an Illinois criminal proceeding in which Huon was charged with rape and acquitted by a jury.  The trial court dismissed the case against each Gawker defendant (including the individuals).  Huon appealed the decision and the U.S. Court of Appeals for

the Seventh Circuit heard argument on May 31, 2016.  Huon is seeking at least $100,000,000 in damages.

- ***Ashley Terrill v. Gawker Media, LLC, et al.,* No. 16-CV-00411 (S.D.N.Y.) (the "<u>Terrill Litigation</u>")**

  Gawker Media, Sam Biddle, John Cook, and Nick Denton are defendants in this suit for defamation, breach of confidence, intentional interference with prospective economic advantage, fraudulent misrepresentation, and negligent hiring and retention.  The suit arises from an article regarding plaintiff's investigation into a former executive for the dating application Tinder, and plaintiff's belief that she was being harassed for undertaking the investigation.  The Terrill Litigation is currently pending in the Southern District of New York.  The Court is expected to set a briefing schedule for Defendants' motion to dismiss in June 2016.  Plaintiff is seeking at least $10,000,000 in damages.

- ***Teresa Thomas v. Gawker Media, LLC, et al.,* No. 16-CV-09519 (Or. Multnomah Cty. Cir. Ct.) (the "<u>Thomas Litigation</u>")**

  Gawker Media, Nick Denton, and John Cook are defendants in this defamation and invasion of privacy suit arising from an article that referenced plaintiff's employment at Yahoo Inc. and her potential romantic involvement with a Yahoo, Inc. executive.  The case is pending in the Circuit Court for the State of Oregon, County of Multnomah.  There has been no activity in the case to date aside from the filing of the complaint and purported service of the complaint.  The plaintiff is seeking $74,000 in damages.

- ***Ayyadurai v. Gawker Media, LLC, et al.,* No. 16-CV-10853 (D. Mass.) (the "<u>Ayyadurai Litigation</u>")**

  Gawker Media, Nick Denton, Sam Biddle, and John Cook are defendants in this suit for libel, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and negligent hiring and retention.  The suit arises from publication of three articles regarding the plaintiff's claims to have invented e-mail.  The complaint is filed in the District of Massachusetts, but the Defendants have not been served.  The plaintiff is seeking at least $35,000,000 in damages.

- ***Charles C. Johnson, et al. v. Gawker Media, LLC, et al.,* No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (the "<u>Johnson Litigation</u>")**

  Gawker Media, J.K. Trotter, and Greg Howard are defendants in this suit for defamation, injurious falsehood, invasion of privacy, and conspiracy to interfere with civil rights.  The suit arises from three articles regarding plaintiff's behavior.  The complaint was filed in Superior Court of California, County of Fresno, but

Defendants have not been served.  The plaintiff is seeking at least $24,000,000 in damages.

29.    Pursuant to section 362 of the Bankruptcy Code, the Actions are automatically stayed as against Gawker Media, but not automatically stayed as against Mr. Denton or the Individual Defendants.

## INDEMNIFICATION OF THE NON-DEBTOR THIRD PARTIES

### Mr. Denton

30.    Mr. Denton is fully indemnified by the Debtor for any fees, damages or other losses he suffers in the Actions pursuant to broad indemnification provisions in three separate documents:  (i) an Indemnity Agreement, dated as of December 31, 2009, by and between GMGI and Mr. Denton (the "Indemnity Agreement"), (ii) the Fourth Amended and Restated Memorandum and Articles of Association of GMGI (the "GMGI Articles of Association"); and (iii) the Second Amended and Restated Operating Agreement of Gawker Media, dated as of August 21, 2012 (the "Gawker Media Operating Agreement").

31.    The Gawker Media Operating Agreement indemnifies Mr. Denton for loss or damages arising from errors in judgment or acts or omissions, as long as they do not constitute misconduct or gross negligence.  As a result, for example, Mr. Denton is fully indemnified by the Debtor in connection with his liability for the judgments entered in the Bollea Litigation.[2]

---

[2] Pursuant to the Indemnity Agreement, Mr. Denton is broadly indemnified for all expenses incurred as a party to any proceeding, as long as he acted in good faith and in a manner he reasonably believed to be in the best interests of GMGI, and unless his conduct constituted a breath of duty of loyalty to the Company, or intentional misconduct or a knowing violation of the law.  The GMGI Articles of Association similarly indemnify Mr. Denton for any liability incurred as a result of any act in carrying out his functions at GMGI, other than liability incurred by reason of his own actual fraud or willful default.

**The Individual Defendants**

32.     At least one of the Individual Defendants, Ms. Darbyshire, has express contractual indemnity rights similar to Mr. Denton.   In addition, the remaining Individual Defendants (as well as Ms. Darbyshire and Mr. Denton), are subject to a company practice and policy of indemnification, by which the Debtor defend and indemnify its writers and editorial staff in connection with lawsuits related to the Company's web content.

