Gregg M. Galardi
David B. Hennes
Michael S. Winograd
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Gawker Media, LLC,[1] | Case No. 16-11700 (SMB) |
| Debtor. | |
| Gawker Media, LLC, | |
| Plaintiff, | |
| v. | |
| Meanith Huon, Ashley Terrill, Teresa Thomas, Shiva Ayyadurai, Terry Gene Bollea, Charles C. Johnson, and Got News LLC, | Adv. Proc. No. 16-_____ (   ) |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEBTOR'S MOTION**
**FOR (I) A PRELIMINARY INJUNCTION AND/OR (II) EXTENSION OF THE**
**AUTOMATIC STAY TEMPORARY RESTRAINING ORDER AND DEBTOR'S *EX***
***PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER**

1.     Gawker Media, LLC, the debtor and debtor in possession in the above-captioned

chapter 11 cases ("Gawker Media" or the "Debtor", and together with parent Gawker Media

---

[1] The last four digits of the taxpayer identification number of the Debtor, Gawker Media, LLC are 0492. The Debtor's corporate headquarters is located at 114 Fifth Avenue, 2d Floor, New York, New York 10011.

liGroup, Inc. ("GMGI") and affiliate Kinja, Kft. ("Kinja"), the "Company"), respectfully submit this memorandum of law in support of its Motion for a Preliminary Injunction and/or Extension of the Automatic Stay (the "Motion") and its *Ex Parte* Motion for a Temporary Restraining Order (the TRO Motion").

2.     Through the Motion, the Debtor seeks an order (1) preliminarily enjoining, pending termination of the automatic stay applicable to the Debtor, (A) the following existing lawsuits against the Debtor: (i) *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.); (ii) *Huon v. Denton, et al.*, No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.); (iii) *Ashley Terrill v. Gawker Media, LLC, et al.,* No. 16-CV-00411 (S.D.N.Y.); (iv) *Teresa Thomas v. Gawker Media, LLC, et al.*, No. 16-CV-09519 (Or. Multnomah Cty. Cir. Ct.); (v) *Ayyadurai v. Gawker Media, LLC, et al.*, No. 16-CV-10853 (D. Mass.); and (vi) *Charles C. Johnson, et al. v. Gawker Media, LLC, et al.*, No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (collectively, the "Actions"), as against certain non-debtor parties who are also parties to the Actions, including (i) Nick Denton, the Company's founder and the current President and Chief Executive Officer of GMGI and President of Gawker Media, and (ii) certain current or former employees of the Company, including John Cook, A.J. Daulerio, Gabrielle Darbyshire, Greg Howard, JK Trotter, and Sam Biddle (the "Individual Defendants," and collectively with Mr. Denton, the "Non-Debtor Third Parties"), and (B) any Defendant in this Action (the Adversary Action Defendants") from taking further action in the Actions and from taking further action in any other existing litigation or filing further claims against Mr. Denton or any Individual Defendant where the conduct alleged was in the course of, and within the scope of, Mr. Denton's or the Individual Defendant's employment with the Debtor, absent

approval of this Court; and/or (2) extending the automatic stay imposed by section 362(a) of the Bankruptcy Code to stay the Actions as against Mr. Denton and the Individual Defendants.

3.        Through the TRO Motion, the Debtor seeks a temporary restraining order directing that, pending the Court's hearing and ruling on Debtor's application for a preliminary injunction and/or extension of the automatic stay: (1) the Action captioned *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea Litigation") be temporarily restrained and enjoined as against (A) Mr. Denton, and (B) A.J. Daulerio; (2) Defendant Terry Gene Bollea be temporarily restrained and enjoined from taking further action in Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio, or from otherwise seeking to enforce any judgment entered in the Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio; and/or (3) the automatic stay imposed by section 362(a) of the Bankruptcy Code be hereby extended to stay the Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio.

4.        In support of the Motion and TRO Motion, the Debtor hereby respectfully represents as follows:

## PRELIMINARY STATEMENT

5.        From its humble beginnings in Mr. Denton's apartment in 2002, the Company has grown into one of the most well-known web-based media organizations.  Today, the Company consists of seven distinct media brands with corresponding websites under the names *Gawker*, *Deadspin*, *Lifehacker*, *Gizmodo*, *Kotaku*, *Jalopnik*, and *Jezebel*, each of which boasts a readership in excess of 10 million readers.

6.        The Company's websites have broken some of the day's most important and highly-discussed stories, including, among others, the suppression of conservative news on Facebook, the spread of the Zika virus, and the email exchanges between Hillary Clinton and

Sidney Blumenthal. And they have done so well in advance of — sometimes months in advance of — more traditional media outlets such as the New York Times and Washington Post.

7. As a result, and with limited outside investment, the Company has experienced wide success and tremendous growth. From just a handful of employees and annual revenue below $100,000 in its early years, the Company has grown to more than 300 employees and approximately $49.9 million in annual revenue in 2015.

8. Despite the Company's success and growth, however, Gawker Media is now forced to reorganize as a result of a series of lawsuits brought against it and its current and former employees. Many of those lawsuits have been funded by a billionaire investor on a quest to destroy the Gawker Media to satisfy a personal vendetta.

9. With the filing of its chapter 11 petition, the Debtor is now shielded from these Actions by virtue of the automatic stay. However, various current and former employees — including Mr. Denton and the Individual Defendants — are not. And because Mr. Denton and the Individual Defendants have been named as co-defendants in the Actions, the Actions threaten to thwart the Debtor's chances of a successful reorganization. The specter of ongoing litigation preventing a successful reorganization completely subverts the purpose of the automatic stay.

10. As discussed in more detail below and in the First Day Declaration, on June 10, 2016 (the "Petition Date"), concurrently with this Motion, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is currently operating its businesses and managing its assets as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee of unsecured creditors, or any trustee or examiner, has been appointed in this case. However, if the Actions are not stayed against Mr.

Denton and the Individual Defendants, the reorganization plan will be placed in jeopardy, and the Debtor's enterprise value will be destroyed.

11.     *First*, the Debtor is obligated to indemnify Mr. Denton and the Individual Defendants, both for the attorneys' fees and costs in defending the Actions and for any judgment entered in any Action against Mr. Denton or any Individual Defendant.  That actual and potential financial obligation is significant and plainly diminishes the value of the estate.  For example, the jury awarded the plaintiff in the Bollea Litigation (discussed below) $140.1 million.  In addition to the $130 million judgment entered against Gawker Media, of which Mr. Denton is jointly and severally liable for $115 million, judgment has been entered against Mr. Denton separately in the Bollea Litigation for an additional $10 million.  Absent the relief requested herein, Mr. Bollea would be able to perfect the $115 million judgment.  In addition, if the additional $10 million judgment against Mr. Denton is permitted to be executed — and it may be any time as of June 10, 2016 — the Debtor will be liable for indemnification of that additional cost on top of the combined $130 million in judgments against it directly.

