UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>Gawker Media, LLC,[1]<br><br>                      Debtor. | Chapter 11<br><br>Case No. 16-11700 (SMB) |
| Gawker Media, LLC,<br><br>                      Plaintiffs,<br><br>v.<br><br>Meanith Huon, Ashley Terrill, Teresa Thomas, Shiva Ayyadurai, Terry Gene Bollea, Charles C. Johnson, and Got News LLC,<br><br>                  Defendants. | Adv. Proc. No. 16-_____ (   ) |

**DECLARATION OF WILLIAM D. HOLDEN IN SUPPORT OF THE DEBTOR'S MOTION FOR (I) A PRELIMINARY INJUNCTION AND/OR (II) EXTENSION OF THE AUTOMATIC STAY AND THE DEBTOR'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER**

Pursuant to 28 U.S.C. § 1746, William D. Holden declares as follows:

1. I have submitted the First Day Declaration of William D. Holden pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "First Day Declaration"). I incorporate the First Day Declaration by reference herein. In addition to the facts set forth in the First Day Declaration, there are additional facts that I am aware of by virtue of my position as Chief Restructuring Officer for Gawker Media, LLC, a Delaware limited liability company ("Gawker Media" or the "Debtor") and its parent company, Gawker Media Group, Inc., a Cayman Island corporation ("GMGI" and, together with Gawker Media, the "Company"), that are relevant to the Debtor's Motion for (i) a Preliminary Injunction and/or

---

[1] The last four digits of the taxpayer identification number of the Debtor, Gawker Media, LLC are 0492. The Debtor's corporate headquarters is located at 114 Fifth Avenue, 2d Floor, New York, New York 10011.

Extension of the Automatic Stay (the "Motion") and the Debtor's Motion for a Temporary Restraining Order ("TRO Motion"), both of which are being filed concurrently herewith.

2.  Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtor and our industries as a whole. I am authorized to submit this declaration on behalf the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

### The Debtor

3.  On June 10, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is currently operating its business and managing its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee of unsecured creditors, or any trustee or examiner, has been appointed in these cases.

4.  Gawker Media is a wholly-owned subsidiary of GMGI, a privately-held online media company. Gawker Media operates seven distinct media brands with corresponding websites under the names *Gawker*, *Deadspin*, *Lifehacker*, *Gizmodo*, *Kotaku*, *Jalopnik*, and *Jezebel* (the "Websites"). Kinja, another wholly-owned subsidiary of GMGI, holds the intellectual property licenses for the Websites. *Gawker* is the most well-known brand and Website. However, the Company's six other brands identified above represent approximately 85% of its revenues. The Company's commercial flagship is *Gizmodo*, a technology news brand and website, and the Company's video game, sports, how-to and automotive properties (*Kotaku*, *Deadspin*, *Lifehacker*, and *Jalopnik*) are also leaders in their categories. The Company also

licenses its web content internationally to third parties that run similar websites based on the Company's brands, such as *Gizmodo en Espanol*, *Gizmodo Australia*, *Kotaku Australia*, and *Lifehacker Australia*.

5. The Company's various Websites cover, among other things, news and commentary on current events, politics, pop culture, sports, cars, fashion, productivity, technology and video games. The Websites have a collective global readership of over 90 million readers (approximately 50 million in the United States), generally in the age range of 18 to 34 years old. The Company is recognized as the only digital media company to grow to scale and viability with minimal external investment. Between 2012 and 2015, the Company experienced a compound annual growth rate of approximately 24%, with revenue in 2015 of approximately $49.9 million. The Company's business is run from leased offices at 114 Fifth Avenue in New York, New York. The Company also leases de minimis office space in other cities for certain employees, including through "WeWork", a co-working office space rental company.

