**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Gawker Media, LLC, | Case No. 16-11700 (SMB) |
| Debtor | |

| | |
|---|---|
| Gawker Media, LLC, | |
| Plaintiff, | Adv. Proc. No. 16-ap-1085 |
| v. | |
| Meanith Huon, Ashley Terrill, Teresa Thomas, Shiva Ayyadurai, Terry Gene Bollea, Charles C. Johnson, and Got News LLC, | |
| Defendants. | |

**DEFENDANT TERRY G. BOLLEA'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEBTOR'S MOTION FOR (I) A PRELIMINARY INJUNCTION**
**AND/OR (II) EXTENSION OF THE AUTOMATIC STAY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

ARGUMENT ............................................................................................................. 10

I.      Debtor Has Not Satisfied the Standard for a Preliminary Injunction. .............................. 13

      A.      Allowing Mr. Bollea to Obtain Security for His Judgment against Messrs.
Denton and Daulerio Will Not Cause Imminent, Irreparable Harm to the
Estate or the Sale Process. ................................................................................ 14

            1.      Execution of Judgment Does Not Carry a Collateral Estoppel Risk. ....... 14

            2.      Mr. Bollea's Security for the Assets of Messrs. Denton and Daulerio
And Collection of the Judgment from them Would Not Harm the
Estate. .......................................................................................................... 16

            3.      Mr. Denton Is Not So Indispensable that He Should Be Shielded
from Satisfying the Judgment in the Bollea Litigation and Possible
Personal Bankruptcy. .................................................................................. 19

                  a)      Mr. Denton is not leading the Debtor's day-to-day operations
in any event. ................................................................................... 19

                  b)      Debtor retained a chief restructuring officer who will have
primary responsibility to manage the bankruptcy and sale........... 20

                  c)      Debtor retained an investment bank to spearhead the sale of
its assets. ........................................................................................ 21

                  d)      Debtor has counsel and other professionals who are
responsible for dealing with legal issues and interfacing with
its lawyers. ..................................................................................... 23

                  e)      Mr. Denton is not devoting his full attention to the
bankruptcy proceedings. ................................................................ 24

      B.      The Balance of Hardships Strongly Favors Mr. Bollea. ...................................... 25

      C.      Injunctive Relief Will Not Serve the Public Interest. .......................................... 28

II.     There Are No Unusual Circumstances Justifying Extending the Stay of the Bollea
Litigation to Non-Debtor Defendants. ............................................................................... 32

A.    Extension of the Stay Is Not Appropriate Because the Judgment Debtors
      Are Jointly and Severally Liable........................................................................ 33

B.    Extension of the Stay Is Not Appropriate Because Mr. Denton Does Not
      Have an Absolute Right to Indemnity from Debtor............................................. 33

C.    Extension of the Stay Is Not Appropriate Because Continuing the Bollea
      Litigation Will Not Interfere with the Bankruptcy; Indeed, It Is Necessary to
      Resolve It. ......................................................................................................... 34

CONCLUSION............................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ................................................. 33

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
   792 F. Supp. 969 (S.D.N.Y. 1992) ......................................... 30

*Austro v. Niagara Mohawk Power Corp.*,
   487 N.E.2d 267 (N.Y. 1985) ................................................. 17

*Bein v. Heath*,
   47 U.S. 228 (1848) ............................................................... 29

*Bentley v. Tibbals*,
   223 F. 247 (2d Cir. 1915) ..................................................... 30

*Biondi v. Beekman Hill House Apt. Corp.*,
   731 N.E.2d 577 (N.Y. 2000) ................................................. 17

*Cano v. DPNY, Inc.*,
   287 F.R.D. 251 (S.D.N.Y. 2012) ........................................... 33

*CCS Commc'n Control, Inc. v. Sklar*,
   No. 86-cv-7191 (WCC), 1987 WL 12085 (S.D.N.Y. June 2, 1987) ........................................ 31

*Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins.*,
   945 So.2d 1216 (Fla. 2006) ................................................... 15

*DeSouza v. PlusFunds Grp., Inc.*,
   No. 05-cv-5990 RCCJCF, 2006 WL 2168478 (S.D.N.Y. Aug. 1, 2006) .......................... 18, 34

*Ewald v. Nat'l City Mortg. Co. & Samuel I. White, P.C. (In re Ewald)*,
   298 B.R. 76 (Bankr. E.D. Va. 2002) ..................................... 26

*Goldstein v. Delgratia Mining Corp.*,
   176 F.R.D. 454 (S.D.N.Y. 1997) ........................................... 30

*Goodman v. Port Auth. of N.Y. and N.J.*,
   850 F. Supp. 2d 363 (S.D.N.Y. 2012) ................................... 17

*Gray v. Hirsch*,
   230 B.R. 239 (S.D.N.Y. 1999) .............................................. 35

**Pages(s)**

*In re Ampal-Am. Israel Corp.*,
545 B.R. 802 (Bankr. S.D.N.Y. 2016) ............................................................ 30, 31

*In re Apollo Molded Prods.*,
83 B.R. 189 (Bankr. D. Mass. 1988) ...................................................................... 25

*In re Bidermann Indus. U.S.A., Inc.*,
200 B.R. 779 (Bankr. S.D.N.Y. 1996) ................................................ 12, 32, 33, 34

*In re Chateaugay Corp.*,
201 B.R. 48 (Bankr. S.D.N.Y. 1996) ...................................................................... 28

*In re Chemtura Corp.*,
No. 09-11233 (REG), 2010 WL 4638898 (Bankr. S.D.N.Y. Nov. 8, 2010) ........... 28

*In re Cicale*,
No. 05-14462 (AJG), 2007 WL 1893301 (Bankr. S.D.N.Y. June 29, 2007) ........... 26

*In re Engel*,
246 B.R. 784 (Bankr. M.D. Penn. 2000) ................................................................. 31

*In re FPSDA I, LLC*,
No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ......... 11, 12, 33, 35

*In re Lazarus Burman Assocs.*,
161 B.R. 891 (Bankr. E.D.N.Y. 1993) ..................................................................... 28

*In re Lyondell Chem. Co.*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) ..................................................................... 12

*In re SDNY 19 Mad Park, LLC*,
No. 14-11055 (ALG), 2014 WL 4473872 (Bankr. S.D.N.Y. Sept. 11, 2014) .......... 12

*In re Third Eighty-Ninth Assocs.*,
138 B.R. 144 (S.D.N.Y. 1992) ................................................................................ 13

*In re United Health Care Org.*,
210 B.R. 228 (S.D.N.Y. 1997) ..................................................................... 12, 13, 25

*Pabian v. Pabian*,
469 So.2d 189 (Fla. Ct. App. 1985) ........................................................................ 11

*Pfizer, Inc. v. Styrker Corp.*,
348 F. Supp.2d 131 (S.D.N.Y. 2004) ...................................................................... 17

*Platt v. Russek*,
921 So.2d 5 (Fla. Ct. App. 2004) ................................................................. 10, 26, 27

**Pages(s)**

*PS Capital, LLC v. Palm Springs Town Homes, LLC*,
 9 So.3d 6433 (Fla. Ct. App. 2009) ................................................................... 10, 11

*Queenie, Ltd. v. Nygard Int'l*,
 321 F.3d 282 (2d Cir. 2003) ................................................................................. 15

*Stogniew v. McQueen*,
 656 So.2d 917 (Fla. 1995) .................................................................................... 15

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
 803 F.2d 61 (2d Cir. 1986) ................................................................................... 11

*Trs. of Sickness and Accident Fund of Local One-L v. Philips Winson, Inc.*,
 No. 00-cv-9554 (MHD), 2005 WL 273017 (S.D.N.Y. Feb. 3, 2005) ..................... 11

*Valentine v. Metropolitan Life Ins. Co.*,
 No. 85-3006 CSH, 2004 WL 2496074 (S.D.N.Y. Nov. 4, 2004) ........................... 29

*Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*,
 945 F. Supp. 603 (S.D.N.Y. 1996) ....................................................................... 33

**Statutes**

11 U.S.C. § 362(a) ...................................................................................... 9, 13

Fla. Stat. Ann. § 768.72 ............................................................................... 15, 26

1.      Defendant Terry G. Bollea respectfully submits this memorandum of law in

opposition to Debtor Gawker Media, LLC's ("Debtor") Motion for a Preliminary Injunction

and/or Extension of the Automatic Stay (the "Motion") as it pertains to the matter captioned,

*Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir., Pinellas Cty.) (the

"Bollea Litigation").

## PRELIMINARY STATEMENT

2.      Mr. Bollea holds a valid and enforceable $140.1 million final judgment.  He

wants the judgment to be paid, and he understands that the auction of Debtor's assets under the

supervision of this Court furthers that goal.  While Mr. Bollea has no interest in impeding the

sale of Debtor's assets, he does not believe that non-debtor, intentional tortfeasors should be

entitled to a stay of execution without either filing for personal bankruptcy protection or

complying with Florida law requiring good and sufficient security to stay execution pending

appeal.

3.      Debtor's Motion, which purports to be about protecting Debtor's going business

and pending auction process, actually is part of ongoing improper efforts by its founder and sole

Manager, Nick Denton, to protect himself at the expense of Debtor (which has paid for Mr.

Denton's personal bankruptcy counsel) and its creditors.  Through Debtor's Motion, Mr. Denton

is trying to use this Court's extraordinary equitable powers to shield himself and Debtor's former

employee, Alfred J. Daulerio, from the typical burdens attendant to being a judgment debtor,

such as limitations on dissipation of assets and posting security to stay execution.