**COUNT I**

**INJUNCTIVE RELIEF UNDER SECTION 105(a)**

**(AGAINST ALL ADVERSARY ACTION DEFENDANTS)**

33.     The Debtor repeats and realleges the allegations contained in paragraphs 1 through 32 as if fully set forth herein.

34.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Relief under section 105 of the Bankruptcy Code is particularly appropriate in a chapter 11 case when necessary to protect a debtor's ability to effectively confirm a plan and to preserve the property of a debtor's estate.

35.     The Debtor is entitled to a preliminary injunction under section 105(a) of the Bankruptcy Code, enjoining the Actions as against Mr. Denton the Individual Defendants in the Actions pending the termination of the automatic stay already applicable to the Actions as against the Debtor.

36.     The Court should enjoin the Actions as against Mr. Denton and the Individual Defendants because continued pursuit of the Actions against them will imperil the Debtor's reorganization process, deplete the assets of the Debtor's estates, and lead to inequitable results for a number of reasons.

15

37.     The Debtor's indemnification obligations as to Mr. Denton and the Individual Defendants mean that, in addition to having to pay for defense costs, any judgments that are entered against Mr. Denton or the Individual Defendants would have a crippling effect on the Debtor's estates, prospect of reorganization, and distribution to creditors.  For example, without an injunction, Mr. Bollea would be able to perfect the $115 million judgment for which all the Bollea Litigation defendants are jointly and severally liable.  In addition, judgment has been entered against Mr. Denton separately in that Action for an additional $10 million.  If that additional judgment is permitted to be executed — and it may be any time as of June 10, 2016 — the Debtor will be liable for indemnification of that additional cost on top of the combined $130 million in judgments against it directly.

38.     If the automatic stay is not extended to the Individual Defendants, it would signal to all of the Debtor's employees that they may be left to litigate any such present or future lawsuits alone.  The prospect of facing these lawsuits without the benefit or support of the Debtor could have a potentially disastrous chilling effect on the Debtor's work force, driving writers and editors to leave the Debtor.  As a result, the Debtor would see a precipitous decline in its going concern value and diminished prospects for a successful reorganization.

39.     Mr. Denton is indispensable to the formulation, negotiation, and implementation of this plan.  As the sole individual with the requisite knowledge of the company, its market, its plans for growth, and financial projections, Mr. Denton is uniquely qualified to identify potential buyers, market the Company, and, with the advice and approval of Company's board of directors, negotiate a sale that will obtain the most value for the Debtor, its estates, and its creditors.  Because of the integral role he plays in the Debtor's operations, it

would be extremely difficult, if not impossible, to consummate a value-maximizing sale without his attention and involvement.

40.     However, success against Mr. Denton or the Individual Defendants in the Actions likely would drive Mr. Denton (and potentially the Individual Defendants) to file for personal bankruptcy protection.  A personal bankruptcy case would be tremendously distracting to Mr. Denton, whose uninterrupted attention to these chapter 11 cases is critical to the Debtor's reorganization.  If forced to file for personal bankruptcy, Mr. Denton would be unable to spearhead the Debtor's day-to-day operations, maintain the Debtor's value as a going concern, liaison with the Debtor's professionals, and most importantly, execute a value-maximizing sale.[3]

41.     Allowing the Actions to proceed without the Debtor's participation would severely prejudice the Debtor in its own defense in those Actions and, given the overlap amongst allegations and claims as against the Debtor and as against Mr. Denton and the Individual Defendants, may even potentially subject the Debtor to collateral estoppel to the extent any judgments are entered.

42.     Any harm suffered by the Adversary Action Defendants is vastly outweighed by the harm suffered by the Debtor in the absence of an injunction.  Relative to the damages sought in the Actions, which average approximately $50 million and peak at $140

---

[3]  In the unlikely event that Mr. Denton would not file for personal bankruptcy protection in the absence of the relief requested here, his assets undoubtedly would be seized immediately to satisfy the judgment entered in the Bollea Litigation.  Since Mr. Denton's assets are substantially comprised of his stock in GMGI, Mr. Bollea would become a substantial owner of GMGI, thereby defeating the Debtor's chance at a successful reorganization.  This is an especially inequitable result because the Bollea Litigation is subject to an appeal, Mr. Bollea merely holds a contingent, unliquidated litigation claim against the Debtor.  Moreover, the driving force behind the Bollea Litigation is Peter Thiel, a billionaire investor, who holds a personal vendetta against the Company and has publicly admitted that he funded the Bollea Litigation, and other lawsuits against Gawker to (as the *New York Times* reports) "try to put the media company out of business."

million, Mr. Denton and the Individual Defendants have minimal assets and cannot offer significant sources of recovery. Enjoining the Actions as against Mr. Denton and the Individual Defendants would not diminish any potential recovery on the part of the Adversary Action Defendants because Mr. Denton and the Individual Defendants are not able to satisfy potential judgments in the amount sought in the Actions. If any of Mr. Denton or the Individual Defendants were to commence a personal bankruptcy case, the Actions against him or her would be stayed until the conclusion of that case before the plaintiff in that Action would have a non-contingent, liquidated claim against Mr. Denton or the Individual Defendant.