12.     *Second*, as an online media enterprise comprised solely of written publications, the Debtor is uniquely dependent upon the contributions of its employees to maintain value as a going concern.  The Debtor relies on its writers and editors creating content to exist.  Those employees perform their work with the knowledge that, in the event they are sued individually for their exercise the Constitutional right to free speech, the Debtor not only will indemnify them financially, but it also will protect their name and interests by coordinating and leading the defense.  Prior to the automatic stay, Gawker Media did just that in the Actions, allowing, among other things, its lawyers to represent Mr. Denton and the Individual Defendants without cost to those individuals.  Now that the Actions have been stayed as against the Debtor, should the

Actions be permitted to proceed against Mr. Denton and the Individual Defendants, those individuals would be forced to litigate the cases alone, without the benefit or support of the Debtor and its lawyers. Not only would that gravely affect Mr. Denton and the Individual Defendants, many of whom would be unable to pay for their own defenses, but the knowledge that employees would be forced to defend any future such lawsuits alone would have a profoundly chilling effect on the Debtor's current writing and editorial staff. Such a fear may cause writers and editors leave the Debtor which would substantially diminish the Debtor's enterprise value and possibility of a successful reorganization.

13.     *Third*, given Mr. Denton's uniquely critical position at Gawker Media, Mr. Denton is indispensable to the formulation, negotiation, and implementation of the Debtor's reorganization plan, including specifically the Debtor's plan to sell substantially all of the Debtor's assets to preserve value for distribution to creditors. If the Actions are permitted to proceed against him, Mr. Denton unquestionably would be distracted to the detriment of the Debtor's reorganization. Without a stay of the Actions as against Mr. Denton, including enforcement of the $125 million Bollea Litigation judgment for which he is personally liable, Mr. Denton likely would have to declare personal bankruptcy. If forced to file for personal bankruptcy, Mr. Denton would be unable to spearhead the Debtor's day-to-day operations, maintain the Debtor's value as a going concern, liaison with the Debtor's professionals, and most importantly, execute a value-maximizing sale. Given that the claims against Mr. Denton and the Individual Defendants arise from the same set of facts as those against the Debtor, allowing the Actions to proceed would also mean that many of the Debtor's other officers would continue to be burdened and distracted by discovery requests as well, further detracting from the Debtor's reorganization efforts.

14.     *Fourth*, allowing the Actions to proceed without the Debtor's participation would severely prejudice the Debtor in its own defense in those Actions and, given the overlap amongst allegations and claims as against the Debtor and as against Mr. Denton and the Individual Defendants, even potentially subject the Debtor to collateral estoppel to the extent any judgments are entered.

15.     In short, allowing the Actions to proceed against Mr. Denton and the Individual Defendants would have a calamitous effect.  Not only would it destroy the enterprise value of the Debtor and otherwise undermine its efforts to reorganize, but that would lead to the loss of well over 300 jobs.  Further, the important stories that the Websites bring to the forefront of industry and national discourse would be lost, to the direct detriment of the public

16.     A narrow temporary restraining order pending a hearing and ruling on the Debtor's Motion is also urgently needed and warranted here.  The $115 million judgment in the Bollea Litigation for which Mr. Denton and Mr. Daulerio are each jointly and severally liable and the $10 million judgment against Mr. Denton and $100,000 judgment against Mr. Daulerio may be executed any time as of the date of this filing.  Plaintiff in the Bollea Litigation has refused to agree to even a brief temporary stay of execution of the judgments.  Indeed, Peter Thiel, the driving force and financier of the Bollea Litigation, has repeatedly stated publicly that he is bent on destroying Gawker Media and Mr. Denton.  There is no question that Mr. Bollea will seek to have the judgments in the Bollea Litigation perfected as urgently as possible. Execution of those judgments would set off an immediate chain of irreparable harms, as discussed above:  (i) it will lead to crippling indemnification obligations for the Debtor; (ii) it will drive Mr. Denton to file for personal bankruptcy, thereby significantly distracting him from his central and vital role in the Debtor's ongoing efforts to successfully reorganize, including

through the sale of its assets; and (iii) it will cause a chilling effect amongst the Debtor's writers and editors, who are critical to the Debtor's revenue and efforts to reorganize.

17.    In addition, the purpose of the Debtor's request for this Temporary Restraining Order would be vitiated if advance notice of the TRO Motion were provided to Mr. Bollea.  As explained above, it is our firm belief that upon notice of this adversary action, Mr. Bollea would seek to even further accelerate his perfection of the judgments against Mr. Denton and Mr. Daulerio in the Bollea Action.

## STATEMENT OF FACTS

## I.    THE DEBTOR

18.    On June 10, 2016 (the "Petition Date"), concurrently with the Motion and TRO Motion, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is currently operating its businesses and managing its assets as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The factual background regarding the Company, its business operations, its capital and debt structure, and the events leading up to the filing of this chapter 11 case is set forth in detail in the First Day Declaration filed concurrently with the voluntary petition.

19.    Gawker Media is a wholly-owned subsidiary of GMGI, a privately-held online media company.   Gawker Media operates seven distinct media brands with corresponding websites under the names *Gawker*, *Deadspin*, *Lifehacker*, *Gizmodo*, *Kotaku*, *Jalopnik*, and *Jezebel* (the "Websites").    Kinja, another wholly-owned subsidiary of GMGI, holds the intellectual property licenses for the Websites.   Holden Decl. ¶ 4.  *Gawker* is the most well-known brand and Website.  *Id.*   However, the Company's six other brands identified above represent approximately 85% of its revenues. *Id.*   The Company's commercial flagship is *Gizmodo*, a technology news brand and website, and the Company's video game, sports, how-to

and automotive properties (*Kotaku*, *Deadspin*, *Lifehacker*, and *Jalopnik*) are also leaders in their categories. *Id.* The Company also licenses its web content internationally to third parties that run similar websites based on the Company's brands, such as *Gizmodo en Espanol*, *Gizmodo Australia*, *Kotaku Australia*, and *Lifehacker Australia*.

20.    The Company's various Websites cover, among other things, news and commentary on current events, politics, pop culture, sports, cars, fashion, productivity, technology and video games. *Id.* ¶ 5. The Websites have a collective global readership of over 90 million readers (approximately 50 million in the United States), generally in the age range of 18 to 34 years old. *Id.* The Debtor is recognized as the only digital media company to grow to scale and viability with minimal external investment. *Id.* Between 2012 and 2015, the Company experienced a compound annual growth rate of approximately 24%, with revenue in 2015 of approximately $49.9 million. *Id.* The Company's business is run from leased offices at 114 Fifth Avenue in New York, New York. The Company also leases *de minimis* office space in other cities for certain employees, including through "WeWork", a co-working office space rental company. *Id.*

21.    The following provides a description of the Company's media brands and the corresponding Websites:

- **Gizmodo:** *Gizmodo.com* was the first brand launched by the Company, covering consumer electronics and other technology as well as science and science fiction, and natural and man-made wonders. Gizmodo is the Company's commercial flagship, with a strong appeal to blue-chip technology and automotive advertisers. Its exclusives, on subjects from the iPhone to the hidden bias in news provided by social media, are drivers for technology conversation. The website has approximately 19.7 million readers in the U.S. and over 35 million readers globally. Approximately 25 staff members at Gawker Media work on the Gizmodo brand.

- **Deadspin:** *Deadspin.com* focuses on bringing sports fans stories that may not make it to more mainstream sports news. The property is best known for

exclusives about sports stars, and Deadspin's coverage has broadened to include male lifestyle coverage. The website has approximately 12 million readers in the U.S. and over 13 million readers globally. Approximately 16 staff members at Gawker Media work on the Deadspin brand.