6. The following provides a description of the Company's media brands and the corresponding Websites:

- **Gizmodo:** *Gizmodo.com* was the first brand launched by the Company, covering consumer electronics and other technology as well as science and science fiction, and natural and man-made wonders. Gizmodo is the Company's commercial flagship, with a strong appeal to blue-chip technology and automotive advertisers. Its exclusives, on subjects from the iPhone to the hidden bias in news provided by social media, are drivers for technology conversation. The website has approximately 19.7 million readers in the U.S. and over 35 million readers globally. Approximately 25 staff members at Gawker Media work on the Gizmodo brand.

- **Deadspin:** *Deadspin.com* focuses on bringing sports fans stories that may not make it to more mainstream sports news. The property is best known for exclusives about sports stars, and Deadspin's coverage has broadened to include male lifestyle coverage. The website has approximately 12 million readers in the

3

U.S. and over 13 million readers globally. Approximately 16 staff members at Gawker Media work on the Deadspin brand.

- **Gawker:** *Gawker.com* is the most popularly known of the Company's brands. From its origin as a Manhattan-centric media blog, it has grown into a national news operation focused on politics and culture. The website has approximately 11.7 million readers in the U.S. and over 14 million readers globally. Approximately 13 staff members at Gawker Media work on the Gawker brand.

- **Jezebel:** *Jezebel.com* is focused on providing media for, by and about women. It began as a counter to more typical women's magazines, bringing an intelligent perspective to celebrity, politics and culture. Jezebel is home to one of the group's most active reader communities. The website has approximately 9.5 million readers in the U.S. and approximately 13 million readers globally. Approximately 14 staff members at Gawker Media work on the Jezebel brand.

- **Lifehacker:** *Lifehacker.com* focuses readers on how to improve their personal productivity and their lives, whether through a new app or a new method of meditation. Explanatory articles, and the reader discussions they spark, contribute to Lifehacker's reputation as a definitive reference site. The website has approximately 15.6 million readers in the U.S. and over 27 million readers globally. Approximately 25 staff members at Gawker Media work on the Lifehacker brand.

- **Kotaku:** *Kotaku.com* injects intelligent cultural criticism and a playful spirit to the entertainment industry's largest and newest category, the video game. As well as reviewing games and other interactive entertainment, Kotaku covers discussion on the politics of video game communities. The website has approximately 7.5 million readers in the U.S. and over 13 million readers globally. Approximately 14 staff members at Gawker Media work on the Kotaku brand.

- **Jalopnik:** *Jalopnik.com* provides a forum for auto enthusiasts in digital media. Covering new models, industry news, car culture and motorsports, it aims to inject humor and candor into this media category. The *Jalopnik Film Festival*, sponsored the last two years by a major auto company, is one of the Company's marquee annual events. In video, the brand has made an impact with *Neat Stuff In Cool Cars*, an unconventional approach to car testing, and *Jason Drives*, in which a mad genius writer goes for a spin in the weirdest cars on the planet. The website has approximately 7.5 million readers in the U.S. and over 10 million readers globally. Approximately 10 staff members at Gawker Media work on the Jalopnik brand.

7. The Company's primary source of revenue is selling advertising space on its Websites. Its advertising business builds on the high level of engagement of the brands'

readership. The Company's programs for clients include sponsored discussions, licensing of testimonials, events which bring invited readers access to new shows and products, and media generated by those events.

8. The Company has five key departments: sales, technology, editorial, legal, and operations. The head of each department reports to Mr. Denton. Each of the Company's Websites has its own "editor-in-chief," all of whom report to the Company's Executive Editor, John Cook. Daily editorial decisions are made by the editors-in-chief and Mr. Cook, with input from Mr. Denton, and major editorial decisions are made by a three-person committee consisting of Mr. Cook, Mr. Denton, and the Company's general counsel.

9. The Websites' individual editors-in-chief manage editorial staff, including writers, who generate content for the Websites. Other key roles at the company include the executive editor for feature pieces, the manager of publishing partnerships, the executive managing editor, the director of the Company's editorial labs, the art direction department, and the video direction department. These individuals provide services across the Websites and brands.