4.      At its core, Debtor's Motion is a transparent effort to protect Mr. Denton from

having to file for personal bankruptcy.  Debtor's motion papers candidly acknowledge that he

would likely file for personal bankruptcy absent the extraordinary relief he seeks here.  And,

astonishingly, in the week before filing for bankruptcy, Debtor or one of its affiliates made a

"loan" to Mr. Denton – for the express purpose of paying for **Mr. Denton's personal bankruptcy counsel**. This apparently uncollateralized "loan" was made at a time when Debtor and its affiliates were negotiating a loan for themselves, with an effective interest rate approaching 30%.

5.     Debtor's effort to protect its Manager, Mr. Denton, comes at great prejudice to Mr. Bollea, who was awarded $140.1 million judgment as a result of what a jury concluded were tortious acts committed by Debtor, Mr. Denton, and their co-defendant, Mr. Daulerio, with intent to harm Mr. Bollea. Debtors' Motion seeks the extraordinary relief of preventing Mr. Bollea, a judgment creditor, even from obtaining security for his judgment by establishing liens against Messrs. Denton's and Daulerio's real and personal property and obtaining priority over subsequent creditors – even though, earlier on the same day that Debtor filed for bankruptcy protection, Debtor and Mr. Denton (and co-defendant Daulerio) represented to the Florida court that they were willing to provide such security.

6.     Mr. Bollea agreed to accept a stay of execution of the Florida judgment based on Messrs. Denton and Daulerio's pledge of shares, and the Florida court, in an oral ruling from the bench, granted the motion to stay execution based on the pledge of shares. But before the Florida court could enter the written stay order, Debtor came to this Court and obtained a temporary restraining order based on representations that "as of *today*, the $140.1 million of judgments in the [Bollea Litigation] against Gawker Media, Mr. Denton and Mr. Daulerio may be executed"; Mr. Bollea "refused to agree to even a brief temporary stay of execution of the judgment"; and the Florida court "denied Gawker Media's request to post stock or alternative collateral in lieu of" bonds. Each of these representations was false, and the Court should deny Debtor any relief on the basis of unclean hands alone.

2

7.     Assuming *arguendo* that the Court will allow Debtor to seek relief in equity, the Motion still fails on its merits.

8.     First, the Denton-controlled Debtor bases its current motion in part on claims that injunctive relief is necessary to protect the estate because "Mr. Denton is fully indemnified by Debtor for any fees, damages or other losses he suffers in [the Bollea Litigation and other litigation] pursuant to broad indemnification provisions in three separate documents:" (i) an indemnity agreement between Mr. Denton and one of Debtor's affiliates; (ii) the operative articles of association of that affiliate; and (iii) Debtor's operative operating agreement. Debtors' assertion of its indemnification obligations – based on two documents to which Debtor is not even a party and a third document that expressly disavows indemnification for misconduct and gross negligence – violates Debtor's fiduciary duties to its creditors. A responsible debtor not controlled by Denton would be contesting any indemnification obligation, not proclaiming a non-existent one.

9.     Second, Debtor cannot satisfy the elements necessary to justify the issuance of a preliminary injunction. Proceeding with the Bollea Litigation against non-debtors, Messrs. Denton and Daulerio, will not irreparably harm the estate because (i) it does not pose a risk of collateral estoppel; (ii) Debtor has no indemnity obligations to Messrs. Denton and Daulerio in light of the jury finding of their intentional torts; and (iii) Mr. Denton is not so essential to the day-to-day business or the reorganization process that he should be able to avoid the consequences of his tortious actions because Debtor has retained the services of many professionals to assist itself through the bankruptcy and sale process while Mr. Denton is spending his time blogging, Tweeting and providing interviews. Moreover, the balance of hardships and public interest favor denying Debtor's motion as Debtor's requested relief would

3

leave Mr. Bollea's judgment against Messrs. Denton and Daulerio unprotected and reward

Debtor further for misrepresentations to this Court.

10.    Third, there are no unusual circumstances justifying an extension of the automatic

stay to Messrs. Denton and Daulerio.  Under well-settled law, the stay cannot be extended to

joint tortfeasors such as Messrs. Denton and Daulerio.  In any event, neither of the other factors

for an extension of the automatic stay are present:  Messrs. Denton and Daulerio do not have an

absolute right to indemnity from Debtor and continuing the Bollea Litigation against the non-

debtor defendants will actually help resolve the bankruptcy because, for all intents and purposes,

the bankruptcy cannot conclude until the Bollea Litigation is resolved.

11.    At bottom, Debtor, which is controlled by its manager, Mr. Denton, filed this

motion to serve Mr. Denton's, not Debtor's, interests while at the same time offering zero

protection to Mr. Bollea – the victim of Mr. Denton's intentionally tortious and malicious

conduct.  There is no justification for the extraordinary relief Mr. Denton seeks, and the Court

should deny Debtors' Motion.

## STATEMENT OF FACTS

### *A Jury Finds that Debtor and the Two Individual Co-Defendants Intentionally Harmed Mr. Bollea and Award Him $140.1 Million in Compensatory and Punitive Damages.*

12.    In October 2012, Debtor, Mr. Denton and Mr. Daulerio posted on Gawker.com

secretly and illegally recorded video footage of Mr. Bollea engaging in sexual activity in a

private bedroom.  Then, they refused Mr. Bollea's pleas to remove the video.  With no other

recourse to protect his privacy, on October 15, 2012, Mr. Bollea sued Debtor, Mr. Denton, Mr.

Daulerio, and a number of other defendants.  Mr. Bollea's claims against Debtor and Messrs.

Denton and Daulerio proceeded to trial, which began on March 1, 2016.  *See* Declaration of

Shane B. Vogt in Support of Defendant Terry Bollea's Opposition to the Motion (the "Vogt

Declaration" or "Vogt Decl.") ¶¶ 2-3.  Mr. Bollea asserted the following causes of action:  (1)

publication of private facts; (2) invasion of privacy based on intrusion; (3) violation of Florida's

common law right of publicity; (4) intentional infliction of emotional distress; and (5) violation

of Florida's Security of Communications Act.  *Id.* ¶ 2.

13.    On March 18, 2016, the jury returned a verdict for Mr. Bollea on all counts and

awarded $115 million in compensatory damages against Debtor and Messrs. Denton and

Daulerio (collectively, with Debtor, the "Judgment Debtors").  *Id.* ¶ 5; Ex. A (March 18, 2016

Trial Tr. 3834:10-3837:2).[1]  Mr. Denton and Debtor's President and General Counsel, Heather

Dietrick, attended every day of the trial.  Vogt Decl. ¶ 4.

14.    The jury also found that *each* of the Judgment Debtors acted with the "specific

intent to harm [Mr. Bollea] when they posted the video on the Internet," and thus punitive

damages against each of them were warranted.  *Id.* ¶ 5; Ex. A (March 18, 2016 Trial Tr. 3837:3-

20); *see also* Ex. B (Verdict Form at 10) (asking under the section for punitive damages, "[d]id

Defendant(s) have a specific intent to harm Plaintiff when they posted the VIDEO on the

Internet?").  On March 21, 2016, the jury awarded Mr. Bollea an additional $25.1 million in

punitive damages divided as follows: $15 million against Debtor, $10 million against Mr.

Denton, and $100,000 against Mr. Daulerio.  *Id.* ¶ 6; Ex. C (Final Judgment ¶¶ 2-4); Ex. S

(Punitive Damages Verdict Form).  The jury awarded a fraction of the compensatory damages

award in punitive damages based on Judgement Debtors' respective net worth.  Vogt Decl. ¶ 6.

15.    Subsequently, the Judgment Debtors moved for a judgment notwithstanding the

verdict, a new trial, or a reduction of the award against them.  *Id.* ¶ 7.  On May 25, 2016, the

Court denied the Judgment Debtors' post-trial motions and specially set a hearing on June 10,

---

[1] All referenced exhibits are attached to the Vogt Declaration.

2016 to address Judgment Debtors' request to be heard concerning the amount of the bond

necessary to stay execution.  *Id.* ¶ 8.

***The Judgment Debtors Disavow Their Own Proposal to Secure the Judgment Pending Appeal,
and Debtor Instead Files for Bankruptcy.***

16.      On the afternoon of June 9, 2016, Judgment Debtors filed a Motion for Stay of

Execution Pending Appeal (the "Motion for Stay").  *Id.* ¶ 9.  In their Motion for Stay, Judgment

Debtors offered to pledge Mr. Denton's GMGI stock as security to stay execution as to all of the

defendants. Ex. T (Motion for Stay at 9).  Specifically, the Motion for Stay represents: "Mr.

Denton is prepared to provide security that Plaintiff's expert valued at $81 million . . . [and] . . .

the Court should exercise its discretion to accept Mr. Denton's shares as security in exchange for

staying execution of the judgment against Defendants pending their appeal."  *Id*.  In support, Mr.

Denton filed an affidavit dated June 9, 2016 which states "I respectfully request that the Court

deem that full ownership interest [in GMGI] to be adequate security to stay the judgment

pending appeal."  Ex. U (Denton Affidavit in Support of Motion for Stay ¶ 9).

17.      At the hearing on June 10, 2016, the Judgment Debtors represented that, if they

were required to post a bond, they would "immediately face financial ruin," which would

"ensure that there would be nothing for [Mr. Bollea] to collect."  Ex. D (June 10, 2016 Hearing

Tr. 9:3-10:8).  Thus, to avoid such "ruin," Messrs. Denton and Daulerio represented to the Court

that they would pledge their shares in Gawker Media Group, Inc. ("GMGI") – the Debtor's

parent company that has also since filed for bankruptcy – as security for the judgment pending

the disposition of the appeals.  *Id.* at 7:23-8:4.  They orally represented that the shares were

worth over $81 million under Mr. Bollea's expert's valuation calculation from the trial.  *Id.* at

15:19-16:4.  In this Court, Debtor has taken a completely irreconcilable position, claiming that

Mr. Denton "has minimal assets and cannot offer significant sources of recovery."  Debtor Br. ¶

60.    Unbeknownst to Mr. Bollea and the Florida court at that time, Debtor had already signed its

bankruptcy petition (on June 9, 2016) and voted to sell of the assets of Debtor, Kinja and GMGI.