43.     Were the Actions to drive Mr. Denton into personal bankruptcy, the plaintiffs in the Actions, already subject to the automatic stay in the Debtor's bankruptcy case, would also be met by the automatic stay in Mr. Denton's personal bankruptcy case, resulting in the same creditors disputing the same issues in the same forum—but in two separate cases. This would result in tremendous inefficiency, cost to the Debtor's and Mr. Denton's estates, and reduction in the value available to the creditors.

44.     The Debtor is also entitled to a temporary restraining order pending hearing on the Debtor's Motion pursuant to Federal Rule of Civil Procedure 65. The Debtor has a reasonable likelihood of success on the merits of its TRO because proceeding with the Actions would cause immediate and irreparable injury to the Debtor's reorganization efforts and value as a going concern. These devastating consequences vastly outweigh any harm to Adversary Action Defendants.

45.     The $115 million judgment in the Bollea Litigation for which Mr. Denton is jointly and severally liable and the $10 million judgment in the Bollea Litigation for which

Mr. Denton is solely liable may be executed any time as of the date of this filing.  Execution of those judgments would set off an immediate chain of irreparable harms, as discussed above.

## COUNT II

## INJUNCTIVE RELIEF UNDER SECTION 362(a)

## (AGAINST ALL ADVERSARY ACTION DEFENDANTS)

46.     The Debtor repeats and realleges the allegations contained in paragraphs 1 through 43 as if fully set forth herein.

47.     Section 362(a)(1) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

48.     Section 362(a)(3) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

49.     The Debtor commenced the chapter 11 cases to preserve its assets for the benefit of its creditors.  As discussed above, if the Actions are allowed to proceed, they will significantly interfere with or otherwise impair the Debtor's efforts to reorganize, including specifically the Debtor's plan to sell substantially all of the Debtor's assets to preserve value for distribution to creditors.  They would give rise to indemnification claims against Debtor, which would have to be paid from funds that would otherwise be available to the Debtor for the administration of its estates and the distributions to creditors.  Permitting this depletion of assets would undermine the purpose of chapter 11 relief.

50.     Moreover, the Actions would have a chilling effect on the Debtor's employees and, as a result, on the Debtor's ability to continue to generate revenue on an ongoing basis.

51.     In addition, the Actions would be a significant burden and distraction on Mr. Denton and other key personnel, who would be forced to devote their time and attention to the Actions (and in the case of Mr. Denton, even personal bankruptcy) rather than the reorganization process.

52.     Finally, allowing the Actions to proceed would be prejudicial to the Debtor in its own defense of the Actions, and even subject it to collateral estoppel, further increasing the Debtor's liability.

53.     For the reasons stated herein, the Debtor is entitled to an extension of the automatic stay under section 362 of the Bankruptcy Code to the Actions as against Mr. Denton and the Individual Defendants.

**WHEREFORE**, for all of the foregoing reasons, the Debtor respectfully requests entry of:

1.     A preliminary and permanent injunction enjoining, pending termination of the automatic stay applicable to the Debtor:

   a.  the Actions as against Mr. Denton;

   b.  any Adversary Action Defendant from taking further action in the Actions and from taking further action in any other existing litigation or filing further claims against Mr. Denton where the conduct alleged was in the course of, and within the scope of, Mr. Denton's employment with the Debtor, absent approval of this Court;

   c.  the Actions as against the Individual Defendants; and

   d.  any Adversary Action Defendant from taking further action in the Actions and from taking further action in any other existing litigation or filing further claims against the Individual Defendants where the

conduct alleged was in the course of, and within the scope of, the Individual Defendants' respective employment with the Debtor, absent approval of this Court;

2.      An order extending to the automatic stay under section 362 of the

Bankruptcy Code to:

    a.  the Actions as against Mr. Denton; and

    b.  the Actions as against the Individual Defendants; and

3.      An order granting such other and further relief as the Court may deem just

and proper.

Dated:              June10, 2016
                    New York, New York


                                        */s/ Gregg M. Galardi*
                                        Gregg M. Galardi
                                        David B. Hennes
                                        Michael S. Winograd
                                        ROPES & GRAY LLP
                                        1211 Avenue of the Americas
                                        New York, NY  10036-8704
                                        Telephone:  (212) 596-9000
                                        Facsimile:  (212) 596-9090
                                        gregg.galardi@ropesgray.com
                                        david.hennes@ropesgray.com
                                        michael.winograd@ropesgray.com

                                        *Proposed Counsel to the Debtor*
                                        *and Debtor in Possession*