- **Gawker:** *Gawker.com* is the most popularly known of the Company's brands. From its origin as a Manhattan-centric media blog, it has grown into a national news operation focused on politics and culture. The website has approximately 11.7 million readers in the U.S. and over 14 million readers globally. Approximately 13 staff members at Gawker Media work on the Gawker brand.

- **Jezebel:** *Jezebel.com* is focused on providing media for, by and about women. It began as a counter to more typical women's magazines, bringing an intelligent perspective to celebrity, politics and culture. Jezebel is home to one of the group's most active reader communities. The website has approximately 9.5 million readers in the U.S. and approximately 13 million readers globally. Approximately 14 staff members at Gawker Media work on the Jezebel brand.

- **Lifehacker:** *Lifehacker.com* focuses readers on how to improve their personal productivity and their lives, whether through a new app or a new method of meditation. Explanatory articles, and the reader discussions they spark, contribute to Lifehacker's reputation as a definitive reference site. The website has approximately 15.6 million readers in the U.S. and over 27 million readers globally. Approximately 25 staff members at Gawker Media work on the Lifehacker brand.

- **Kotaku:** *Kotaku.com* injects intelligent cultural criticism and a playful spirit to the entertainment industry's largest and newest category, the video game. As well as reviewing games and other interactive entertainment, Kotaku covers discussion on the politics of video game communities. The website has approximately 7.5 million readers in the U.S. and over 13 million readers globally. Approximately 14 staff members at Gawker Media work on the Kotaku brand.

- **Jalopnik**: *Jalopnik.com* provides a forum for auto enthusiasts in digital media. Covering new models, industry news, car culture and motorsports, it aims to inject humor and candor into this media category. The *Jalopnik Film Festival*, sponsored the last two years by a major auto company, is one of the Company's marquee annual events. In video, the brand has made an impact with *Neat Stuff In Cool Cars*, an unconventional approach to car testing, and *Jason Drives*, in which a mad genius writer goes for a spin in the weirdest cars on the planet. The website has approximately 7.5 million readers in the U.S. and over 10 million readers globally. Approximately 10 staff members at Gawker Media work on the Jalopnik brand.

*Id.* ¶ 6.

22.     The Company's primary source of revenue is selling advertising space on its Websites. *Id.* ¶ 7. Its advertising business builds on the high level of engagement of the brands' readership. *Id.* The Company's programs for clients include sponsored discussions, licensing of testimonials, events which bring invited readers access to new shows and products, and media generated by those events. *Id.*

23.     The Company has five key departments: sales, technology, editorial, legal, and operations. *Id.* ¶ 8. The head of each department reports to Mr. Denton. Each of the Company's Websites has its own "editor-in-chief," all of whom report to the Company's Executive Editor, John Cook. *Id.* Daily editorial decisions are made by the editors-in-chief and Mr. Cook, with input from Mr. Denton, and major editorial decisions are made by a three-person committee consisting of Mr. Cook, Mr. Denton, and the Company's general counsel. *Id.*

24.     The Websites' individual editors-in-chief manage editorial staff, including writers, who generate content for the Websites. *Id.* ¶ 9. Other key roles at the company include the executive editor for feature pieces, the manager of publishing partnerships, the executive managing editor, the director of the Debtor's editorial labs, the art direction department, and the video direction department. *Id.* These individuals provide services across the Websites and brands. *Id.*

## II.     THE NON-DEBTOR THIRD PARTIES

### A.     Nick Denton

25.     The Company had a humble beginning as a single blog written and published by one individual out of his New York City apartment: Nick Denton. *Id.* ¶ 10. Mr. Denton founded the Company in 2002, at which time he employed only two writers, who were paid out of his own pocket. *Id.* Since its inception, the Company has grown to 125 writers at its peak,

with the seven U.S. websites described above and a collective international readership of over 90 million readers.  *Id.*

26.     With Mr. Denton at its helm, the Company has grown continuously.  *Id.* ¶ 11.  It earned approximately $6,000 per month at the end of its second year.  Having weathered the recession of 2008-2009, it generated over $4,000,000 in revenue per month in 2015.  *Id.*  This dramatic growth trajectory is attributable to the vision and forward thinking of Mr. Denton, who has seen the Company through from its inception to its globally recognized status, and without whom there simply would not be a *Gawker* brand.  *Id.*

27.     Mr. Denton's background includes an education in politics, philosophy, and economics, which he studied while attending Oxford University.  *Id.* ¶ 12.  There, he was first exposed to the publishing world, working as the editor of the university's magazine.  *Id.*  After beginning his career as a journalist with the *Financial Times*, he went on to co-write a book about the collapse of the U.K.'s Barings Bank called *All That Glitters* in 1997.  *Id.*

28.     In 2002, the same year that he launched *Gawker*.com, Mr. Denton taught a class at the Berkeley University Graduate School of Journalism called "Freedom of the Press: Political Change and the Media in Hungary."  *Id.* ¶ 13.  His personal views on the free press have been cast into the public eye throughout the litigation captioned, *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (the "Bollea Litigation"), which is the precipitating cause of the Company's chapter 11 cases.  *Id.*  In fact, last year, he blogged about the threat to free speech his Company faced as a result of the litigation, writing that, "[t]he free press is prized in theory, constitutionally protected in this country and elsewhere because of its value to society – and unpopular with public figures who are exposed or embarrassed by its work.  *Id.*  As a business,

media carries the usual risks, vulnerable to recession and changes in technology, and a special danger, which Gawker Media is still facing." *Id.*

29.   In addition to founding the Company, Mr. Denton currently serves as the President and Chief Executive Officer of GMGI and the President of Growth Media. *Id.* ¶ 14.   In that capacity, he is responsible for developing, communicating, and implementing the Company's go-forward business strategy and vision, soliciting guidance and advice from the board of directors, and managing the operations and resources of the Company. *Id.* He is also a substantial shareholder in GMGI, holding approximately thirty percent of its stock. *Id.* GMI, in turn, wholly owns Growth Media. *Id.*

30.   The head of each of the Company's five main departments reports to Mr. Denton, which results in a structure whereby every single employee of the Company reports, either directly or indirectly, to Mr. Denton. *Id.* ¶ 15.

31.   Mr. Denton makes significant editorial decisions in consultation with Heather Dietrick, the Company's General Counsel, and John Cook, its Executive Editor. *Id.* ¶ 16.   He is charged with final decision-making authority in the Company's technology and sales departments. *Id.* Every week, the Company's Chief Technology Officer reports directly to Mr. Denton, at which time Mr. Denton makes major decisions with respect to the Websites' format and design. *Id.* He is responsible for hiring department heads and setting overarching sales, advertising and marketing strategies. *Id.*

32.   Furthermore, Mr. Denton is instrumental and central to the spirit of the Company's operations. *Id.* ¶ 17.   He has significant creative input and editorial oversight over the Company's various publications, and his unique vision for the brands informs their forward trajectory. *Id.*

-13-

33.     Ultimately, Mr. Denton is the face of the Company's business. *Id.* ¶ 18.  Indeed, in consultation with outside sources, he is responsible for handling the Company's public relations. *Id.*  He maintains significant industry contacts and relationships. *Id.*  For this reason, potential acquirers have approached Mr. Denton directly to express their interest in the Company. *Id.*

**B.     The Individual Defendants**

34.     Each of the Individual Defendants is a current or former employee of the Company and is a co-defendant in one or more of the Actions by virtue of his or her employment with the Company. *Id.* ¶ 19.  The Individual Defendants include the following individuals:

- ***John Cook.***  John Cook, the Executive Editor of Gawker.com, has been employed by the Debtor since October 2010 (except for a brief period between March 2014 and January 2015).