### The Non-Debtor Third Parties

### Nick Denton

10. The Company had a humble beginning as a single blog written and published by one individual out of his New York City apartment: Nick Denton. Mr. Denton founded the Company in 2002, at which time he employed only two writers, who were paid out of his own pocket. Since its inception, the Company has grown to 125 writers at its peak, with the seven U.S. websites described above and a collective international readership of over 90 million readers.

11. With Mr. Denton at its helm, the Company has grown continuously. It earned approximately $6,000 per month at the end of its second year. Having weathered the recession of 2008-2009, it generated over $4,000,000 in revenue per month in 2015. This dramatic growth trajectory is attributable to the vision and forward thinking of Mr. Denton, who has seen the Company through from its inception to its globally recognized status, and without whom there simply would not be a *Gawker* brand.

12. Mr. Denton's background includes an education in politics, philosophy, and economics, which he studied while attending Oxford University. There, he was first exposed to the publishing world, working as the editor of the university's magazine. After beginning his career as a journalist with the *Financial Times*, he went on to co-write a book about the collapse of the U.K.'s Barings Bank called *All That Glitters* in 1997.

13. In 2002, the same year that he launched *Gawker*.com, Mr. Denton taught a class at the Berkeley University Graduate School of Journalism called "Freedom of the Press: Political Change and the Media in Hungary." His personal views on the free press have been cast into the public eye throughout the litigation captioned, *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (the "Bollea Litigation"), which is the precipitating cause of the Company's chapter 11 cases. In fact, last year, he blogged about the threat to free speech his Company faced as a result of the litigation, writing that, "[t]he free press is prized in theory, constitutionally protected in this country and elsewhere because of its value to society – and unpopular with public figures who are exposed or embarrassed by its work. As a business, media carries the usual risks, vulnerable to recession and changes in technology, and a special danger, which Gawker Media is still facing."

14. In addition to founding the Company, Mr. Denton currently serves as the President and Chief Executive Officer of GMGI and the President of Growth Media. In that capacity, he is responsible for developing, communicating, and implementing the Company's go-forward business strategy and vision, soliciting guidance and advice from the board of directors, and managing the operations and resources of the Company. He is also a substantial shareholder in GMGI, holding approximately thirty percent of its stock. GMI, in turn, wholly owns Growth Media.

15. The head of each of the Company's five main departments reports to Mr. Denton, which results in a company structure whereby every single employee of the Company reports, either directly or indirectly, to Mr. Denton.

16. Mr. Denton makes significant editorial decisions in consultation with Heather Dietrick, the Company's General Counsel, and John Cook, its Executive Editor. He is charged with final decision-making authority in the Company's technology and sales departments. Every week, the Company's Chief Technology Officer reports directly to Mr. Denton, at which time Mr. Denton makes major decisions with respect to the Websites' format and design. He is responsible for hiring department heads and setting overarching sales, advertising and marketing strategies.

17. Furthermore, Mr. Denton is instrumental and central to the spirit of the Company's operations. He has significant creative input and editorial oversight over the Company's various publications, and his unique vision for the brands informs their forward trajectory.

18. Ultimately, Mr. Denton is the face of the Company's business. Indeed, in consultation with outside sources, he is responsible for handling the Company's public relations.

He maintains significant industry contacts and relationships. For this reason, potential acquirers have approached Mr. Denton directly to express their interest in the Company.

### The Individual Defendants

19. Each of the Individual Defendants is a current or former employee of the Company and is a co-defendant in one or more of the Actions by virtue of his or her employment with the Company. The Individual Defendants include the following individuals:

- *John Cook.* John Cook, the Executive Editor of Gawker.com, has been employed by the Debtor since October 2010 (except for a brief period between March 2014 and January 2015).

- *A.J. Daulerio.* A.J. Daulerio, the former editor-in-chief of Gawker.com, was employed by the Debtor until January 2013.

- *Gabrielle Darbyshire.* Gabrielle Darbyshire, formerly the Chief Operations Officer of Gawker Media, was a founding member of the Debtor. Ms. Darbyshire was employed by the Debtor from January 2008 through June 2013.