*See* Ex. E (Gawker Media Bankruptcy Petition at 4-5); Ex. H (GMGI Bankruptcy Petition at 5).

Judgment Debtors never advised the Florida court that the bankruptcy filing was imminent. *See*

*generally* Ex. D (June 10, 2016 Hearing Tr.).

18.    In addition to pledging the shares, the Judgment Debtors told the court that they

"would be willing to undertake whatever discovery" was necessary for Mr. Bollea and the court

to understand their financial picture. *Id.* at 18:4-25.

19.    In its Motion, Debtor claims, "[Mr. Bollea] has refused to agree to even a brief

temporary stay of execution of the judgments." Debtor Br. ¶ 16. This is simply not true. In fact,

Mr. Bollea agreed to the Judgment Debtors' proposal that the execution on the judgment be

stayed in exchange for Mr. Denton's and Mr. Daulerio's pledged shares in GMGI. Ex. D (June

10, 2016 Hearing Tr. 26:8-17) (Mr. Bollea's Counsel: "So I think what we were planning to do,

Your Honor – and we actually worked a lot on this after we received the motion yesterday, is we

had a propos[al] for Gawker, which was a temporary stay of execution. They do what they have

already promised to do today, which is they pledge Mr. Denton's shares. They pledge his

options. They pledge Mr. Daulerio's shares.").

20.    However, Mr. Bollea did request that there be some reasonable conditions

associated with the pledge so as to ensure their transfer and value. First, Mr. Bollea asked that

the shares, as well as all necessary authorizations and approvals to transfer those shares to Mr.

Bollea, be held in trust by Mr. Bollea's attorneys and that they be endorsed or structured so that

they would immediately vest upon the dismissal of any appeal or the affirmance of any final

judgment. *Id.* at 26:24-27:12. Second, Mr. Bollea asked that the Judgment Debtors fully comply

with the non-monetary portions of the final judgment, including discovery in aid of execution

that, as noted above, the Judgment Debtors had represented they were willing to undertake. *Id.*

at 27:13-22. Third, Mr. Bollea sought protection against the dissipation of assets, requesting that

there "be no sale of all or substantially all of the assets or the stock of Gawker Media, [GMGI],

or Kinja while these issues are pending," *id.* at 30:8-12, and that except for "ordinary living

expenses and things of that nature," the Judgment Debtors not "dissipate any assets that may

otherwise be subject to execution . . . without coming back to the Court for prior approval." *Id.*

at 29:14-22.

21.      The Judgment Debtors rejected those conditions – *some of which they had*

*specifically proposed*. *Id*. at 37:24-51:13. In its Motion, Debtor flatly represented to this Court

that the Florida court "denied Gawker Media's request to post stock or alternative collateral in

lieu of the bonds." Debtor's Br. ¶ 20.[2] This is patently untrue. The Florida court agreed that the

Judgment Debtors could pledge their shares as security for the judgment. Ex. D (June 10, 2016

Hearing Tr. 52:7-18) ("The Court will accept the pledging of the – of GMGI's stock shares . . .").

In addition, over the Judgment Debtors' objections, the Florida court agreed to impose Mr.

Bollea's requested conditions, reasoning that "if you don't have conditions that go to that pledge,

what prevents – what assurances are there, other than a pledge, which by itself is sort of

meaningless." *Id.* at 44:14-23. The Florida court thus told the parties it was going to "grant the

defendant[s'] motion to stay execution of the judgment pending appeal with the conditions that

have been outlined" and requested a revised written order adding Mr. Daulerio's shares. *Id.* at

52:7-10, 53:19-21.

---

[2] Debtor's Brief erroneously includes two Paragraph 20s. This Paragraph 20 appears on page 15 of Debtor's Brief directly after Paragraph 35.

22.    Rather than accept the conditional version of the very relief they asked for, Debtor declared bankruptcy within hours of the June 10 hearing.  Debtor's Manager is Mr. Denton.  *See* Ex. K (Gawker Media Operating Agreement § 1.01).

23.    Debtor, which sought and received an extension of time to perform the most basic task of filing its financial statements, was prepared to expend enormous effort to meet its goal of using the bankruptcy process to protect Mr. Denton's personal interests.  It immediately filed a complaint and motion papers seeking a temporary restraining order to extend the protection of its bankruptcy (without the same burdens) to Messrs. Denton and Daulerio.  Debtor obtained this temporary restraining order *ex parte* after representing to the court that "as of *today*, the $140.1 million of judgments in the *Bollea* [action] against Gawker Media, Mr. Denton, and Mr. Daulerio may be executed" and that "[i]t is our firm belief that upon notice of this adversary action, Mr. Bollea will seek to accelerate execution of any actual or potential judgments against Mr. Denton or Mr. Daulerio."  Declaration of Michael S. Winograd in Support of the Motion, dated June 10, 2016 (the "Winograd Declaration") ¶¶ 6, 9 (emphasis in original).  These statements, too, were false.  Debtor chose not to inform this Court of the Florida court's decision to grant the stay of execution earlier that same day.

24.    In addition, on the heels of Debtor's bankruptcy, GMGI – the very shares of which were the subject of Messrs. Denton's and Daulerio's proposed pledge – filed for bankruptcy.  In fact, GMGI had voted to seek bankruptcy protection before the June 10, 2016 hearing.  *See* Ex. H (GMGI Bankruptcy Petition at 5, 7).  Accordingly, the shares that Messrs. Denton and Daulerio agreed to pledge were worth far less than the $81 million valuation the Judgment Debtors represented to the Florida court.  *Accord* Debtor Br. ¶ 60 (representing that Mr. Denton "has minimal assets and cannot offer significant sources of recovery").

***Debtors Prepare For Bankruptcy By Making A Loan to Nick Denton.***

25.     Finally, Debtor also took another very unusual step in preparing for its

bankruptcy.  During the week ending June 10, 2016, at the same time that it was negotiating a

DIP loan that has an effective interest rate near 30%, either Debtor or one of its affiliates made a

payment of $200,000 "in the form of a loan to the CEO for purposes of paying for personal

bankruptcy counsel."  Ex. G (GMGI 13 Week Cash Flow Report at 3) (listing non-operational

disbursements).  The sole disclosure we found of this "loan" was buried in a bullet point to an

exhibit to Debtors' motion for DIP financing.  *Id.*  This loan was concealed from the Florida

Court.

## ARGUMENT

26.     In its Motion, Debtor seeks to extend the automatic stay of the Bollea Litigation

to its non-debtor joint tortfeasors Messrs. Denton and Daulerio *without* offering any protection to

Mr. Bollea – the victim of their intentional torts.  Mr. Bollea is not just a plaintiff in litigation

against the non-debtors; he is a judgment creditor who holds a legitimate and collectable claim

against Messrs. Denton and Daulerio.  Under Florida law, a court "should not grant a stay that

prejudices a judgment holder's realistic opportunities to collect upon the judgment or that

prevents a creditor from establishing a lien and priority to collect upon the judgment."  *Platt v.

Russek*, 921 So.2d 5, 8 (Fla. Ct. App. 2004).  Indeed, judgment debtors are not entitled to a

"'free' or unbounded stay for an indefinite period."  *PS Capital, LLC v. Palm Springs Town

Homes, LLC*, 9 So.3d 643, 646 n.3 (Fla. Ct. App. 2009).  Accordingly, Florida law mandates

protection of the interests of judgment creditors like Mr. Bollea.  *Platt*, 921 So.2d at 8 (holding

that court cannot stay a judgment pending appeal "without imposing *any* conditions upon the

judgment debtor" (emphasis in original)).  Specifically, a judgment debtor must post a bond

where there is a stay of execution of the final judgment as "necessary to protect the judgment

creditor from losses, costs, and legal expenses that might ensue as a result of the delay." *PS Capital*, 9 So.3d at 646; *see also Platt*, 291 So.2d at 8 ("Without a full bond, the trial court should not grant a stay that prevents a judgment holder from obtaining priority over subsequent creditors."); *Pabian v. Pabian*, 469 So.2d 189, 191 (Fla. Ct. App. 1985) ("[T]he guiding principle in setting a supersedeas bond is to protect the party in whose favor judgment was entered by assuring its payment in the event the judgment is affirmed on appeal"). As discussed below, Debtor has not made a sufficient showing as to why the stay should be extended to Messrs. Denton and Daulerio at all, much less without affording any security to Mr. Bollea. Indeed, none of the cases upon which Debtor relies holds that a stay could or should be extended to actual judgment debtors.

27.    Congress chose to apply the automatic stay of judicial proceedings only to actions against the debtor. *See* 11 U.S.C. § 362(a). Indeed, "[i]t is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants." *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986); *see also Trs. of Sickness and Accident Fund of Local One-L v. Philips Winson, Inc.*, No. 00-cv-9554 (MHD), 2005 WL 273017, at *2 (S.D.N.Y. Feb. 3, 2005) ("It is well settled that the automatic stay under section 362(a) of the Code ordinarily applies only to the debtor and not to co-defendants.").