- ***A.J. Daulerio.***  A.J. Daulerio, the former editor-in-chief of Gawker.com, was employed by the Debtor until January 2013.

- ***Gabrielle Darbyshire.***  Gabrielle Darbyshire, formerly the Chief Operations Officer of Gawker Media, was a founding member of the Debtor.  Ms. Darbyshire was employed by the Debtor from January 2008 through June 2013.

- ***Greg Howard.***  Greg Howard is a former writer for Deadspin.com.  Mr. Howard was employed by the Debtor from February 2014 until March 2016.

- ***JK Trotter.***  JK Trotter is a writer for Gawker.com. Mr. Trotter has been employed by the Debtor since August 2013.

- ***Sam Biddle***.  Sam Biddle, a senior writer at *Gawker.com*, has been employed by the Debtor since August 2010.

*Id.*

**III.    THE ACTIONS**

35.     As of the Petition Date, there were numerous lawsuits pending across the United States involving Gawker Media, relating to activities and events prior to the Petition Date. *Id.* ¶

20.    Among those lawsuits are the Actions, each of which involves claims against not only Gawker Media, but also against one or more of Mr. Denton and the Individual Defendants.  *Id.* The Actions include:

- *Bollea v. Gawker Media, LLC, et al.*, **No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea Litigation")**

  Gawker Media, Nick Denton, and AJ Daulerio are defendants in this lawsuit for invasion of privacy, right of publicity, intrusion upon seclusion, intentional infliction of emotional distress, and violations of Florida's wiretap statute arising from publication of a report and commentary and accompanying video excerpts involving Plaintiff's extramarital affair, a tape depicting it, and Plaintiff's sex life and public persona more generally.  A Florida jury awarded $140.1 million to the Plaintiff.  Mr. Denton and Mr. Daulerio are each jointly and severally liability on $115 million of the judgment.  An additional $10 million of punitive damages was assessed against Mr. Denton separately, and an additional $100,000 of punitive damages was assessed against Mr. Daulerio separately.  The bond to stay execution of the judgments pending appeal is $50 million for each of the Bollea Litigation defendants.  The court has refused to reduce the cash bond and denied Gawker Media's request to post stock or alternative collateral in lieu of the bonds.  As of June 10, 2016, the judgments in the Bollea Litigation became available for execution.

- *Huon v. Denton, et al.*, **No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.) (the "Huon Litigation")**

  Gawker Media, Nick Denton and Gabrielle Darbyshire are defendants in this suit, which asserts causes of action for defamation and related torts arising from an article published by Gawker and from third-party user comments posted on Gawker's website.  The article at issue reported on plaintiff's filing of a lawsuit against another publisher, Above the Law, over its report about an Illinois criminal proceeding in which Huon was charged with rape and acquitted by a jury.  The trial court dismissed the case against each Gawker defendant (including the individuals).  Huon appealed the decision and the U.S. Court of Appeals for the Seventh Circuit heard argument on May 31, 2016.  Huon is seeking at least $100,000,000 in damages.

- *Ashley Terrill v. Gawker Media, LLC, et al.*, **No. 16-CV-00411 (S.D.N.Y.) (the "Terrill Litigation")**

  Gawker Media, Sam Biddle, John Cook, and Nick Denton are defendants in this suit for defamation, breach of confidence, intentional interference with prospective economic advantage, fraudulent misrepresentation, and negligent hiring and retention.   The suit arises from an article regarding plaintiff's

investigation into a former executive for the dating application Tinder, and plaintiff's belief that she was being harassed for undertaking the investigation. The Terrill Litigation is currently pending in the Southern District of New York. The Court is expected to set a briefing schedule for Defendants' motion to dismiss in June 2016.  Plaintiff is seeking at least $10,000,000 in damages.

- *Teresa Thomas v. Gawker Media, LLC, et al.*, No. 16-CV-09519 (Or. Multnomah Cty. Cir. Ct.) (the "Thomas Litigation")

  Gawker Media, Nick Denton, and John Cook are defendants in this defamation and invasion of privacy suit arising from an article that referenced plaintiff's employment at Yahoo Inc. and her potential romantic involvement with a Yahoo, Inc. executive.  The case is pending in the Circuit Court for the State of Oregon, County of Multnomah.  There has been no activity in the case to date aside from the filing of the complaint and purported service of the complaint.  The plaintiff is seeking $74,000 in damages.

- *Ayyadurai v. Gawker Media, LLC, et al.*, No. 16-CV-10853 (D. Mass.) (the "Ayyadurai Litigation")

  Gawker Media, Nick Denton, Sam Biddle, and John Cook are defendants in this suit for libel, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and negligent hiring and retention. The suit arises from publication of three articles regarding the plaintiff's claims to have invented e-mail.  The complaint is filed in the District of Massachusetts, but the Defendants have not been served.  The plaintiff is seeking at least $35,000,000 in damages.

- *Charles C. Johnson, et al. v. Gawker Media, LLC, et al.*, No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (the "Johnson Litigation")

  Gawker Media, J.K. Trotter, and Greg Howard are defendants in this suit for defamation, injurious falsehood, invasion of privacy, and conspiracy to interfere with civil rights.  The suit arises from three articles regarding plaintiff's behavior. The complaint was filed in Superior Court of California, County of Fresno, but Defendants have not been served.  The plaintiff is seeking at least $24,000,000 in damages.

*Id.*

36.    Pursuant to section 362 of the Bankruptcy Code, the Actions are automatically stayed as against Gawker Media, but not automatically stayed as against Mr. Denton or the Individual Defendants.  *Id.* ¶ 21.

## IV.   INDEMNIFICATION OF THE NON-DEBTOR THIRD PARTIES BY THE DEBTOR IN CONNECTON WITH THE ACTIONS

37.    In addition to the other disastrous effects allowing the Actions to proceed against Mr. Denton and the Individual Defendants would have on the Debtor and its reorganization efforts, it also would saddle the Debtor with significant actual and potential liabilities by virtue of the Debtor's indemnification obligations towards Mr. Denton and the Individual Defendants. *Id.* ¶ 22.

### A.    Mr. Denton

38.    Mr. Denton is fully indemnified by the Debtor for any fees, damages or other losses he suffers in the Actions pursuant to broad indemnification provisions in three separate documents:  (i) an Indemnity Agreement, dated as of December 31, 2009, by and between GMGI and Mr. Denton (the "Indemnity Agreement"), (ii) the Fourth Amended and Restated Memorandum and Articles of Association of GMGI (the "GMGI Articles of Association"); and (iii) the Second Amended and Restated Operating Agreement of Gawker Media, dated as of August 21, 2012 (the "Gawker Media Operating Agreement").  *Id.* ¶ 23.