- *Greg Howard.* Greg Howard is a former writer for Deadspin.com. Mr. Howard was employed by the Debtor from February 2014 until March 2016.

- *JK Trotter.* JK Trotter is a writer for Gawker.com. Mr. Trotter has been employed by the Debtor since August 2013.

- *Sam Biddle.* Sam Biddle, a senior writer at *Gawker.com*, has been employed by the Debtor since August 2010.

### The Actions

20. As of the Petition Date, there were numerous lawsuits pending across the United States involving Gawker Media, relating to activities and events prior to the Petition Date. Among those lawsuits are the Actions, each of which involves claims against not only Gawker Media, but also against one or more of Mr. Denton and the Individual Defendants. The Actions include:

- *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea Litigation")

Gawker Media, Nick Denton, and AJ Daulerio are defendants in this lawsuit for invasion of privacy, right of publicity, intrusion upon seclusion, intentional infliction of emotional distress, and violations of Florida's wiretap statute arising from publication of a report and commentary and accompanying video excerpts involving Plaintiff's extramarital affair, a tape depicting it, and Plaintiff's sex life and public persona more generally. A Florida jury awarded $140.1 million to the Plaintiff. Mr. Denton and Mr. Daulerio are each jointly and severally liability on $115 million of the judgment. An additional $10 million of punitive damages was assessed against Mr. Denton separately, and an additional $100,000 of punitive damages was assessed against Mr. Daulerio separately. The bond to stay execution of the judgments pending appeal is $50 million for each of the Bollea Litigation defendants. The court has refused to reduce the cash bond and denied Gawker Media's request to post stock or alternative collateral in lieu of the bonds. As of June 10, 2016, the judgments in the Bollea Litigation became available for execution.

- *Huon v. Denton, et al.*, No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.) (the "Huon Litigation")

Gawker Media, Nick Denton and Gabrielle Darbyshire are defendants in this suit, which asserts causes of action for defamation and related torts arising from an article published by Gawker and from third-party user comments posted on Gawker's website. The article at issue reported on plaintiff's filing of a lawsuit against another publisher, Above the Law, over its report about an Illinois criminal proceeding in which Huon was charged with rape and acquitted by a jury. The trial court dismissed the case against each Gawker defendant (including the individuals). Huon appealed the decision and the U.S. Court of Appeals for the Seventh Circuit heard argument on May 31, 2016. Huon is seeking at least $100,000,000 in damages.

- *Ashley Terrill v. Gawker Media, LLC, et al.*, No. 16-CV-00411 (S.D.N.Y.) (the "Terrill Litigation")

Gawker Media, Sam Biddle, John Cook, and Nick Denton are defendants in this suit for defamation, breach of confidence, intentional interference with prospective economic advantage, fraudulent misrepresentation, and negligent hiring and retention. The suit arises from an article regarding plaintiff's investigation into a former executive for the dating application Tinder, and plaintiff's belief that she was being harassed for undertaking the investigation. The Terrill Litigation is currently pending in the Southern District of New York. The Court is expected to set a briefing schedule for Defendants' motion to dismiss in June 2016. Plaintiff is seeking at least $10,000,000 in damages.

- *Teresa Thomas v. Gawker Media LLC, et al.*, No. 16-CV-09519 (Or. Multnomah Cty. Cir. Ct.) (the "Thomas Litigation")

Gawker Media, Nick Denton, and John Cook are defendants in this defamation and invasion of privacy suit arising from an article that referenced plaintiff's employment at Yahoo Inc. and her potential romantic involvement with a Yahoo, Inc. executive. The case is pending in the Circuit Court for the State of Oregon, County of Multnomah. There has been no activity in the case to date aside from the filing of the complaint and purported service of the complaint. The plaintiff is seeking $74,000 in damages.