28.    Under certain "unusual circumstances" a court may extend the stay to non-debtors. *See In re FPSDA I, LLC,* No. 10-75439, 2012 WL 6681794, at *7 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012). "'[U]nusual circumstances' exist where there is such an identify of interest between the debtor and the non-debtor defendant that the debtor is the true, real party in interest, and a judgment against the third party will, in effect, be a judgment or a finding against the debtor." *In re Bidermann Indus. U.S.A., Inc.,* 200 B.R. 779, 783-84 (Bankr.

11

S.D.N.Y. 1996).  Conversely, "unusual circumstances do not exist where the debtor's insider is

independently liable, the right to indemnity is not absolute, and the continuation of the suit will

not interfere with the bankruptcy."  *Id.* at 784.

29.    A court could also effectively extend the stay by preliminarily enjoining actions

against a non-debtor pursuant to section 105(a) of the bankruptcy code.  *See In re Lyondell*

*Chem. Co.*, 402 B.R. 571, 587 (Bankr. S.D.N.Y. 2009).  "[E]xtensions of the [automatic] stay to

protect non-debtor parties are the exception, not the rule, and are generally not favored."  *FPSDA*

*I*, 2012 WL 6681794, at *8.  Moreover, "[t]he grant of a motion staying an action against a

debtor's principal . . . is extraordinary relief."  *In re SDNY 19 Mad Park, LLC*, No. 14-11055

(ALG), 2014 WL 4473873, at *2 (Bankr. S.D.N.Y. Sept. 11, 2014).

30.    In considering whether to enjoin an action against a non-debtor, courts consider

the following:

> The first requirement is that there must be danger of imminent,
> irreparable harm to the estate or the debtor's ability to reorganize.
> Second, there must be a reasonable likelihood of a successful
> reorganization.  Third, the court must balance the relative harm as
> between the debtor and the creditor who would be restrained.
> Fourth, the court must consider the public interest; this requires a
> balancing of the public interest in successful bankruptcy
> reorganizations with competing social interests.

*In re United Health Care Org.*, 210 B.R. 228, 233 (S.D.N.Y. 1997) (internal quotation marks and

citations omitted); *see also Lyondell*, 402 B.R. at 588-89 (applying same factors).

31.    There is nothing extraordinary here that entitles the intentional tortfeasors Messrs.

Denton and Daulerio to the benefit of deferring satisfaction of a judgment against them while

leaving the victim of their tort, Mr. Bollea, without the protections he is afforded under Florida

law.

32.    First, Debtor has not satisfied the standards for a preliminary injunction.  Debtor
has failed to establish an imminent threat to the property or the proposed sale.  Mr. Denton is not
nearly as "indispensable" as Debtor pretends, and the auction process has been in a no-shop
period.  Instead, the balance of harms and the public interest weigh heavily against an injunction
that would leave a judgment creditor, Mr. Bollea, with no protection whatsoever against the
dissipation of assets by those who committed intentional torts against him.

33.    Second, this case does not present the "unusual circumstances" necessary to
extend the stay that were described in *Bidermann*:  the Judgment Debtors are jointly and
severally liable for the $115 million compensatory component of the judgment; their right to
indemnity from Debtor is non-existent; and the extension of judgment security to Mr. Bollea will
not interfere with the bankruptcy.

34.    Accordingly, the Court should deny Debtor's motion to extend the stay to non-
debtors who have been adjudged to be intentional tortfeasors.  Equity stands with the victim of
an intentional tort, not those who commit it.

## I.    Debtor Has Not Satisfied the Standard for a Preliminary Injunction.

35.    Debtor has not satisfied the standard for a preliminary injunction.  In considering
a motion for a preliminary injunction, a bankruptcy court will consider whether (1) there is a
threat of imminent, irreparable harm to the estate or the ability to reorganize in the absence of an
injunction; (2) there is a likelihood of successful reorganization; (3) the balance of harms favors
the debtor; and (4) an injunction would serve the public interest.  *See United Health Care*, 210
B.R. at 233.  Debtor has the burden of establishing these factors.  *See In re Calpine Corp.*, 354
B.R. 45, 49 (Bankr. S.D.N.Y. 2006) ("When the stay does not apply automatically, the debtor
then bears the burden of demonstrating that circumstances warrant extending the stay." (citing *In
re Third Eighty-Ninth Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992)))).  Here, the factors do not

weigh in favor of enjoining Mr. Bollea from collecting the judgment against Messrs. Denton and

Daulerio, especially without their providing Mr. Bollea with protection against their dissipation

of assets.[3]

**A.    Allowing Mr. Bollea to Obtain Security for His Judgment against Messrs. Denton and Daulerio Will Not Cause Imminent, Irreparable Harm to the Estate or the Sale Process.**

36.    Debtor argues that unless Mr. Bollea is enjoined from executing his judgment

against Messrs. Denton and Daulerio, the estate will be imminently, irreparably harmed because

(1) Debtor will bear the risk of collateral estoppel; (2) Debtor's property will be harmed through

its indemnity obligations; and (3) Mr. Denton will be distracted from his responsibilities to

Debtor and its reorganization.  *See* Debtor Br. ¶¶ 49-57.  Debtor is wrong; none of these

concerns apply here.

**1.    Execution of Judgment Does Not Carry a Collateral Estoppel Risk.**

37.    Debtor claims that "[a]llowing the Actions to proceed against Mr. Denton and the

Individual Defendants without the participation of the Debtor would . . . not only severely

prejudice the Debtor in any eventual defense of the claims against it, but could collaterally estop

its defense altogether."  Debtor Br. ¶ 51.  While Debtor implies that collateral estoppel would be

in addition to other harms, collateral estoppel is the only potential harm Debtor identifies.  *Id.*  It

is not applicable here.

38.    "[T]he essential elements [of collateral estoppel] require that the parties and

issues be identical, and that the particular matter be fully litigated and determined in a contest

which results in a final decision of a court of competent jurisdiction."  *Dadeland Depot, Inc. v.*

---

[3] Mr. Bollea does not contest that Debtor may likely "reorganize" itself through an asset sale – one prong of the preliminary injunction test.  However, as discussed below, allowing Mr. Bollea to protect his interest in the judgment against Messrs. Denton and Daulerio will not harm the estate or disrupt any reorganization plans.  In fact, as the key precipitating factor in Debtor's bankruptcy, conclusion of the Bollea Litigation is necessary for the resolution of the bankruptcy.

*St. Paul Fire and Marine Ins.*, 945 So.2d 1216, 1235 (Fla. 2006) (internal quotation marks and citation omitted).  Because the trial in the Bollea Litigation has concluded, all that remains is the appeal and Mr. Bollea's collection of the judgment against Messrs. Denton and Daulerio (with his ability to collect against Debtor stayed pursuant to 11 U.S.C. § 362(a)).  Debtor does not explain how continuing with either of these phases of the Bollea Litigation could possibly create a risk of collateral estoppel for Debtor because there is no such risk.

39.     Simply put, the potential appeal does not raise collateral estoppel issues.  Debtor has indicated that it intends to pursue the appeal with Messrs. Denton and Daulerio, and Debtor's participation would eliminate any collateral estoppel concerns by definition.  Moreover, even if Debtor did not participate in the appeal, there would be no collateral estoppel risk because Debtor would not be a party to the appeal; indeed, its right to appeal the judgment is stayed and thereby preserved.  *See Stogniew v. McQueen*, 656 So.2d 917, 919 (Fla. 1995) (explaining that Florida has traditionally required mutuality among the parties for the doctrine of collateral estoppel to apply).  In other words, an appeal that did not involve Debtor would only consider the judgments against Messrs. Denton and Daulerio.[4]  "If such apprehension could support application of the stay, there would be vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants."  *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003) (noting that it was unable to locate "any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision").

---

[4] For the same reason, there would be no collateral estoppel issue for Debtor with regard to enforcement proceedings against Messrs. Denton or Daulerio as decisions affecting rights to collect against them would not have a carry-over effect on collection issues relating to Debtor's assets.

2.    Mr. Bollea's Security for the Assets of Messrs. Denton and Daulerio And
      Collection of the Judgment from them Would Not Harm the Estate.

40.    Debtor also argues that allowing Mr. Bollea to collect from Messrs. Denton and

Daulerio could be a drain on Debtor's estate because of Debtor's indemnity obligations to Mr.

Denton and that Debtor's employees may feel "chill[ed]" if these intentional tortfeasors are not

indemnified.  Debtor Br. ¶¶ 52-54.  These arguments fail with respect to the Bollea Litigation

because (i) the only applicable indemnification agreement, which applies only to Mr. Denton,

precludes the indemnification of misconduct or gross negligence, of which Mr. Denton has been

adjudged guilty; (ii) indemnification of Mr. Denton or Mr. Daulerio for compensatory damages

would simply shift a claim from Mr. Bollea to another creditor; and (iii) the hypothetical chilling

effect on employees cannot create an indemnification obligation that does not exist, nor does it

defeat the legitimate rights of a judgment creditor.

41.    Debtor flatly asserts – without any doubt – that it has an indemnification

obligation to Mr. Denton under three documents:  "(i) an Indemnity Agreement, dated as of

December 31, 2009, by and between GMGI and Mr. Denton (the 'Indemnity Agreement'); (ii)

the Fourth Amended and Restated Memorandum and Articles of Association of GMGI (the

'GMGI Articles of Association'); and (iii) the Second Amended and Restated Operating

Agreement of Gawker Media, dated as of August 21, 2012 (the 'Gawker Media Operating

Agreement')."  Debtor Br. ¶ 38.  But Debtor is not a party to two of those agreements – the

Indemnity Agreement and the GMGI Articles of Association.  *See* Ex. I (Indemnity Agreement)

("This Indemnity Agreement . . . is made as of December 31, 2009 by and between [GMGI] . . .

and Nicholas Denton ('Indemnitee').");  Ex. J (GMGI Articles of Association ¶ 45.1) ("Every

Director and officer of the Company [defined as GMGI] . . . shall be indemnified . . . .").