39.    The Gawker Media Operating Agreement indemnifies Mr. Denton for loss or damages arising from errors in judgment or acts or omissions, as long as they do not constitute misconduct or gross negligence.  As a result, for example, Mr. Denton is fully indemnified by the Debtor in connection with his liability for the judgments entered in the Bollea Litigation.[2]

---

[2] Pursuant to the Indemnity Agreement, Mr. Denton is broadly indemnified for all expenses incurred as a party to any proceeding, as long as he acted in good faith and in a manner he reasonably believed to be in the best interests of GMGI, and unless his conduct constituted a breath of duty of loyalty to the Company, or intentional misconduct or a knowing violation of the law.  The GMGI Articles of Association similarly indemnify Mr. Denton for any liability incurred as a result of any act in carrying out his functions at GMGI, other than liability incurred by reason of his own actual fraud or willful default.

**B.    The Individual Defendants**

40.    At least one of the Individual Defendants, Ms. Darbyshire, has express contractual indemnity rights similar to Mr. Denton.  *Id.* ¶ 25.  In addition, the remaining Individual Defendants (as well as Ms. Darbyshire and Mr. Denton), are subject to a company practice and policy of indemnification, by which the Debtor defends and indemnifies their writers and editorial staff in connection with lawsuits related to the Company's web content.  *Id.*

## ARGUMENT

## I.    THE BANKRUPTCY COURT HAS JURISDICTION OVER THE ACTIONS

41.    Pursuant to 28 U.S.C. § 1334(b), the Court has subject matter jurisdiction over the Actions because they are "related to" the chapter 11 case.  Section 1334(b) provides:

> Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to a case under title 11.

28 U.S.C. § 1334(b).  The Second Circuit has held that a proceeding is "related to" a chapter 11 case if its outcome could have "any conceivable effect" on the bankruptcy proceeding, which includes any matter that "bring[s] into question the very distribution of the estate's property and its allocation . . . ."  Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp), 980 F.2d 110, 114 (2d Cir. 1992) (citing Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984)).

42.    Courts also have found "related to" jurisdiction over an action "if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  Hunnicutt Co. v. TJX Cos., Inc. (In re Ames Dep't Stores, Inc.), 190 B.R. 157, 160 (S.D.N.Y. 1995) (quoting Pacor, 743 F.2d at 994 (3d Cir. 1984)); see also In re River Center

Holdings, LLC, 288 B.R. 59, 65 (Bankr. S.D.N.Y. 2003) (litigation between non-debtors is related to a bankruptcy case if it gives rise to a claim against the estate); Masterwear Corp. v. Rubin Baum Levin Constant & Friedman (In re Masterwear Corp.), 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) (same).

43.     Applying these standards, the Actions are clearly "related to" the chapter 11 case. Not only is the Debtor required to pay for Mr. Denton's and the Individual Defendants' cost of defending these Actions, but if a judgment is rendered against Mr. Denton as an Individual Defendant in any of the Actions, that person will bring a costly indemnification claim against the Debtor's estates.     Moreover, prosecution of the Actions would impair the Debtor's reorganization efforts by both distracting key personnel from administering the chapter 11 cases and deterring the Debtor's writers from publishing new content.  Courts have repeatedly found "related to" jurisdiction in such circumstances.  See, e.g., Blackacre Bridge Capital LLC v. Korff (In re River Ctr. Holdings, LLC), 288 B.R. 59, 65 (Bankr. S.D.N.Y. 2003) (holding that "related to" jurisdiction exists if the disputed or conditional indemnity claim has a "reasonable legal basis"); Bond St. Assocs. v. Ames Dep't Stores, Inc., 174 B.R. 28, 33 (S.D.N.Y. 1994) (finding jurisdiction even in the absence of an indemnification agreement where third party defendant would "normally have a claim" for indemnification against the debtor); In re Residential Capital, LLC, 480 B.R. 529, 539 (Bankr. S.D.N.Y. 2012) (explaining that "[j]urisdiction over third parties may be properly exercised under 'related to' jurisdiction provided by 28 U.S.C. § 1334(b) due to the impact of the litigation on the Debtor's reorganization efforts").

## II.     THE COURT SHOULD ISSUE A TRO AND PRELIMINARY INJUNCTION STAYING THE ACTIONS AS AGAINST THE NON-DEBTOR THIRD PARTIES PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE

44.     Section 105 of the Bankruptcy Code confers upon bankruptcy courts the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]."    11 U.S.C. § 105(a).    Thus, as matter of equity, bankruptcy courts may enjoin actions against non-debtors when doing so would protect the debtor's estate.  See Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.), 40 B.R. 219, 226 (S.D.N.Y. 1984) ("[U]nder section 105, the Bankruptcy Court may use its injunctive authority to protect the integrity of a bankrupt's estate and . . . issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan.") (internal quotation marks omitted).

45.    Courts in the Second Circuit have construed section 105 liberally to enjoin suits that might impede the reorganization process.  See In re Adelphia Commc'ns Corp., 298 B.R. 49, 54 (S.D.N.Y. 2003)); see also E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.), 124 B.R. 635, 642 (S.D.N.Y. 1991) (affirming section 105 injunction precluding action against non-debtor and explaining that section 105 "extends to creditor's actions against third parties, when such an injunction is necessary to protect the debtors and the parties in interest to the reorganization in their attempt to reorganize successfully"); LTV Steel Co. v. Bd. of Educ. of the Clev. City Sch. Dist. (In re Chateaugay Corp.), 93 B.R. 26, 29 (S.D.N.Y. 1988) ("The Bankruptcy Court has authority under section 105 broader than the automatic stay provision of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization process.").

46.    When determining whether to issue an injunction, courts in the Second Circuit apply "the traditional preliminary injunction standard as modified to fit the bankruptcy context." Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.), 365 B.R. 401, 409 (S.D.N.Y. 2007); see also LTV Corp. v. Back (In re Chateauguy Corp.), 201 B.R. 48, 71 (Bankr. S.D.N.Y. 1996) (It is well settled that a "debtor need not satisfy the more rigorous requirements for a preliminary

injunction under Rule 65 of the Federal Rules of Civil Procedure" to enjoin proceedings under

Section 105). Thus, courts evaluate the following factors: "(1) whether there is a likelihood of

successful reorganization; (2) whether there in an imminent irreparable harm to the estate in the

absence of an injunction; (3) whether the balance of harm tips in favor of the moving party; and

(4) whether the public interest weights in favor of an injunction." In re Calpine Corp., 365 B.R.

at 409. "In evaluating these factors, the court takes a flexible approach and no one factor is

determinative." Id. (internal quotation marks omitted). These requirements are easily met here.

### A.    There Is a Reasonable Likelihood of a Successful Reorganization

47.    The Debtor has a reasonable likelihood of a successful reorganization. Where, as

here, a debtor's time to submit a plan of reorganization has not yet expired, this element is

satisfied so long as the debtor is actively pursuing its reorganization efforts, and the action taken

against the debtor would impede the debtor's ability to file its plan. See Gathering Rest., Inc. v.

First Nat'l Bank of Valparaiso (In re Gathering Rest., Inc.), 79 B.R. 992, 1001 (Bankr. N.D. Ind.

1986) ("[T]he Court at the early stages must make at least a rebuttable presumption that the

[debtor has] made a good faith filing and [is] making a good faith effort to reorganize.");

Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.), 402 B.R.