- *Ayyadurai v. Gawker Media, LLC, et al.*, No. 16-CV-10853 (D. Mass.) (the "Ayyadurai Litigation")

Gawker Media, Nick Denton, Sam Biddle, and John Cook are defendants in this suit for libel, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and negligent hiring and retention. The suit arises from publication of three articles regarding the plaintiff's claims to have invented e-mail. The complaint is filed in the District of Massachusetts, but the Defendants have not been served. The plaintiff is seeking at least $35,000,000 in damages.

- *Charles C. Johnson, et al. v. Gawker Media, LLC, et al.*, No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (the "Johnson Litigation")

Gawker Media, J.K. Trotter, and Greg Howard are defendants in this suit for defamation, injurious falsehood, invasion of privacy, and conspiracy to interfere with civil rights. The suit arises from three articles regarding plaintiff's behavior. The complaint was filed in Superior Court of California, County of Fresno, but Defendants have not been served. The plaintiff is seeking at least $24,000,000 in damages.

21.    Pursuant to section 362 of the Bankruptcy Code, the Actions are automatically stayed as against Gawker Media, but not automatically stayed as against Mr. Denton or the Individual Defendants.

### Indemnification of the Non-Debtor Third Parties

#### Mr. Denton

22.    Mr. Denton is fully indemnified by the Debtor for any fees, damages or other losses he suffers in the Actions pursuant to broad indemnification provisions in three

separate documents: (i) an Indemnity Agreement, dated as of December 31, 2009, by and between GMGI and Mr. Denton (the "Indemnity Agreement"), (ii) the Fourth Amended and Restated Memorandum and Articles of Association of GMGI (the "GMGI Articles of Association"); and (iii) the Second Amended and Restated Operating Agreement of Gawker Media, dated as of August 21, 2012 (the "Gawker Media Operating Agreement").

23.     The Gawker Media Operating Agreement indemnifies Mr. Denton for loss or damages arising from errors in judgment or acts or omissions, as long as they do not constitute misconduct or gross negligence. As a result, for example, Mr. Denton is fully indemnified by the Debtor in connection with his liability for the judgments entered in the Bollea Litigation.[2]

### The Individual Defendants

24.     At least one of the Individual Defendants, Ms. Darbyshire, has express contractual indemnity rights similar to Mr. Denton. In addition, the remaining Individual Defendants (as well as Ms. Darbyshire and Mr. Denton), are subject to a company practice and policy of indemnification, by which the Debtor defend and indemnify their writers and editorial staff in connection with lawsuits related to the Company's web content.

### The Reorganization Process

25.     The Debtor's businesses, comprised solely of written publications, are uniquely dependent upon the contributions of their employees to maintain value as a going concern. Unlike a business with tangible hard assets, the Debtor derives all of its value from web content that is written, edited, and published by their employees. In order to reorganize and

---

[2] Pursuant to the Indemnity Agreement, Mr. Denton is broadly indemnified for all expenses incurred as a party to any proceeding, as long as he acted in good faith and in a manner he reasonably believed to be in the best interests of GMGI, and unless his conduct constituted a breath of duty of loyalty to the Company, or intentional misconduct or a knowing violation of the law. The GMGI Articles of Association similarly indemnify Mr. Denton for any liability incurred as a result of any act in carrying out his functions at GMGI, other than liability incurred by reason of his own actual fraud or willful default.

allow their creditors to recover any value, they must maintain their business operations, which depend on the continued employment of their writing and editorial staff.

26. The Debtor's indemnification obligations as to Mr. Denton and the Individual Defendants mean that, in addition to having to pay for defense costs, any judgments that are entered against Mr. Denton or the Individual Defendants would have a crippling effect on the Debtor's estates, prospect of reorganization, and distribution to creditors. Moreover, if the automatic stay is not extended to the Individual Defendants, it would signal to all of the Debtor's employees that they may be left to litigate any such present or future lawsuits alone. The prospect of facing these lawsuits without the benefit or support of the Debtor could have a potentially disastrous chilling effect on the Debtor's work force, driving writers and editors to leave the Debtor. As a result, the Debtor would see a precipitous decline in its going concern value and diminished prospects for a successful reorganization. In short, I believe that denial of the Motion will result in immediate and irreparable harm to the Debtor and its creditors.