Accordingly, Debtor's alleged indemnity obligations to Mr. Denton cannot arise from these two

agreements, notwithstanding that the Denton-controlled Debtor has asserted that it has obligations to Mr. Denton under them.

42.    Debtor also has no indemnity obligations to Mr. Denton for the Bollea Litigation under the Gawker Media Operating Agreement.  As Debtor admits, the "Gawker Media Operating Agreement indemnifies Mr. Denton for loss or damages arising from errors in judgment or acts or omissions, *as long as they do not constitute misconduct or gross negligence*."  Debtor Br. ¶ 39 (emphasis added); *see also* Ex. K (Gawker Media Operating Agreement § 3.04(b)) ("The Company . . . shall indemnify and defend the Member, Manager and the officers . . . so long as such conduct shall not constitute willful misconduct or gross negligence.").  The jury in the Bollea Litigation found Mr. Denton liable for several intentional torts, including the intentional infliction of emotional distress.  In addition, the jury's award of punitive damages against Mr. Denton further confirms that his actions constituted intentional misconduct and/or gross negligence.  *See* Fla. Stat. Ann. § 768.72(2) ("A defendant may be held liable for punitive damages only if the trier of fact based on clear and convincing evidence, finds that the defendant was *personally* guilty of *intentional misconduct or gross negligence*." (emphasis added)).  Indeed, the jury expressly found that Mr. Denton had "a specific intent to harm [Mr. Bollea] when [he] posted the video on the Internet."  Ex. A (March 18, 2016 Trial Tr. 3837:12-18).  Accordingly, Mr. Denton is not entitled to indemnification from Debtor for the judgment in the Bollea Litigation under the Gawker Media Operating Agreement.[5]

---

[5] To the extent Debtor claims a "policy and practice" of indemnifying employees, the jury findings of intentional torts by Messrs. Denton and Daulerio preclude indemnification for the Bollea Litigaiton. Under New York law, "indemnification agreements are unenforceable as violative of public policy to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury."  *Goodman v. Port Auth. of N.Y. and N.J.*, 850 F. Supp. 2d 363, 390 (S.D.N.Y. 2012) (citing *Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985)); *see also Pfizer, Inc. v. Styrker Corp.*, 348 F. Supp.2d 131, 145 (S.D.N.Y. 2004) ("New York prohibits indemnification for punitive damages as against public policy.") (citing *Biondi v. Beekman Hill House Apt. Corp.*, 731 N.E.2d 577, 579 (N.Y. 2000)).  Accordingly, because Mr. Bollea's claims against Mr. Denton were for intentional torts and the judgment against Mr. Denton stems from what the jury found was intentional harm caused

43.     Even if Debtor had indemnification obligations to Messrs. Denton or Daulerio,

Mr. Bollea's collection of the compensatory portion of the judgment against the individuals

would not affect the total amount of unsecured debt that Debtor owes to its creditors.  Rather, for

every dollar that Mr. Bollea collects from Mr. Denton or Mr. Daulerio to satisfy the

compensatory portion of the judgment, Mr. Bollea's claim against Debtor is reduced by that

amount, and Mr. Denton or Mr. Daulerio would presumably have an indemnification claim in

that amount against Debtor.  In other words, Debtor's purported indemnification obligations

would not have any effect on the estate; it will simply shift Debtor's liability to a different

creditor – one who has been adjudged to be an intentional tortfeasor, rather than his victim.[6]

44.     Finally, Debtor argues that "[i]f the automatic stay is not extended . . . it would

signal to all of the Debtor's employees that they may be left to litigate any such lawsuits alone,"

which could have a "grave chilling effect on the Debtor's work force, driving writers and editors

to leave the Debtor" and thereby adversely affect the value of Debtor and its prospects for a

successful reorganization.  *See* Debtor Br. ¶54.  With regard to the Bollea Litigation, however,

there is already a judgment that removes any indemnification obligations that Debtor may have

toward Messrs. Denton and Daulerio.  Moreover, Mr. Denton's own statements belie Debtor's

concerns.  On June 15, 2016, for example, Mr. Denton posted on Debtor's website a lengthy

missive about the future of Debtor's business in light of the bankruptcy in which he wrote, "the

---

to Mr. Bollea, Debtor cannot indemnify Mr. Denton or Mr. Daulerio for this judgment.  *See DeSouza v. PlusFunds Grp., Inc.*, No. 05-cv-5990 RCCJCF, 2006 WL 2168478, at *3 (S.D.N.Y. Aug. 1, 2006) (declining to extend stay to non-debtor codefendants who may be indemnified by debtor defendant because their liability could rest upon their own breaches of duty).

[6] Debtor makes no effort to disavow its purported indemnification obligation.  However, Debtor's plan is "to proceed with a sale of substantially all of the Debtor's assets *to preserve value for distribution to creditors*." Declaration of William D. Holden in Support of the Motion ¶ 27 (emphasis added).  Notably, one way to "preserve value for distribution to creditors" is to encourage Mr. Bollea to collect as much of the judgment from Messrs. Denton and Daulerio and then to challenge any claims for indemnification that they may have.  Debtor, instead, has simply acceded to their indemnification claims.  The fact that Debtor, whose Manager is Mr. Denton, has so readily conceded its indemnity obligations speaks volumes about its intention in this adversary proceeding – to protect Mr. Denton from the judgment without Mr. Denton having to file for personal bankruptcy.

18

default response of [Debtor's] writers when faced with a crisis is to write more;" "as long as [Debtor's audience] keep reading, we'll keep informing and engaging you around the issues you're passionate about;" and "it's business as usual."  Nick Denton, Here is the Good News.[7]
In addition, Debtor cites no authority for the proposition that the theoretical "chilling effect" on current employees is sufficient to trump Mr. Bollea's rights as a judgment creditor, nor should it. Indeed, any "chilling effect" would be extremely limited as it would only extend through the sale of the company, which Debtor aims to accomplish over the next several weeks.

3. <u>Mr. Denton Is Not So Indispensable that He Should Be Shielded from Satisfying the Judgment in the Bollea Litigation and Possible Personal Bankruptcy.</u>

45.    Finally, Debtor claims that Mr. Denton is "indispensable to the formulation, negotiation, and implementation of [its] plan" to sell its assets and that Mr. Denton is the "primary point of contact for both the Debtor's legal counsel and financial professionals working with the Debtor" in the bankruptcy.[8]  *See* Debtor Br. ¶¶ 56-57.  Although Mr. Denton has a role to play in the bankruptcy and planned sale of Debtor, Debtor's own papers and Mr. Denton's recent public statements and appearances belie Debtor's position that Mr. Denton should be shielded from any and all distractions, including Mr. Bollea's right to enforce a judgment resulting from Mr. Denton's own intentional torts.  Instead, Debtor's bankruptcy and potential sale are being guided by several retained professionals and corporate officers who are responsible for many of the matters for which Debtor claims Mr. Denton is indispensable.

a)    *Mr. Denton is not leading the Debtor's day-to-day operations in any event.*

---

[7] Available at http://gawker.com/here-is-the-good-news-1781980613.
[8] Debtor does not claim that Mr. Daulerio will play any role in the bankruptcy proceedings and therefore does not address this argument to enforcement of the judgment against him.

46.    Debtor makes a passing suggestion that denial of the stay would result in Mr. Denton being "distracted from leading Debtor's day-to-day operations. Debtor Br. ¶ 57. But, as Debtor detailed elsewhere in its motion papers, Mr. Denton does not lead Debtor's day-to-day operations. Each of Debtor's websites has its own editor-in-chief, who manage the editorial staff, including writes, and make editorial decisions with Debtor's executive Editor, John Cook, with some "input from Mr. Denton." *Id.* ¶¶ 23-24. Likewise, each of Debtors' five departments (sales, technology, editorial, legal, and operations) has its own head and can function on its own. *Id.* ¶ 23. Indeed, Mr. Denton was able to absent himself for the entire Bollea trial (along with debtor's president Ms. Dietrick) and the websites did not crash. Instead, Mr. Denton's role traditionally has been more strategic than day-to-day, as he is "responsible for developing, communicating and implementing the Company's go-forward business strategy and vision." *Id.* ¶ 29. And the strategic vision is now a sale that, as described below, will be implemented by others.

b)    *Debtor retained a chief restructuring officer who will have primary responsibility to manage the bankruptcy and sale.*

47.    Debtor argues that Mr. Denton is the "sole individual with the requisite knowledge of the company, its market, its plans for growth, and financial projections" to lead it through the bankruptcy. Debtor Br. ¶ 56. Debtor, however, has hired a Chief Restructuring Officer, William D. Holden. *See* Ex. L (First Day Declaration ¶ 1). Mr. Holden has more than 20 years of experience in "providing operational and strategic advisory services to companies facing complex financial and/or operational challenges." *Id.* ¶ 2. He is also "generally familiar with the Debtors'[9] capital structure, operation, business affairs, and books and records." *Id.* ¶ 5.

---

[9] Only Debtor brought this adversary proceeding. However, Debtor's parent company, GMGI, and affiliate, Kinja, have also filed for bankruptcy protection. GMGI and Kinja's bankruptcies are being jointly administered with

48.     As the Chief Restructuring Officer, Mr. Holden has "***primary responsibility***" for, among other things:

- The coordination and management of potential sales of Debtor's assets including negotiations with stakeholders and counterparties;

- The development of any business plan or proposed plan of reorganization;

- Oversight and approval of expenditures and cash payments; and

- Review of all materials distributed outside Debtor.