571, 589-90 (Bankr. S.D.N.Y. 2009) (concluding that, where motion made one month after

commencement of chapter 11 cases, the debtors "have so far been successful in doing everything

they've needed to do to date" and commenting that "reasonable likelihood" standard does not

require the debtors to show a probability of confirming a plan that would provide for a 100%

repayment to unsecured creditors).

48.    The Debtor is and has been engaged in intensive efforts to restructure its business.

Holden Decl. ¶ 26; First Day Decl. ¶¶ 37, 38. Indeed, it is these efforts to arrive at a consensual

restructuring that the Debtor is trying to insulate and protect with this Motion. Given the

positive, good-faith steps that the Debtor has taken prior to the Petition Date and in the initial

stages of the chapter 11 cases, it should, at the very least, be allowed the chance to pursue

reorganization.  See, e.g., Sudbury, Inc. v. Escott (In re Sudbury, Inc.), 140 B.R. 461,466 (Bankr.

N.D. Ohio 1992) ("The evidence establishes that the Debtor is hard at work on a reorganization

plan.  Plaintiffs do not suggest that Debtor's effort will fail."); Lahman Mfg. Co. v. First Nat'l

Bank of Aberdeen (In re Lahman Mfg. Co.), 33 B.R. 681, 684-85 (Bankr. D.S.D. 1983).

Especially at this early stage of the chapter 11 cases, the court should support the Debtor's

efforts at reorganization – a paramount goal of both the Debtor and its creditors alike – by

granting the requested injunction.

**B.**     **There Is A Threat of Imminent Irreparable Harm to the Debtor in the Absence of an Injunction**

49.     Although the irreparable harm test typically requires a finding of irreparable harm

to the estate, "[t]here is a limited exception . . . in the bankruptcy context where the action to be

enjoined is one that threatens the reorganization process."  In re Calpine Corp., 365 B.R. at 409

(citations omitted).  In assessing irreparable harm, courts have focused on several factors:  (i)

whether the debtor bears a risk of collateral estoppel if a judgment is entered against a non-

debtor, (ii) whether the debtor's property would be harmed, and (iii) whether the debtor's key

personnel would be distracted by actions against the non-debtor.  Id. at 410; Lomas Fin. Corp. v.

N. Trust Co. (In re Lomas Fin. Corp.), 117 B.R. 64, 66-67 (S.D.N.Y. 1990) (same); Malm v.

Goldin, No. 92 Civ. 8012 (LJF), 1993 WL 330489, at *2 (S.D.N.Y. Aug. 27, 1993) (same).

50.     The presence of any *one* of these factors satisfies the irreparable harm

requirement.  See In re Calpine Corp., 365 B.R. at 410 (affirming the bankruptcy court's finding

of irreparable harm with regard to the one of the factors and thus, declining to address the other

two); Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp., No. 06 Civ.

5358(PKC), 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006) (deciding not to address the collateral estoppel factor because "the decision of the Bankruptcy Court [wa]s well supported by other threats to reorganization").  Here, declining to stay the Actions as against Mr. Denton and the Individual Defendants would result in all three factors being present.

### 1.   Collateral Estoppel

51.   Courts have consistently concluded that the risks of collateral estoppel in a third party litigation constitute irreparable harm to a debtor's reorganization process.  See Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.), 354 B.R. 45, 49-50 (Bankr. S.D.N.Y. 2006), aff'd, 365 B.R. 401 (S.D.N.Y. 2007) (noting that "[c]ourts . . . enjoin litigation against non-debtors when an adverse judgment in that litigation will collaterally estop the debtor in subsequent litigation" and extending the automatic stay to co-defendants in light of "a significant risk of collateral estoppel, stare decisis and evidentiary prejudice") (citations omitted)); Sudbury, 140 B.R. at 463 (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.), 26 B.R. 420, 426-29 (Bankr. S.D.N.Y. 1983) (staying action and concluding that risk of collateral estoppel would irreparably injure the estates).  Here, the claims against Mr. Denton and the Individual Defendants in the Actions arise out of the same facts as those against the Debtor.  Holden Decl. ¶ 20.  Allowing the Actions to proceed against Mr. Denton and the Individual Defendants without the participation of the Debtor would therefore not only severely prejudice the Debtor in any eventual defense of the claims against it, but could collaterally estop its defense altogether.

### 2.   Harm to the Property

52.     Courts also will issue an injunction where allowing third party litigation to proceed would cause a "drain on [the debtor's] estate."  In re Calpine Corp., 365 B.R. at 410. The Debtor's indemnification obligations as to Mr. Denton and the Individual Defendants mean that, in addition to paying for defense costs, if a judgment is entered against Mr. Denton or the Individual Defendants, the Debtor would be expected to indemnify Mr. Denton and the Individual Defendants for that judgment.  That obligation could have a crippling effect on the debtor's estate, prospect of reorganization, and distribution to creditors.  To the extent the Debtor is collaterally estopped from defending the claims against it directly in the Actions, that would compound that deleterious effect.  To mitigate these potentially disastrous consequences, the court should extend the automatic stay to Mr. Denton and the Individual Defendants.  See A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986) (Where there is "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case" . . . "[t]o refuse application of the statutory stay . . . would defeat the very purpose and intent of the statute").

53.     Further, the Debtor's businesses, comprised solely of written publications, are uniquely dependent upon the contributions of their employees to maintain value as a going concern.  Unlike a business with tangible hard assets, the Debtor derives all of its value from web content that is written, edited, and published by their employees.  In order to reorganize and allow its creditors to recover any value, they must maintain its business operations, which depend on the continued employment of their writing and editorial staff.  Holden Decl. ¶ 27.

54.     The Debtor's employees contribute creative material to the Debtor freely, with the understanding that the Debtor maintains a practice and policy of not only indemnifying the employees, but also taking the lead on coordinating and leading their defense in any lawsuits

against the employees individually arising from Debtor's publications. If the automatic stay is not extended to the Individual Defendants, it would signal to all of the Debtor's employees that they may be left to litigate any such lawsuits alone. The prospect of facing these lawsuits without the benefit or support of the Debtor could have a grave chilling effect on the Debtor's work force, driving writers and editors to leave the Debtor. As a result, the Debtor would see a precipitous decline in its going concern value and diminished prospects for a successful reorganization. *Id.* ¶ 28.

### 3.    Distraction of Key Personnel

55.    Courts also routinely stay litigation against non-debtor defendants where such litigation would distract key personnel of the debtor from focusing on the chapter 11 process and maximizing recovery to the estate. See In re Johns-Manville, 26 B.R. at 426 (extension of the stay was appropriate to actions against the debtor's key personnel where the drain on these individuals' time and energy at the crucial hour of plan formulation could frustrate the debtor's efforts at a plan of reorganization); In re Calpine Corp., 365 B.R. at 411 (affirming finding of irreparable harm where allowing a litigation to proceed against a non-debtor would distract an "integral and indispensable member of the restructuring team" from the debtors' restructuring efforts).