27. As set forth more fully in the First Day Declaration, Debtor intends to proceed with a sale of substantially all of the Debtor's assets to preserve value for distribution to creditors. Mr. Denton is indispensable to the formulation, negotiation, and implementation of this plan. As the sole individual with the requisite knowledge of the company, its market, its plans for growth, and financial projections, Mr. Denton is uniquely qualified to identify potential buyers, market the Debtor, and, with the advice and approval of Debtor's the board of directors, negotiate a sale that will obtain the most value for the Debtor, its estates, and its creditors. Because of the integral role he plays in the Debtor's operations, it would be extremely difficult, if not impossible, to consummate a value-maximizing sale without his attention and involvement.

28. However, success against Mr. Denton or the Individual Defendants in the Actions likely would drive Mr. Denton (and potentially the Individual Defendants) to file for personal bankruptcy protection. A personal bankruptcy case would be tremendously distracting to Mr. Denton, whose uninterrupted attention to this chapter 11 case is critical to the Debtor's reorganization. If forced to file for personal bankruptcy, Mr. Denton would be unable to spearhead the Debtor's day-to-day operations, maintain the Debtor's value as a going concern, liaison with the Debtor's professionals, and most importantly, execute a value-maximizing sale.[3]

29. Moreover, Mr. Denton is the primary point of contact for both the Debtor's legal counsel and financial professionals working with the Debtor during these chapter 11 cases. If the Actions are allowed to proceed, and for example, judgments of $125 million are executed against Mr. Denton in the Bollea Litigation, and Mr. Denton is forced to declare personal bankruptcy, he will be distracted from leading the Debtor's day-to-day operations, maintain the Debtor's value as a going concern, or liaise with the Debtor's professionals. A personal bankruptcy case would be tremendously distracting to Mr. Denton, whose uninterrupted attention to these chapter 11 cases is critical to the success of reorganization and the recovery for the creditors.

30. Any harm suffered by the Adversary Action Defendants is vastly outweighed by the harm suffered by the Debtor in the absence of an injunction. Relative to the damages sought in the Actions, which average approximately $50 million and peak at $140

---

[3] In the unlikely event that Mr. Denton would not file for personal bankruptcy protection in the absence of the relief requested here, his assets undoubtedly would be seized immediately to satisfy the judgment entered in the Bollea Litigation. Since Mr. Denton's assets are substantially comprised of his stock in GMGI, Mr. Bollea would become a substantial owner of GMGI, thereby defeating the Debtor's chance at a successful reorganization. This is an especially inequitable result because the Bollea Litigation is subject to an appeal, Mr. Bollea merely holds a contingent, unliquidated litigation claim against the Debtor. Moreover, the driving force behind the Bollea Litigation is Peter Thiel, a billionaire investor, who holds a personal vendetta against the Company and has publicly admitted that he funded the Bollea Litigation, and other lawsuits against Gawker to (as the *New York Times* reports) "try to put the media company out of business."

million, Mr. Denton and the Individual Defendants have minimal assets and cannot offer significant sources of recovery. Enjoining the Actions as against Mr. Denton and the Individual Defendants would not diminish any potential recovery on the part of the Adversary Action Defendants because Mr. Denton and the Individual Defendants are not able to satisfy the potential judgments in the amount sought in the Actions. If either Mr. Denton or any of the Individual Defendants were to commence a personal bankruptcy case, the Actions against him or her would be stayed until the conclusion of that case before the plaintiff in that Action would have a non-contingent, liquidated claim against Mr. Denton or the Individual Defendant.

31. Notwithstanding anything to the contrary contained in this declaration, nothing in this declaration is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of or the validity of any claim, or (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing. The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 10, 2016
      New York, New York

                                                                       _____
                                                                        William D. Holden