Ex. M (Opportune Engagement Letter at 2); *see also* Ex. N (CRO Motion ¶ 3).  In addition, Mr. Holden is an "Authorized Officer" of Debtor.  As a result, he has the power to manage Debtor throughout the bankruptcy process including, to "commence the process of marketing and selling the assets of the Company and its subsidiaries" and to "enter into an asset purchase agreement to sell the assets of the Company and its subsidiaries."  Ex. E (Gawker Media Bankruptcy Petition at 12); *see also generally id.* at 8-13.  In short, Mr. Holden not only has the same responsibilities in shepherding Debtor through the bankruptcy process for which Debtor claims Mr. Denton is "indispensable," but Mr. Holden – not Mr. Denton – in fact has "primary responsibility."

> c)     ***Debtor retained an investment bank to spearhead the sale of its assets.***

49.     Debtor also describes Mr. Denton as being "uniquely qualified to identify potential buyers, market the Debtor, and . . . negotiate a sale that will obtain the most value for the Debtor, its estate, and its creditors."  Debtor Br. ¶ 56.  But Debtor has retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), an investment banking firm, to do that very same thing.

50.     On May 16, 2016, Debtors retained Houlihan Lokey with a mandate "to explore the possibility of a sale of all or substantially all of the Debtors' assets, with the goal of

---

Debtor's bankruptcy.  Therefore, references to "Debtor*s*" are to the three debtor entities – Debtor (*i.e.*, Gawker Media, LLC), GMGI and Kinja.

maximizing return to the Debtors' estates in the event of a possible chapter 11 filing." Ex. P

(Sale Motion ¶ 12). Debtors chose Houlihan Lokey because of (1) Debtors' need for investment

banking advice; (2) "Houlihan's extensive experience and excellent reputation in providing

investment banking services in complex chapter 11 cases;" and (3) "Houlihan's market leading

Technology, Media and Telecom Group that provides extraordinary expertise and relationships

in the industry." Ex. O (Houlihan Lokey Application ¶ 14).

51.    Notwithstanding Debtor's claims in this motion, it is Houlihan Lokey that is

leading the sale efforts. Houlihan Lokey's responsibilities include:

- Analyzing and structuring potential transactions scenarios and the potential

  impact of those scenarios on the value of Debtors;

- Assisting Debtors in evaluating sales proposals; and

- Assisting Debtors with the structure and negotiation of any potential sale.

*Id.* ¶ 15.

52.    Debtors' claims about the unique nature of Mr. Denton's role also fly in the face

of the "Exclusive Agency" provision of the Houlihan Lokey engagement letter. *See* Ex. Q

(Houlihan Lokey Agreement § 2). Debtors' claim that "Mr. Denton is uniquely qualified to

identify potential buyers," Debtor Br. ¶ 56, rings particularly false because Debtor and its

management cannot initiate *any* discussions with a potential party without first informing

Houlihan Lokey. Ex. Q (Houlihan Lokey Agreement § 2). And Debtors' claim that Mr. Denton

is "uniquely qualified to . . . market the Debtor, and . . . negotiate a sale," Debtor Br. ¶ 56, is

likewise belied by Debtors' contractual obligation to "promptly inform Houlihan Lokey of such

inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest

in a Transaction and in any resulting negotiations." Ex. Q (Houlihan Lokey Agreement § 2).

53.     And not surprisingly it is Houlihan Lokey, not Mr. Denton, that has been at the forefront of the sale process.  Since being hired, Houlihan Lokey has successfully secured a stalking horse bid for Debtor of $90 million.  *See* Ex. P (Sale Motion ¶¶ 2, 13).  In addition, Houlihan Lokey identified five other potential buyers, one of whom submitted a term sheet and three of whom "expressed continued interest in participating in the process and Auction."  *Id.* ¶ 13.  Since then, press coverage "noting that Houlihan had been hired and suggesting the Debtors' assets were for sale, has generated additional inbound interest from strategic parties." *Id.*¶ 14.

54.     In sum, Houlihan Lokey will not only play an integral role in the sale of Debtor's assets, it has already been spearheading the process and by contract must take the lead role.  It is simply not the case that Mr. Denton is "uniquely qualified to identify potential buyers, market the Debtor, and . . . negotiate a sale that will obtain the most value for the Debtor, its estate, and its creditors."  Debtor Br. ¶ 56.

> d)     *Debtor has counsel and other professionals who are responsible for dealing with legal issues and interfacing with its lawyers.*

55.     Debtor also claims that "Mr. Denton is the primary point of contact" for its legal counsel.  Debtor Br. ¶ 57.  But Debtor cannot get its story straight.  Its Chief Restructuring Officer, Mr. Holden, has sworn to this Court that he is "responsible, along with Heather Dietrick (General Counsel), for monitoring outside counsel retained by the Debtors in the ordinary course of business."  Ex. R (Ropes & Gray Motion ¶ 5).  In fact, Ms. Dietrick is not just Debtor's General Counsel; she is also its President.  Indeed, in a June 12, 2016 New York Times article, Mr. Denton described Ms. Dietrick, not himself, as "the person that holds everything together."

Gawker's General Counsel Takes on a Leadership Role, NY Times (June 12, 2016).[10]  Mr.

Denton also explained that "the place would not run without [Ms. Dietrick]."  *Id.*

> e)    *Mr. Denton is not devoting his full attention to the bankruptcy proceedings.*

56.    Finally, Debtor claims that Mr. Denton's "uninterrupted attention to these chapter

11 cases is critical to the success of reorganization and the recovery for the creditors."  Debtor

Br. ¶ 57.  However, Mr. Denton's attention has not been singularly focused on the bankruptcy

proceedings and the sale of Debtor's assets.  Since the jury verdict and through the start of the

sale process and the bankruptcy, he has had plenty of time to (i) write long blog posts on

Debtor's website, gawker.com; (ii) respond to people commenting on his posts; (iii) giving

interviews to several news outlets; and (iv) engage in Twitter battles on a variety of topics

including Donald Trump and the recent Brexit vote.  *See* Vogt Decl. ¶ 12.  For example, on June

2, 2016, Mr. Denton sat for a 45-minute interview at an industry conference where he spoke at

length about the Bollea Litigation.[11]  Most recently, Mr. Denton did not attend the June 15, 2016

hearing on the First Day Motions.  Debtor's counsel represented to the Court that Mr. Denton

was not in attendance because there was a "lot of activity and a lot of litigation going on"

requiring him to be "back at the company working with the employees," Ex. F (June 15, 2016

Hearing Tr. 10:4-12).  In fact, Mr. Denton was at CNBC's studios that morning for a live

television interview on CNBC's Squawkbox.  *See* Vogt. Decl. ¶ 12.  And by early afternoon, Mr.

Denton posted a nearly 3,000 word blog entry on gawker.com and then was busy replying to

individual reader comments on his blog post during the afternoon.  *See* Here Is the Good News

---

[10] Available at http://www.nytimes.com/2016/06/13/business/media/gawkers-general-counsel-takes-on-a-leadership-role.html?_r=0.
[11] The interview is available at https://www.youtube.com/watch?v=Vx28-mBOYR0.

(June 15, 2016).[12]  Given all the time Mr. Denton has to attend to matters not relating to the

bankruptcy, he would surely have had time to attend to the limited actions that the Florida court

would have required of him in exchange for staying execution of the judgment against him.

57.    At bottom, while Mr. Denton certainly will have a role to play in the bankruptcy

proceedings, he is not acting alone and has plenty of capable assistance such that he should not

be absolved from dealing with his personal responsibilities.  As one court noted,

> If one suit on a guaranty is likely to hamper the Debtor's
> reorganization by diverting its principal's time and energy away
> from his duties, then *all* major proceedings against the principal,
> corporate-related or personal, are likely to do the same.  If we
> accepted such reasoning, we would enjoin such matters as divorce
> proceedings and other suits against corporate officers on personal
> matters with the same alacrity as the Debtor urges us to exercise in
> enjoining the suit on the notes here.  Such an outcome stretches
> beyond the purpose and intent of Chapter 11 and, indeed, of the
> Code itself.

*In re Apollo Molded Prods.*, 83 B.R. 189, 193 (Bankr. D. Mass. 1988) (emphasis in original;

internal quotation marks and citation omitted).[13]

**B.    The Balance of Hardships Strongly Favors Mr. Bollea.**

58.    The next prong of the preliminary injunction analysis requires the Court to assess

the "relative harm between the debtor and the creditor who would be restrained."  *United Health

Care*, 210 B.R. at 233.  Here, the harm that Mr. Bollea would face if he is enjoined from

protecting the assets of Messrs. Denton and Daulerio and enforcing his judgment against them

far outweighs any alleged harm that would accrue to Debtor if the injunction were not issued.

---

[12] Available at http://gawker.com/here-is-the-good-news-1781980613.

[13] Significantly, if the Court were to find Mr. Denton to be so indispensable to the sale process such that he cannot
be distracted by the Bollea Litigation, any resulting injunction should extend only through the sale of Debtor's assets
because, at that point, Mr. Denton would have fulfilled any responsibilities he has to the reorganization process.
Indeed, Debtor's counsel has indicated that, after the sale, the stay will have to be lifted.  *See* Ex. F (June 15, 2016
Hearing Tr. 78:6-10) (Debtor's Counsel:  "What we intend to do is get the sale done, which is the purpose of
standing down, and then the stay will be lifted, and that proceeding will proceed in Florida.").

Indeed, Debtor's entire argument belies its real motivation – to protect Mr. Denton from the possibility of having to declare personal bankruptcy.