56.    As set forth more fully in the First Day Declaration, the Debtor intends to proceed with a sale of substantially all of the Debtor's assets to preserve value for distribution to creditors. Holden Decl. ¶ 29. Mr. Denton is indispensable to the formulation, negotiation, and implementation of this plan. *Id.* As the sole individual with the requisite knowledge of the company, its market, its plans for growth, and financial projections, Mr. Denton is uniquely qualified to identify potential buyers, market the Debtor, and, with the advice and approval of Debtor's the board of directors, negotiate a sale that will obtain the most value for the Debtor, its

estate, and its creditors. *Id.* Because of the integral role he plays in the Debtor's operations, it would be extremely difficult, if not impossible, to consummate a value-maximizing sale without his attention and involvement. *Id.*

57.     Moreover, Mr. Denton is the primary point of contact for both the Debtor's legal counsel and financial professionals working with the Debtor during these chapter 11 cases. *Id.* ¶ 30.  If the Actions are allowed to proceed, and for example, judgments of $125 million are executed against Mr. Denton in the Bollea Litigation, and Mr. Denton is forced to declare personal bankruptcy, he will be distracted from leading the Debtor's day-to-day operations, maintain the Debtor's value as a going concern, or liaise with the Debtor's professionals. *Id.* A personal bankruptcy case would be tremendously distracting to Mr. Denton, whose uninterrupted attention to these chapter 11 cases is critical to the success of reorganization and the recovery for the creditors. *Id.*[3]

### C.     The Balance of Hardships Favors the Debtor

58.     The potential harm to the Debtor if the Actions are allowed to proceed is beyond measure.  If not enjoined, the continued prosecution of the Actions would be deleterious to the value of the Debtor's estate and ultimately to its reorganization and distributions to creditors.

59.     Moreover, if not enjoined, success against Mr. Denton or the Individual Defendants in the Actions likely would drive Mr. Denton (and potentially the Individual

---

[3]  In the unlikely event that Mr. Denton would not file for personal bankruptcy protection in the absence of the relief requested here, his assets undoubtedly would be seized immediately to satisfy the judgment entered in the Bollea Litigation.  Since Mr. Denton's assets are substantially comprised of his stock in GMGI, Mr. Bollea would become a substantial owner of GMGI, thereby defeating the Debtor's chance at a successful reorganization.  This is an especially inequitable result because the Bollea Litigation is subject to an appeal, Mr. Bollea merely holds a contingent, unliquidated litigation claim against the Debtor.  Moreover, the driving force behind the Bollea Litigation is Peter Thiel, a billionaire investor, who holds a personal vendetta against the Company and has publicly admitted that he funded the Bollea Litigation, and other lawsuits against Gawker to (as the New York Times reports) "try to put the media company out of business."

Defendants) to file for personal bankruptcy protection. *Id.* The plaintiffs in the Actions, already subject to the automatic stay in the Debtor's bankruptcy case, would also be met by the automatic stay in Mr. Denton's personal bankruptcy case, resulting in the same creditors disputing the same issues in the same forum—but in two separate cases. This would result in tremendous inefficiency, burden on the Court, cost to the Debtor's and Mr. Denton's estates, and reduction in the value available to the creditors.

60.    Granting the injunction, on the other hand, does not deprive the plaintiffs in the Actions (the "Adversary Action Defendants") from any alternate source of recovery. *Id.* ¶ 31. Relative to the damages sought in the Actions, which average approximately $50 million and peak at $140 million, the Non-Debtor Third Parties have minimal assets and cannot offer significant sources of recovery. *Id.* For example, Mr. Bollea would lose no alternate recovery on account of his contingent and unliquidated claim if the automatic stay were extended to Mr. Denton. If Mr. Denton were to commence a personal bankruptcy case, the Bollea Litigation would be stayed until the conclusion of that case before Mr. Bollea would have a non-contingent, liquidated claim against Mr. Denton. Extending the automatic stay to Mr. Denton would therefore deprive Mr. Bollea of no benefit or value he would otherwise have. Thus, there is no justification for refusing to extend the automatic stay to the Individual Defendants or Mr. Denton.

### D.    The Granting of the Injunction Serves the Public Interest

61.    Courts have found that the "public interest" element is satisfied if granting the injunction would promote a successful reorganization. In re Johns-Manville, 26 B.R. at 426; Sudbury, 140 B.R. at 465 ("[c]ourts have generally recognized a public interest in reorganization") (citing United States v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983)); Am.

<u>Film Tech.</u>, 175 B.R. at 849 (stating that in the bankruptcy context, "public interest" is met by promoting successful reorganization).

62.     Here, injunctive relief in favor of the Debtor will serve the public interest by saving hundreds of jobs, preserving the Debtor's multi-million dollar media brands, and maximizing the potential value for creditors.  Reorganization is especially important in this case because the Debtor plays a unique role as pioneers for free press.  As Mr. Denton explained:

> Being a tight community of free writers, independent as a company and committed to putting out the real story, Gawker Media can bear a higher level of uncertainty than most.  I believe it's more likely than not that we emerge tested and stronger, clear in our responsibility to readers and the value of our writers' profession. Without someone actually having the gumption to fight these cases, journalists might as well resign themselves to a role as liaisons for PR people and stenographers for celebrities.

63.     It is Mr. Denton's commitment to free press that has propelled his company — once described as a "stenographer for celebrities" — into a place where honest news and commentary thrive, reporting on current events, politics (especially prescient in an election year), popular culture, sports, women's issues, and technology.  For example, in the past year, the Debtor broke stories about the suppression of conservative news on Facebook, the spread of the Zika virus, and the email exchanges between Hillary Clinton and Sidney Blumenthal, among many others.  By contrast, traditional news sources, such as the New York Times and Washington Post reported on these hot button issues only months later.  For these reasons, the public would undoubtedly suffer if the Debtor was to stop publishing and be unable to find a way out of chapter 11 bankruptcy, particularly if that were to be the case because of litigation financed by a billionaire-investor who is personally dissatisfied with the Debtor's content.  Thus, the Court should enjoin the Actions to allow the Debtor at least a chance for a successful reorganization.

E.       **The Debtor Has Satisfied the Requirements for the Entry of a Temporary Restraining Order**

64.     The facts presented here also satisfy the requirements under Rule 65 for a temporary restraining order pending hearing on the Debtor's motion for a preliminary injunction. A temporary restraining order is properly granted to preserve the status quo and prevent immediate and irreparable injury pending a hearing upon a motion for a preliminary injunction. See 13 James Wm. Moore et al., Moore's Federal Practice ¶¶ 65.30 and 65.36[1] (3d ed. 1997). The applicable standard for issuance of a temporary restraining order mirrors the standard governing the issuance of a preliminary injunction. See Roberts v. Atl. Recording Corp., 892 F. Supp. 83, 86 (S.D.N.Y. 1995). Specifically, Rule 65(b) provides, as follows:

> A temporary restraining order may be granted without . . . notice to the adverse party . . . only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party . . . can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed. R. Civ. P. 65(b).

65.     Here a narrow temporary restraining order is urgently needed. As of *today,* the $140.1 million of judgments in the *Bollea* against Gawker Media, Mr. Denton and Mr. Daulerio may be executed. The Final Judgment provides, "***let execution issue forthwith***." *See* Final Judgment issued in Bollea Litigation (emphasis in original).

66.     Plaintiff in the Bollea Litigation has refused to agree even to a brief temporary stay of execution of the judgments. Meanwhile, Peter Thiel, the driving force and financier of the Bollea Litigation, has repeatedly stated publicly that he is bent on destroying Gawker Media and Mr. Denton. For example, on May 25, Mr. Thiel, gave a lengthy interview to *The New York*

*Times* in which he admitted that he has funded the Bollea Litigation, and other lawsuits against

Gawker, to (as the *Times* reports) "try to put the media company out of business."