59.    Mr. Bollea – the party whom the Judgment Debtors were found to have intentionally harmed – would be severely prejudiced by an injunction.  Staying enforcement of the judgment against Messrs. Denton and Daulerio would leave Mr. Bollea's judgment against them (which includes $10 million in punitive damages against Mr. Denton that is not collectable against Debtor) *completely unprotected*.  This would be a decidedly unfair result because it "would prejudice the judgment holder by staying execution on conditions that did not provide the judgment holder with protection." *See Platt*, 921 So.2d at 8.  Indeed, under Florida law, a court cannot stay a judgment "without imposing any conditions upon the judgment debtor" – the exact relief Debtor seeks on behalf of Messrs. Denton and Daulerio.  *Id.* (emphasis in original).

60.    On the other hand, as Debtor represented at the hearing on first-day motions, it is in the interests of the bankruptcy estate to expedite the conclusion of the Bollea Litigation, not to stall it.  *See* Ex. F (June 15, 2016 Hearing Tr. 79:2-4) (Debtor's Counsel: "Let's talk about getting that judgment through the appellate process on an expedited basis.  That's what our goal is.").  Indeed, this bankruptcy case cannot conclude until the underlying judgment in the Bollea Litigation is resolved as Mr. Bollea's unsecured claim accounts for over 99% of the value of the twenty largest unsecured claims against Debtor.  *See* Ex. E (Gawker Media Bankruptcy Petition at 21-23).  Therefore, the Bollea Litigation, both from an appellate and collection standpoint, must proceed.  *See, e.g., In re Cicale*, No. 05-14462 (AJG), 2007 WL 1893301, at *4 (Bankr. S.D.N.Y. June 29, 2007) (explaining that, rather than impeding the bankruptcy proceeding, lifting the stay "may, in fact, expedite the resolution of any remaining issues in the bankruptcy court"); *In re Ewald*, 298 B.R. 76, 81 (Bankr. E.D. Va. 2002) (finding that resolution of the

amount, validity and priority of a creditor's claim in state court would assist with the administration of the debtor's bankruptcy case and granting relief from the automatic stay). In addition, even if, as Debtor claims, collection against Messrs. Denton and Daulerio would force them to declare bankruptcy and thereby stay any further collection efforts, *see* Debtor Br. ¶¶ 59-60, Mr. Bollea's claims against them would at the very least be protected through the resulting bankruptcy proceedings.

61.     Notably, Judgment Debtors could have avoided this Motion – at least with respect to the Bollea Litigation – and possibly Debtor's bankruptcy by abiding by their own proposal to pledge Messrs. Denton's and Daulerio's shares in GMGI as security to stay execution of the judgment pending appeal. Mr. Bollea and the Florida court accepted the Judgment Debtors' proposal but, as discussed above, imposed reasonable conditions on the pledge to further safeguard Mr. Bollea including (i) limited discovery regarding the Judgment Debtors' assets; (ii) assurances against dissipation of assets; and (iii) mechanisms to ensure the pledged shares would transfer to Mr. Bollea. All of these modest requirements were consistent with Florida law, which commands that "[a] trial court should not grant a stay that prejudices a judgment holder's realistic opportunities to collect upon the judgment or that prevents a creditor from establishing a lien and priority to collect upon the judgment." *Platt*, 921 So.2d at 8. For example, in *Platt*, the court explained that "it would be reasonable to require the judgment debtor to submit to a deposition in aid of execution and a production of financial records before entry of such a stay. It would also seem prudent to permit the judgment creditor to update this information every few months by additional discovery during the pendency of the appeal." *Id.* As the Florida court reasoned, "if you don't have conditions that go to that pledge, what prevents – what assurances

are there, other than a pledge, which by itself is sort of meaningless." Ex. D (June 10, 2016

Hearing Tr. 44:14-23).

62.     In sum, the balance of hardships more than favors allowing Mr. Bollea to protect

his judgment against the non-debtor intentional tortfeasors, Messrs. Denton and Daulerio.

### C.     Injunctive Relief Will Not Serve the Public Interest.

63.     The final factor that a court considers is whether the injunction will serve the

public interest.  In the context of a bankruptcy proceeding, one part of the public interest "is in

promoting a successful reorganization."  *In re Lazarus Burman Assocs.*, 161 B.R. 891, 901

(Bankr. E.D.N.Y. 1993) (citation omitted); *see also In re Chateaugay Corp.*, 201 B.R. 48, 72

(Bankr. S.D.N.Y. 1996) ("Public policy, as evidenced by chapter 11 of the Bankruptcy Code,

strongly favors the reorganization and rehabilitation of troubled companies and the concomitant

preservation of jobs and going concern values.").  But the public interest also "favors the

expeditious administration of bankruptcy cases" and "recognizes the desirability of

implementing the legitimate expectations of creditors . . . to get paid."  *In re Chemtura Corp.*,

No. 09-11233 (REG), 2010 WL 4638898, at *8 (Bankr. S.D.N.Y. Nov. 8, 2010).  Here, the

public interest overwhelmingly favors Mr. Bollea's enforcement of the judgment against Messrs.

Denton and Daulerio.

64.     The jury in the Bollea Litigation returned a verdict finding that Messrs. Denton

and Daulerio are *intentional* tortfeasors who intended to cause harm to Mr. Bollea by intruding

on his privacy and causing him severe emotional distress.  The jury further found that both

Messrs. Denton and Daulerio were separately liable for punitive damages, which requires a

finding that they were each "personally guilty" of either (i) "intentionally" acting against Mr.

Bollea" despite their "knowledge of the wrongfulness of the conduct and the high probability

that injury or damage to [Mr. Bollea] would result" or (ii) acting "so reckless[ly] or wanting[ly]

in care" that their conduct "constituted a conscious disregard or indifference to the life, safety or

rights of [Mr. Bollea]." Fla. Stat. Ann. § 768.72. Finally, the jury expressly found that Messrs.

Denton and Daulerio had a "specific intent to harm plaintiff when they posted the video on the

Internet. Ex. A (March 18, 2016 Trial Tr. 3837:12-18). It is certainly in the public interest that

such tortfeasors compensate their victim, pay their punitive damages, and not be left free to

dissipate their assets.

65.     Moreover, the public interest would be best served by not endorsing Debtor's

transparent attempt to use its own bankruptcy to shield Mr. Denton from satisfying the judgment

against him. Although Debtor claims to have "commenced the chapter 11 case to preserve its

assets for the benefit of its creditors," Debtor Br. ¶ 72, its motion for a preliminary injunction and

blind acceptance of indemnity obligations that are on their face baseless belies such a motivation.

Rather, the Motion and the bankruptcy proceedings are designed to protect Mr. Denton from

whatever financial difficulty would accrue if he were forced to satisfy the judgment against him.

Denying Debtor's Motion would send a clear message that bankruptcy cannot be used as a tool

to insulate non-debtors, especially ones who committed intentional torts, from satisfying

judgments against them.

66.     Finally, the public interest would be further served by not rewarding Debtor for its

blatant misrepresentations to the Court. "The equitable powers of this court can never be exerted

in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an

advantage. To aid a party in such a case would make this court an abettor of iniquity."

*Valentine v. Metropolitan Life Ins. Co.*, No. 85-3006 CSH, 2004 WL 2496074, at *4 (S.D.N.Y.

Nov. 4, 2004) (quoting *Bein v. Heath*, 47 U.S. 228, 247 (1848)). On this Motion, Debtor comes

before the Court with unclean hands. *See In re Ampal-Am. Israel Corp.*, 545 B.R. 802, 810

(Bankr. S.D.N.Y. 2016) ("The doctrine of unclean hands is based on the maxim that 'one who comes into equity must come with clean hands.'" (quoting *Bentley v. Tibbals*, 223 F. 247, 251 (2d Cir. 1915))). Courts routinely find a party has unclean hands and therefore is not entitled to equitable relief when that party makes misrepresentations to the court in order to gain the relief sought. *See Goldstein v. Delgratia Mining Corp.*, 176 F.R.D. 454, 457-58 (S.D.N.Y. 1997) (finding the plaintiff to be "a striking example" of acting with unclean hands where he misrepresented to the court the state of proceedings in related actions in order to obtain a voluntary dismissal); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 970 (S.D.N.Y. 1992) (holding that a party's fabrication of testimony in order to obtain a finding of laches barred it from receiving such equitable relief).

67.    This Court issued a Temporary Restraining Order pursuant to an *ex parte* request that included a representation that Mr. Bollea had "refused to agree even to a brief temporary stay of execution of the judgments" and "[t]here [was] no question that Mr. Bollea [would] seek to have the judgments against [Debtor], Mr. Denton and Mr. Daulerio perfected as urgently as possible." Winograd Declaration ¶¶ 7-8. Of course, this could not be further from the truth. As discussed above, at Judgment Debtors' behest, Mr. Bollea agreed to stay execution of the judgment in exchange for Mr. Denton and Mr. Daulerio's pledging of their shares in GMGI, and the Florida court was prepared to enter an order to that effect. However, because Debtor sought *ex parte* relief, Mr. Bollea did not have an opportunity to correct the record. Thus, while the Temporary Restraining Order has been in place, the Florida court has been unable to enter its order, and Mr. Bollea's judgment against Messrs. Denton and Daulerio has been unprotected. Moreover, despite its "continuing duty to correct errors in filed documents," Debtor has yet to correct the record on its application. *See In re Engel*, 246 B.R. 784, 794 (Bankr. M.D. Penn.

2000) (explaining that parties have "continuing duty to correct errors in filed documents" even where misstatement were made inadvertently).  Therefore, denying Debtor further relief would advance the public interest by reinforcing the requirement that "one who comes into equity must come with clean hands." *Ampal-Am. Israel Corp.*, 545 B.R. at 810; *see also CCS Commc'n Control, Inc. v. Sklar*, No. 86-cv-7191 (WCC), 1987 WL 12085, at \*3-4 (S.D.N.Y. June 2, 1987) (denying plaintiff's request for preliminary injunction where its chairman committed perjury at an evidentiary hearing to gain the injunctive relief).