67.     There is no question that Mr. Bollea will seek to have the judgments against

Gawker Media, Mr. Denton and Mr. Daulerio perfected as urgently as possible.  As set forth in

detail above, execution of those judgments will set off a chain of immediate, irreparable harms:

(i) it will lead to crippling indemnification obligations for the Debtor; (ii) it will drive Mr.

Denton to file for personal bankruptcy, thereby significantly distracting him from his central and

vital role in the Debtor's ongoing efforts to successfully reorganize, including through the sale of

its assets; and (iii) it will cause a chilling effect amongst the Debtor's writers and editors, who

are critical to the Debtor's revenue and efforts to reorganize..   The requested Temporary

Restraining Order is therefore urgently needed to avoid imminent irreparable harm to the

Debtor's sale and reorganization efforts.

68.     The purpose of the Debtor's request for this Temporary Restraining Order would

be vitiated if advance notice were provided to Mr. Bollea.  As explained above, it is our firm

belief that upon notice of this adversary action, Mr. Bollea would seek to even further accelerate

his perfection of the judgments against Mr. Denton and Mr. Daulerio in the Bollea Action.

## III.    IN THE ALTERNATIVE, THE COURT SHOULD STAY THE ACTIONS AGAINST THE NON-DEBTOR THIRD PARTIES PURSUANT TO SECTION 362(A) OF THE BANKRUPTCY CODE

69.     In addition to the Court's authority to grant injunctive relief, Section 362(a) of the

Bankruptcy Code also provides an alternative means to provide the Debtor with relief they seek

here.  Although the express language of section 362(a)(1) refers only to actions against the

debtor, Congress intended the automatic stay to apply to any litigation that could imperil the

assets of a debtor's estate:

> The automatic stay is one of the fundamental debtor protections
> provided by the bankruptcy laws.  It gives the debtor a breathing
> spell from his creditors.   It stops all collection efforts, all
> harassment, and all foreclosure actions.  It permits the debtor to
> attempt a repayment or reorganization plan, or simply to be
> relieved of the financial pressure that drove him into bankruptcy.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 54-

55 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5840-41, 5963; see also

McCartney v. Integra Nat'l Bank N., 106 F.3d 506, 509 (3d Cir. 1997); In re The Drexel

Burnham Lambert Grp., Inc., 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) (the "automatic stay is

key to the collective and preservative nature of a bankruptcy proceeding."); Fed. Deposit Ins.

Corp. v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 133 (2d Cir. 1992) ("The purpose of

the automatic stay is to prevent a chaotic and uncontrolled scramble for the debtor's assets in a

variety of uncoordinated proceedings in different courts.") (internal quotation marks omitted);

AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.), 117 B.R. 789, 798 (Bankr. S.D.N.Y.

1990) ("The automatic stay prevents creditors from reaching the assets of the debtor's estate

piecemeal and preserves the debtor's estate so that all creditors and their claims can be

assembled in the bankruptcy court for a single organized proceeding.").

70.     Similarly, the Bankruptcy Code's definition of property of the estate is flexible

and broad.  Under section 541 of the Bankruptcy Code, property of the estate encompasses "all

kinds of property, including tangible or intangible property."  Whiting Pools, 462 U.S. at 205 n.9

(citations omitted); see also In re NextWave Personal Commc'ns Inc., 244 B.R. 253, 267 n.7

(Bankr. S.D.N.Y. 2000) (Section 541 is "broadly construed to encompass all conceivable

interests of the debtor in property"), rev'd on other grounds sub nom, In re F.C.C., 208 F.3d 137

(2d Cir. 2000).

71.     Courts therefore have extended the automatic stay under section 362 to enjoin actions against non-debtor when a claim against the non-debtor would have an immediate adverse economic consequence for the debtor's estate.  See Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287-88 (2d Cir. 2003) ("The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtors); A. H. Robins Co., 788 F.2d at 998-1007 (recognizing the broad reach Congress intended for the automatic stay and holding that the protection of the automatic stay reaches beyond direct actions against the debtor to actions against non-debtors in appropriate circumstances); N. Star Contracting Corp. v. McSpedon (In re N. Star Contracting Corp.), 125 B.R. 368, 371 (S.D.N.Y. 1991) (explaining that a stay of a third party action is justified under section 362 where "a right to indemnification exists … because a judgment against the non-debtor will affect the debtor's assets").

72.     The Debtor commenced the chapter 11 case to preserve its assets for the benefit of its creditors.  As discussed above, if the Actions are allowed to proceed, they will give rise to indemnification claims against the Debtor, which would have to be paid from funds that would otherwise be available to the Debtor for the administration of its estate and for distributions to creditors.  Permitting this depletion of assets would undermine the purpose of chapter 11 relief.  Moreover, the Actions would have a chilling effect on the Debtor's employees and, as a result, on the Debtor's ability to continue to generate revenue on an ongoing basis.  In addition, the Actions would be a significant burden and distraction on Mr. Denton and other key personnel, who would be forced to devote their time and attention to the Actions (and in the case of Mr. Denton, even personal bankruptcy) rather than the reorganization process.  Finally, allowing the Actions to proceed would be prejudicial to the Debtor in its own defense of the Actions, and

even subject it to collateral estoppel, further increasing the Debtor's liability.

73.     Based on the foregoing, it is clear that absent an injunction or an order otherwise extending the automatic stay, the Debtor will be deprived of the opportunity to pursue a successful reorganization.

## CONCLUSION

74.     For the foregoing reasons, and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, the Debtor respectfully requests that the Court grant its Motion and enter (1) a preliminary injunction enjoining, pending the termination of the automatic stay applicable to the Debtor, (A) the Actions as against (i) Nick Denton, and (ii) the Individual Defendants, and (B) any Adversary Action Defendant from taking further action in the Actions and from taking further action in any other existing litigation or filing further claims against Mr. Denton or any Individual Defendant where the conduct alleged was in the course of, and within the scope of, Mr. Denton's or the Individual Defendants' employment with the Debtor, absent approval of this Court; and/or (2) an order extending the automatic stay imposed by section 362(a) of the Bankruptcy Code to stay the Actions as against Mr. Denton and the Individual Defendants.

75.     For the foregoing reasons, and the Court having jurisdiction to consider the TRO Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, the Debtor further respectfully requests that the Court grant its TRO Motion and enter a temporary restraining order directing that, pending the Court's hearing and ruling on Debtor's Motion: (1) the Action captioned *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea Litigation") be temporarily restrained and enjoined as against (A) Mr. Denton, and (B) A.J. Daulerio; (2) Defendant Terry Gene Bollea be temporarily restrained and enjoined

from taking further action in Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio, or from otherwise seeking to enforce any judgment entered in the Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio; and (3) the automatic stay imposed by section 362(a) of the Bankruptcy Code be hereby extended to stay the Bollea Litigation as against (A) Mr. Denton, and (B) A.J. Daulerio.

Dated:  June 10, 2016
         New York, New York

*/s/ Gregg M. Galardi*
Gregg M. Galardi
David B. Hennes
Michael S. Winograd
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090
gregg.galardi@ropesgray.com
david.hennes@ropesgray.com
michael.winograd@ropesgray.com

*Proposed Counsel to the Debtor
and Debtor in Possession*