68.    Debtor, however, argues that an injunction will serve the public interest because it would promote a successful reorganization and allow it to continue to "play[] a unique role as pioneers for free press."  Debtor Br. ¶¶ 61-63.  These considerations do not outweigh the public interest factors in favor of continued enforcement discussed above.

69.    *First*, Debtor cannot successfully reorganize or conclude the bankruptcy without resolving the Bollea Litigation – the singular cause of Debtor's bankruptcy.  *See supra* ¶ 60; *infra* ¶ 78.

70.    *Second*, there is no evidence that Debtor would be unable to operate until a sale if Mr. Bollea were to enforce his judgment against Messrs. Denton or Daulerio.  With all the personnel assisting Debtor in bankruptcy and its day-to-day operations, Debtor should be able to navigate the bankruptcy successfully even if Mr. Denton were distracted by his own personal legal issues.  *See supra* ¶¶ 45-57.  Further, even without a stay, Debtor will be able to continue to operate and continue its "pioneer[ing]" work publishing articles such as "Texas Library Cat Ousted from Office by 'Kitty Hating' City Hall;"[14] "George W. Bush Denies Participating in Kanye West Orgy;"[15] and "Please Enjoy the DEA's Very Good Guide to 'Rave Parties,'"[16] (all

---

[14] Available at http://gawker.com/texas-library-cat-ousted-from-office-by-kitty-hating-1782645043.
[15] Available at http://gawker.com/george-w-bush-denies-participating-in-kanye-orgy-1782675226.

of which have been published since Debtor's bankruptcy) because it has arranged for DIP

financing.  And at the same time, Debtor remains free to publish its "unique" articles that have

caused the litigation costs – including a $130 million judgment – that resulted in this bankruptcy

and may depress the value of the bids in the upcoming auction process.

71.     In sum, the facts do not weigh in favor of a preliminary injunction.  Mr. Bollea's

enforcement of the judgment against Messrs. Denton and Daulerio will not cause imminent

irreparable harm to the estate; the balance of hardships favor Mr. Bollea, and the public interest

would be best served by allowing the victim of intentional torts to collect against non-debtor

joint tortfeasors.

## II.    There Are No Unusual Circumstances Justifying Extending the Stay of the Bollea Litigation to Non-Debtor Defendants.

72.     In addition to failing to meet the requirements for a preliminary injunction,

Debtor has failed to demonstrate any "unusual circumstances" justifying extending the automatic

stay under section 362(a) to the non-debtor tortfeasors in the Bollea Litigation.  As this Court has

noted, "'unusual circumstances' exist where the claim clearly arises out of the defendant's

actions in his capacity as the debtor's officer, and he is undisputedly entitled to indemnity."

*Bidermann*, 200 B.R. at 784.  However, extending the stay is not warranted where (1) the non-

debtor is independently liable, (2) the non-debtor's right to immunity is not absolute, and (3) the

lawsuit will not interfere with the bankruptcy.  *Id.*  None of these standards, all of which are

required, are met here.  Messrs. Denton and Daulerio were found to be independently liable in

the Bollea Litigation.  Further, any indemnification obligations that Debtor allegedly has to

Messrs. Denton and Daulerio are mooted by their intentional misconduct.  Finally, allowing Mr.

Bollea to protect and collect on the judgment against Messrs. Denton and Daulerio will not

---

[16] Available at http://gawker.com/please-enjoy-the-deas-very-good-2001-guide-to-rave-par-1782650849.

interfere with the bankruptcy.  Accordingly, the stay should not be extended to cover Mr.

Bollea's collection efforts against Messrs. Denton and Daulerio.

### A. Extension of the Stay Is Not Appropriate Because the Judgment Debtors Are Jointly and Severally Liable.

73.    "[W]here the debtor and non-debtor 'co-defendant are joint tortfeasors or where

the non-debtor's liability rests upon his own breach of duty,' a stay clearly cannot be extended to

the non-debtor."  *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp.

603, 608 (S.D.N.Y. 1996) (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999-1000 (4th

Cir. 1986)); *see also Cano v. DPNY, Inc.*, 287 F.R.D. 251, 262 (S.D.N.Y. 2012) (same (quoting

*Variable-Parameter*, 945 F. Supp. at 608)); *FPSDA I*, 2012 WL 6681794, at *8 ("[T]he stay

should not be extended where the non-debtor is 'independently liable as, for example, where the

debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own

breach of duty.'" (quoting *A.H. Robins*, 788 F.2d at 999-1000)).

74.    Here, the Judgment Debtors are jointly and severally liable for the compensatory

judgment.  *See* Debtor Br. ¶ 20 at p. 15 (noting that Messrs. Denton and Daulerio are "each

jointly and severally liab[le] on $115 million of the judgment").  Therefore, the stay cannot be

extended to Mr. Bollea's claims against Messrs. Denton and Daulerio.

### B. Extension of the Stay Is Not Appropriate Because Mr. Denton Does Not Have an Absolute Right to Indemnity from Debtor.

75.    If "the right to indemnity is not absolute" and the non-debtor must "demonstrate

his entitlement to indemnity," then that weighs against extending the stay.  *Bidermann*, 200 B.R.

at 784-85 (rejecting argument that potential indemnification claim warrants stay of action against

non-debtor).  As this Court has acknowledged, there is "[n]o policy" that "allows a corporate

insider to commit an intentional tort against a third party, and escape responsibility by asserting a

disputed indemnity claim."  *Id.* at 785; *see also DeSouza v. PlusFunds Grp., Inc.*, No. 05-cv-

5990 RCCJCF, 2006 WL 2168478, at *3 (S.D.N.Y. Aug. 1, 2006) (declining to extend stay to

non-debtor codefendants who may be indemnified by debtor defendant because their liability

could rest upon their own breaches of duty).

76.    In *DeSouza*, for example, the court refused to extend the stay to non-debtor

directors because there indemnification rights were not absolute.  *See* 2006 WL 2168478, at *3.

There the non-debtors argued that the stay should be extended to them because the debtor had to

indemnify them for their conduct.  Those indemnification rights, however, were subject to

Delaware corporate law, which requires "that a director's actions be in 'good faith' and that the

director 'reasonably believe' that those actions are in the 'best interests' of the company as a

prerequisite for indemnification."  *Id.* at *3 (citations omitted).  Because claims against the

individual directors rested on their own alleged breaches of their duties as directors, the court

found their indemnity claims were not necessarily subject to indemnification and, therefore, held

that "there [was] no basis to extend the automatic stay."  *Id.*

77.    Here, although Mr. Denton holds some indemnity rights against Debtor, those

rights are not absolute.  Indeed, because he committed intentional torts and has a judgment

against him for punitive damages, he *cannot* be indemnified both under the terms of the Gawker

Media Operating Agreement and New York law.  *See supra* ¶¶ 42-43.  "The risk and uncertainty

of indemnity is something [Mr. Denton], not his victim, [Mr. Bollea,] should have to bear."

*Bidermann*, 200 B.R. at 785.

**C.    Extension of the Stay Is Not Appropriate Because Continuing the Bollea
Litigation Will Not Interfere with the Bankruptcy; Indeed, It Is Necessary to
Resolve It.**

78.    Finally, extending the stay is not warranted because continuing with the Bollea

Litigation is necessary for the bankruptcies' resolution.  Because an extension of the stay to non-

debtors is extraordinary relief, the movant must demonstrate through clear and convincing

evidence "an actual impact upon, or threat to, the reorganization efforts if the stay is not

extended." *FPSDA I*, 2012 WL 6681794, at *8 (citing *Gray v. Hirsch*, 230 B.R. 239, 243-44

(S.D.N.Y. 1999)).  A debtor will often experience some risk that its reorganization could be

hindered by an action brought against one of its principals or officers, but "limited or theoretical

risk" is insufficient to warrant extension of the stay.  *Gray*, 230 B.R. at 243-44 (holding that

although an action against owner of several debtor entities could adversely affect debtor, stay

was not warranted because the action against owner did not "pose any serious threat of a material

effect on [debtors'] financial or personnel needs for reorganization").  The continuation of the

Bollea Litigation will not interfere with Debtor's ability to reorganize because (1) it will not

create further indemnification obligations, *see supra* ¶¶ 75-77, (2) there are several key personnel

and retained professionals who can assist Mr. Denton with the bankruptcy, *see supra* ¶¶ 46-55,

and (3) the Bankruptcy cannot conclude without first resolving the Bollea Litigation*, see supra*

¶¶ 60, 78.

## CONCLUSION

79.     For the foregoing reasons, Debtor's Motion should be denied.

Date:   July 5, 2016
        New York, New York

                                        Respectfully submitted


                                        s / Daniel H. Tabak
                                        Daniel H. Tabak
                                        Mark Spatz
                                        COHEN & GRESSER LLP
                                        800 Third Avenue, 21st Floor
                                        New York, New York 10003
                                        Tel:  (212) 957-7600
                                        dtabak@cohengresser.com
                                        mspatz@cohengresser.com

Eric B. Fisher
Jessica L. Jimenez
BINDER & SCHWARTZ LLP
366 Madison Avenue, Sixth Floor
New York, New York 10017
Tel:  (212) 933-4551
efisher@binderschwartz.com
jjimenez@binderschwartz.com

Shane B. Vogt (admitted *pro hac vice*)
BAJO CUVA COHEN TURKEL
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 868-6650
shane.vogt@bajocuva.com

*Attorneys for Terry G. Bollea*