**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Gawker Media LLC et al.,[1] | Case No. 16-11700 (SMB) |
| Debtor. | |
| Gawker Media LLC, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 16-1085 (SMB) |
| Meanith Huon, Ashley Terrill, Teresa Thomas, Shiva Ayyadurai, Terry Gene Bollea, Charles C. Johnson, and Got News LLC, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEBTOR'S MOTION FOR (I) A PRELIMINARY**
**INJUNCTION AND/OR (II) EXTENSION OF THE AUTOMATIC STAY**

Gregg M. Galardi
David B. Hennes
Michael S. Winograd
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). The offices of Gawker Media and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011. Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ..........................................................................................................................4

I.    THE DEBTOR HAS FAR EXCEEDED THE PRELIMINARY INJUNCTION
      STANDARD HERE .........................................................................................................4

      A.    Irreparable Harm Exists .........................................................................................5

            1.    Distraction of Key Personnel .........................................................................5

            2.    Harm to the Estate.........................................................................................8

            3.    Collateral Estoppel......................................................................................14

      D.    The Balance of Hardships Favors the Debtor ...........................................................14

      E.    The Granting of the Injunction Serves the Public Interest........................................15

II.   IN THE ALTERNATIVE, THE COURT SHOULD EXTEND THE
      AUTOMATIC STAY PURSUANT TO SECTION 362(A) OF THE BANKRUPTCY
      CODE.................................................................................................................................19

CONCLUSION........................................................................................................................20

# TABLE OF AUTHORITIES

**Pages(s)**

C<small>ASES</small>

A.H. Robins v. Piccinin,
    788 F.2d 994 (4th Cir. 1986) ...................................................................................19

Bollea v. Gawker Media, LLC,
    913 F. Supp. 2d 1325 (M.D. Fla. 2012)...................................................................12

Gawker Media, LLC v. Bollea,
    129 So. 3d 1196 (Fla. Dist. Ct. App. 2014) ............................................................13

In re Bidermann Indus. U.S.A., Inc.,
    200 B.R. 779 (Bankr. S.D.N.Y. 1996).....................................................................19

In re eToys, Inc.,
    331 BR 176 (Bankr. D. Del. 2005) .....................................................................10, 11

Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),
    365 B.R. 401 (S.D.N.Y. 2007).....................................................................................4

Peterson v. Weavering Macro Fixed Income Fund Limited (in liquidation)
    [2015] 1 CILR 45 (Cayman Islands) ..................................................................10, 14

Robert Plan Corp. v. Liberty Mut. Ins. Co.,
    2010 WL 1193151 (E.D.N.Y. Mar. 23, 2010).........................................................19

Stone v. Ritter,
    911 A.2d 362 (Del. 2006) .........................................................................9, 10, 12

Toffoloni v. LFP Pub. Grp., LLC,
    483 F. App'x 561 (11th Cir. 2012) ..........................................................................13

S<small>TATUTES</small>

Del. Code Ann. tit. 8, § 145(a).........................................................................................9

1.      Gawker Media LLC, a debtor and debtor in possession in the above-captioned chapter 11 cases ("Gawker Media" or "Debtor", and together with parent debtor Gawker Media Group, Inc. ("GMGI") and affiliate debtor Kinja Kft. ("Kinja"), the "Debtors" or the "Company"), respectfully submits this reply memorandum of law in further support of its Motion for a Preliminary Injunction and/or Extension of the Automatic Stay (the "Motion") and hereby respectfully represents as follows:

## PRELIMINARY STATEMENT

2.      Two things are abundantly clear following the submission of Mr. Bollea's opposition brief, document discovery and the depositions of three of the Debtors' most senior executives, including Mr. Denton:  (1) Gawker Media has far exceeded the standard necessary to obtain the relief it seeks in this Motion, which is necessary and appropriate to maximize the value of the now Court-authorized asset sale, and (2) Mr. Bollea remains intent on using this Adversary Proceeding to further his billionaire financial backer's campaign to destroy the Debtors and their employees.  The Motion should be granted and Mr. Bollea should not be allowed to serve as an agent for a personal vendetta to the detriment of these chapter 11 proceedings.

3.      Mr. Bollea's primary argument in opposition to the injunction is one that the Court already has concluded is irrelevant to this Motion:  that the Debtors somehow engaged in a fraud on this Court.  As shown below, no such fraud occurred, and Mr. Bollea's continued attempts to advance that position demonstrate the weakness of his substantive arguments.

4.      In addressing the merits of an injunction, Mr. Bollea primarily focuses on, but makes no serious effort to dispute, two irreparable harms that are present here, each of which independently supports the continuance of the existing injunction:  (i) the distraction of Mr. Denton from the asset sale and required post-sale integration of those assets, and (ii) the harm to

the estate as a result of the Debtors' indemnification obligations to Mr. Denton and their other employees. Instead, Mr. Bollea claims that Mr. Denton's role in the Debtors' asset sale and day-to-day operations is not so important that he should be temporarily protected from personal bankruptcy and that Gawker Media's indemnity obligations are void as to the Bollea Litigation (and GMGI's indemnity obligations are irrelevant).

5.      As the testimony from the depositions taken by Mr. Bollea uniformly confirms, Mr. Denton, Gawker Media's founder and CEO, is central and indispensable to the Debtors' asset sale and day-to-day operations (and thus maintenance of the enterprise value for the asset sale). Mr. Denton currently is working "triple duty" (i) running the day-to-day operations of the Company, (ii) marketing the Company to fifty-five potential bidders as authorized by the Court, and (iii) minimizing the impact of the ongoing campaign to destroy the Company and its employees. In fact, two new lawsuits have been threatened in the last month or so alone. If forced to file for personal bankruptcy, the time required to carry out and manage that process and the emotional drain on Mr. Denton unquestionably would be detrimental to the Debtors' efforts to obtain a value-maximizing sale.

6.      Mr. Bollea cannot and does not seriously dispute these facts. In an effort to minimize Mr. Denton's importance, Mr. Bollea offers the unremarkable proposition that there are other officers and professionals who support Mr. Denton. See Opp. ¶¶ 45-55, 57. But the deposition testimony repeatedly confirms that Mr. Denton is intimately involved in, and central to, the Company's day-to-day operations, and is the most critical person for potential bidders during the sale process and post-sale integration period.

7.      As to indemnification, Mr. Bollea does not challenge the indemnification obligations the Debtors owe in connection with the non-Bollea Actions. Without an injunction,

those costs will continue to be significant and grow given the continuing campaign against the Debtors and their employees.  Those costs alone serve as a basis to grant the Motion.

8.      In addressing his own Action, Mr. Bollea likewise makes no substantive challenge to the numerous indemnification obligations owed by GMGI to Mr. Denton, all of which apply to the Bollea Litigation.  Rather, Mr. Bollea argues only that any such obligations are irrelevant because Debtor GMGI is not a party to this Adversary Proceeding.  See Opp. ¶ 41. As discussed below, the caption for this Adversary Proceeding (which was filed before GMGI became a debtor) is no defense for Mr. Bollea and may easily be amended if deemed necessary by the Court.

9.      As a result of his position, Mr. Bollea substantively challenges only the indemnification obligations owed by Gawker Media.  But there is no merit to Mr. Bollea's claim that Gawker Media's contractual and policy obligations do not apply to the Bollea judgment because of a carve out and public policy concerns, respectively.  See Opp. ¶ 42 & n. 5.  His argument on the former amounts to misguided *ipse dixit* and his argument on the latter relies on the wrong state's law.  In both cases, applicable law shows that Gawker Media's indemnity obligations apply to the Bollea judgment.

10.      The injunction likewise is warranted on a third ground:  allowing the Actions to proceed without the Debtor's participation would prejudice the Debtor and even potentially subject it to collateral estoppel.  It is true, as Mr. Bollea notes (Opp. ¶ 38), that a judgment in the Bollea Litigation already has been entered and it is in the interest of all parties to proceed with the appeal in that case.  But Mr. Bollea ignores entirely the non-Bollea Actions, which would continue to pose the risks to Gawker Media of prejudice and collateral estoppel.

11.    In the alternative, the Court may also extend the automatic stay under Section 362(a) of the Bankruptcy Code.  Mr. Bollea's arguments to the contrary cite to the wrong standard from the wrong circuit (to avoid application of the Second Circuit's <u>Queenie</u> decision) and, even as to the inapposite standard, misunderstand its application.

12.    In sum, allowing the Actions to proceed against Mr. Denton and the Individual Defendants would be highly detrimental to the Debtors' asset sale and reorganization efforts. The Motion should be granted.

## ARGUMENT

## I.    THE DEBTOR HAS FAR EXCEEDED THE PRLELIMINARY INJUNCTION STANDARD HERE.

13.    As set forth in the Debtor's Motion, when determining whether to issue an injunction, courts in the Second Circuit evaluate the following factors:  "(1) whether there is a likelihood of successful reorganization; (2) whether there in an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harm tips in favor of the moving party; and (4) whether the public interest weights in favor of an injunction."  <u>Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)</u>, 365 B.R. 401, 409 (S.D.N.Y. 2007); <u>see</u> <u>also</u> Opening Br. ¶¶ 44-46.  "In evaluating these factors, the court takes a flexible approach and no one factor is determinative."  <u>Id</u>. (internal quotation marks omitted).  All factors are present here.[2]

---

[2] As noted above, Mr. Bollea does not contest that there is a reasonable likelihood of successful reorganization here.  <u>See</u> Opp. at 14 n.3.  In addition, Mr. Bollea begins his argument by citing Florida law governing the stay of judgments pending appeal.  <u>See</u> Opp. ¶ 26. That law has no bearing on this Motion, which is brought under Sections 105 and 362(a) of the Bankruptcy Code.

A.    **Irreparable Harm Exists**

1.    **Distraction of Key Personnel**

14.    Mr. Bollea advances no credible argument that Mr. Denton, Gawker Media's founder and CEO, is not central and indispensable to the Company's asset sale, to the operation of its business through that sale, and to the integration of the assets after the sale. That has been obvious from the start, and the deposition testimony taken by Mr. Bollea uniformly confirms it.

15.    Mr. Bollea seeks to minimize the importance of Mr. Denton's role by arguing the unremarkable and obvious proposition that he has staff members and outside professionals to assist him. Opp. ¶¶ 45-55, 57; see also In re Calpine Corp., 365 B.R. at 410-412 (irreparable harm exists where litigation against a non-debtor would distract an "integral and indispensable member of the restructuring team" from the debtors' restructuring efforts). Here, even an ordinary CEO would be critical, but Mr. Denton is no ordinary CEO. He built the Company from the ground up, remains intimately involved in, and central to, its day-to-day operations, is a unique repository of knowledge about the Company, and is the single most critical person to maximizing the value of the sale of its assets.

16.    The testimony from the depositions taken by Mr. Bollea confirms this uniformly. Mr. Denton explained that, in connection with the asset sale process, he is the "persuader" and "salesman." Denton Tr. (Winograd Reply Decl. Ex. A) 38:14-15. As the Company's Chief Restructuring Officer William Holden testified, Mr. Denton's unique ability to play that role is particularly important to the Company's asset sale since "this is not a smokestack industry where you're taking a piece of machine and selling a machine. It's a company where you're selling intellectual property. You're selling knowhow. You're selling a customer base. You're selling a culture." Holden Tr. (Winograd Reply Decl. Ex. B) 14:10-19. In that regard, Mr. Denton "will know things that no one else knows." Holden Tr. 55:16-17.

17.    The witnesses testified that Mr. Denton has been centrally involved in obtaining the DIP financing, identifying potential bidders, proposing and negotiating deal terms and structures — "the amounts, the alternatives, the potential cultural issues" — drafting and giving presentations to potential bidders, serving as the point person for the Company's bankers, discussing intricacies of the business and its websites' "traffic," explaining technologies, developing projections, and generally selling the Company's "story."  Denton Tr. 7:15-17, 34:6-15, 36:13-19, 38:16-39:17, 40:10-25, 46:9-14; Holden Tr. 10:22-11:9, 11:23-13:4, 20:11-19; 20:22-21:3, 22:10, 26:2-4, 61:7-12; Dietrick Tr. (Winograd Reply Decl. Ex. C) 73:9-13, 79:7-14. While the hiring of Houlihan Lokey brought more resources to bear, Mr. Denton remains the driving force.  Holden Tr. 29:25-31:2.  Notwithstanding their abilities, Mr. Holden and Ms. Dietrick testified that they play a similar "support role" to enable Mr. Denton to maximize value. Holden Tr. 11:5-9, 20:11-13, 21:4-6; see also Dietrick Tr. 73:5-22, 81:22-25, 83:6-24.

18.    Now that the Court has authorized the Company to proceed with its asset sale, Mr. Denton has moved from double duty to "triple duty," and his work will "continue to grow and be exponential [now that the company is] out of the no-shop period."  Holden Tr. 20:22-21:3, 61:7-8, 63:2-25; see also Denton Tr. 10:10-13, 21:17-19, 36:20-37:3.  As Mr. Holden explained, Mr. Denton's already hefty workload is "about to get, again, overwhelmed by the entire sale process, and the number of phone calls he's going to have to make and number of reports that he's going to have to review, the analyses that he's going to ask for, the dinners that he's going to have to go on with other CEOs, I mean, it is a massive undertaking for any CEO, and the CEO is always, as is certainly the case here, especially a company that was, you know, built and raised and created by him where he's the primary role there."  Holden Tr. 62:14-25.

19.     And Mr. Denton is uniquely qualified to maximize the value of the Debtors'

assets.  Not only do his deep connections in the media business "give him relationships and

contacts and connections that are extremely valuable in being able to identify and source

potential interested parties,"  but,

> [i]n terms of marketing the company, he is the CEO of a company that
> he built from the ground up. If there's anyone who's interested in buying
> this company, they will have to talk to him, and they will want to talk
> with him.  We will start with 55 bidders that will come into this, and I'm
> reasonably assured that he will have at least one conversation with all 55
> of those buyers[,] for 40 of those buyers, he may have two or three
> conversations.  For 20 to 30 of those buyers, he may have 10
> conversations, once you get down to the final 10. And then, eventually,
> the final 5, it will be -- it's countless conversations. And all of those
> conversations will be in the v[e]in of marketing this company and
> deriving the highest and best value for the assets.

Holden Tr. 57:16-23, 58:4-23.  Simply put, "[t]here is no one else to communicate the story, to

sell the story, to tell the story, and if you're looking for the most that you can get out of this

company, he is the man who is going to be able to deliver that."  Holden Tr. 63:8-12; see also

Dietrick Tr. 83:13-24, 91:9-15.

20.     As part of any agreement, the winning bidder will almost certainly require Mr.

Denton to play a major role in the transition of the assets post-closing.  The current stalking

horse bidder demanded it because, among other reasons, it "wanted to ensure that the value of

the company was not diminished by the departure of employees subsequent to the – any

termination of full-time employment of me by the business."  Denton Tr. 52:7-14.  As Mr.

Holden explained, "[o]nce you get through the sale, [Mr. Denton is] going to need to be the one

who actually integrates all this stuff. And if you're not attaching that to the sale, whatever

distractions he may have at that point, you're not going to maximize value that way either.  He

knows the vendors. He knows the customers. He knows the employees."  Holden Tr. 63:25-64:9.

21.     In sum, Mr. Denton is critical to the ongoing operation of the Company (which has become "more intense now than usual because of the legal campaign against the company and because of the bankruptcy process" (Denton Tr. 9:11-14)), the asset sale process, and any subsequent integration of Debtors' assets post-sale.   The distraction of a personal bankruptcy during this period, which would undoubtedly occur should the Bollea Litigation go forward, would hinder his ability to maximize the value of the Debtors' assets to the detriment of the estate and its creditors.   See Holden Tr. 61:4-64:9, 64:16-65:2; 65:11-66:4; Dietrick Tr. 91:2-93:10.  The Motion should be granted for this reason alone.  See Opening Br. ¶¶ 50, 55.

### 2.     Harm to the Estate

22.     The requested injunction is also warranted because, without it, the Debtors' estate would be harmed by virtue of the Debtors' various indemnification obligations to Mr. Denton and the other Individual Defendants (as discussed above, the distraction of key personnel would also harm the estate).  Mr. Bollea does not address the indemnification costs related to the non-Bollea Actions or the additional lawsuits that recently have been threatened against the Debtor. Those costs would be significant in connection with such a litigation portfolio under ordinary circumstances.   That is especially so here given the existence of an ongoing, coordinated campaign to destroy the Debtors and their employees.  The Actions no doubt will continue to grow in number and be prosecuted with continued, unusual aggression.  The resulting cost to the Debtors will thus be significant, subverting the chapter 11 case's goal of maximizing the estate's value.  These harms, all unchallenged by Mr. Bollea, also warrant the granting of the Motion.

23.     With respect to the Bollea judgment, Mr. Bollea's scant arguments as to Gawker Media's two separate indemnification obligations — under Company policy and its Operating Agreement — are without merit.

24.    <u>Company Policy</u>.  Mr. Denton and the other Individual Defendants are covered by Gawker Media's and GMGI's corporate policy of indemnifying employees in connection with claims related to the Company's web content.  <u>See</u> Opening Br. ¶ 54; GMGI board resolution at GMGI Petition (GMGI Ch. 11 Dkt. 1) at 12.  Indemnification is critical to a media company like the Debtors.  As Mr. Denton testified, "[i]f I wasn't [indemnified], then it wouldn't be possible for . . . me to do my job, and it wouldn't be possible really for any executive to do a high-profile media company job like this."  Denton Tr. 79:20-81:2.  Similarly, "[the Company's] writers and editors need to be indemnified because otherwise they couldn't do their work if they had the threat of being named personally and pursued in lawsuits, as A.J. Daulerio was. . . . I think it's safe to say that a writer cannot work effectively if they are being personally threatened by litigants with billionaire backers."  Denton Tr. 74:24-75:4, 75:9-12.  Without such a policy, many writers and editors would leave the Company and there would be a chilling effect on those who stayed.  That, in turn, would substantially diminish the Company's enterprise value and threaten its asset sale process.  <u>See</u> Opening Br. ¶¶ 53-54; Holden Tr. 50:1-51:11.

25.    In any event, Mr. Bollea barely addresses the Company's policy — relegating his argument to a footnote — wrongly claiming that with respect to the Bollea judgment it is void as against public policy under New York law.  <u>See</u> Opp. at 17 n.5.  But New York law (which is incorrectly analyzed by Mr. Bollea) does not apply here.  Gawker Media is a Delaware company and the Delaware General Corporate Law permits indemnification so long as the person acted in "good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."  Del. Code Ann. tit. 8, § 145(a).  GMGI is a Cayman company and Cayman law allows indemnification so long as there is no "actual fraud or wilful default."  As discussed in more detail below, neither exception is applicable here.  <u>See</u> <u>Stone v. Ritter</u>, 911

A.2d 362, 369 (Del. 2006) (a "failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation"); Peterson v. Weavering Macro Fixed Income Fund Limited (in liquidation) [2015] 1 CILR 45 (Cayman Islands) ("willful default" under Cayman law arises only from intentional dereliction of one's fiduciary duties to the company).

26.   Gawker Media Operating Agreement.   Mr. Denton is also indemnified pursuant to the Gawker Media Operating Agreement.   Pursuant to Section 3.04 of the Operating Agreement, Mr. Denton is indemnified as long as his conduct does not constitute "willful misconduct or gross negligence."   Vogt Opp. Decl., Ex. K (Dkt. 32-11) §3.04.   Mr. Bollea's claim that this carve out applies because Mr. Denton was found liable in the trial court for intentional torts as to Mr. Bollea and assessed punitive damages (Opp. ¶ 45) is mistaken for a variety of reasons.

27.   First, the Bollea jury finding is still subject to appeal.   Second, even if affirmed, previous conclusions by Florida federal and state appellate courts that the Debtor's posting of the Bollea video is protected free speech preclude a finding of "willful misconduct" or "gross negligence" for purposes of indemnification as a matter of law.   See infra section on "Denton Agreement."   Third, any limited involvement Mr. Denton may have had in the posting of the Bollea video (and the evidence did not show that he had any substantive involvement at all) was indisputably to advance corporate, and not personal, interests, with respect to a media company whose core function is writing about matters of public interest, which is the appropriate inquiry for purposes of indemnification.   See Stone, 911 A.2d, at 369.   Fourth, as discussed further below (see infra section on "GMGI Articles"), these exculpatory terms are to be understood in the context of a director or officer's fiduciary duties, and there is no allegation here that Mr. Denton breached a fiduciary duty to the Company.   See also In re eToys, Inc., 331 BR 176, 187

(Bankr. D. Del. 2005) (carve out in professional's indemnification provision for "willful misconduct" or "gross negligence" is consistent with professional's "fiduciary duty" and would be met where professional "knowingly failed to disclose" conflicts of interest).

28.    In addition to the Gawker Media indemnification obligations, Mr. Denton is also indemnified in the Bollea Litigation pursuant to several GMGI indemnification obligations. As to those, Mr. Bollea argues only that any indemnification obligations on the part of GMGI are irrelevant because only Gawker Media is a party to this Adversary Proceeding. See Opp. ¶ 41. At the time this Motion was filed, only Gawker Media had filed its petition. Two days later, GMGI and Kinja also filed. The potential drain of assets from indemnification — regardless of which Debtor is the source of the obligation — affects all of the Debtors, which are related entities and whose bankruptcies are being jointly administered.[3]

29.    Based on that position, Mr. Bollea has not substantively disputed the application of the three sources of GMGI indemnification — Mr. Denton's personal indemnification agreement ("Denton Agreement"), the GMGI Articles of Association ("GMGI Articles"), and the GMGI corporate indemnification policy, which is discussed above. All three are triggered by the Bollea Litigation. In fact, Mr. Bollea named GMGI as a defendant in the Bollea Litigation (it was dismissed for lack of personal jurisdiction). And any conduct by Mr. Denton with respect to Mr. Bollea would have been in the corporate interest of GMGI, the parent and sole shareholder of Gawker Media. Thus, all three GMGI obligations also require indemnification under the circumstances.

30.    Denton Agreement. The Denton Agreement provides broad indemnification for Mr. Denton. Moreover, it contains an express presumption that Mr. Denton is entitled to

---

[3] If the Court deems it necessary for purposes of this Motion, Gawker Media will promptly amend the caption in this Adversary Proceeding to add GMGI and Kinja as plaintiffs.

indemnification, and no judgment (much less one that is still subject to appeal) may "of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee [is not entitled to indemnification]."  Vogt Opp. Decl., Ex. I (Dkt. 32-9) § 13(a), (c). GMGI's indemnification obligations in connection with the Bollea Litigation arise under three separate provisions of the Denton Agreement.

31.    First, Section 7(b) of the Denton Agreement provides that:  "Notwithstanding any limitation" in other provisions of the Agreement, including specifically Section 3, discussed below, "the Company shall indemnify and hold harmless Indemnitee . . . ."  In other words, under Mr. Denton's contract, he has an unconditional right to indemnity.

32.    Second, under Section 3 of the Denton Agreement, GMGI is also required to indemnify Mr. Denton and hold him harmless in connection with third-party proceedings as long as he "acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company . . . ."  Id. § 3.  That requirement is met here since any limited involvement Mr. Denton may have had in the posting of the Bollea video (and, again, the evidence did not show that he had any substantive involvement at all) was done in the furtherance of Debtors' corporate interest.  See Stone, 911 A.2d, at 369.  Indeed, publishing stories of public interest is precisely the business that Debtors are in, and no personal motive has been or could have been asserted by Mr. Bollea.

33.    Moreover, during the course of Mr. Bollea's litigation against the Debtors, multiple courts concluded that the posting was protected under the First Amendment.  See Bollea v. Gawker Media, LLC, 913 F. Supp. 2d 1325, 1328 & 1329 n.3 (M.D. Fla. 2012) ("Indeed, this Court has previously found that Defendants published the video excerpts 'in conjunction with the news reporting function'" that is protected by the First Amendment) (quoting Bollea v. Gawker

Media, LLC, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012)); Gawker Media, LLC v. Bollea, 129

So. 3d 1196, 1200-01 (Fla. Dist. Ct. App. 2014) ("Speech on 'matters of public concern' . . . is

'at the heart of the First Amendment's protection'" and "[i]t is clear that as a result of the public

controversy surrounding the affair and the Sex Tape, exacerbated in part by Mr. Bollea himself,

the report and the related video excerpts address matters of public concern."). Those decisions

alone preclude a finding of bad faith. See Toffoloni v. LFP Pub. Grp., LLC, 483 F. App'x 561,

at *3 (11th Cir. 2012) (vacating award of punitive damages where "[t]he strongest evidence" that

conduct "was reasonable is the fact that the district court in this case initially dismissed

Toffoloni's case because the court agreed [the photographs were protected free speech].

Although that decision . . . was ultimately reversed . . ., we do not believe that publishers should

be held to a higher standard than that of the learned district judge.").

34.    <u>Third</u>, Section 8 provides under the heading "Contribution in the Event of Joint

Liability" that

> if the indemnification and hold harmless rights provided for in this
> agreement are unavailable to Indemnitee in whole or part for any reason
> whatsoever, the Company, in lieu of indemnifying Indemnitee, shall pay,
> in the first instance, the entire amount incurred by Indemnitee . . .
> without requiring Indemnitee to contribute to such payment, and the
> Company hereby waives and relinquishes any right of contribution it
> may have against Indemnitee.

Thus, even if indemnity were for some reason not available, the Company still is required to

contribute the full amount of any joint and several liability.

35.    <u>GMGI Articles</u>.  The GMGI Articles of Association likewise require GMGI to

indemnify Mr. Denton in the Bollea Litigation.  Section 45.1 of the Articles provides a broad

indemnification for directors and officers and excludes only liability that "they may incur by

reason of their own actual fraud or wilful default." Vogt. Opp. Decl., Ex. J (Dkt. 32-1) § 45.1.

There is no allegation in the Bollea Litigation of fraud.  And "willful default" under Cayman law

(GMGI is a Cayman company) arises only from the intentional dereliction of one's fiduciary duties to the company. See Peterson [2015] 1 CILR 45. As such, that carve out is inapplicable to the Bollea Litigation since, as noted above, at all times Mr. Denton was acting in the Company's interests.

### 3.   Collateral Estoppel

36.   The potential effect of collateral estoppel provides a third basis to grant the Motion. See Opening Br. ¶ 51 (discussing cases finding irreparable harm based on the risks of collateral estoppel in non-debtor third party litigation). Mr. Bollea again ignores the numerous non-Bollea pending and threatened Actions that are subjects of the Motion. Regardless of what happens in the Bollea Litigation or whether Mr. Denton files for personal bankruptcy, those Actions will proceed against the other Individual Defendants, without the Debtor's participation. As a result, absent an injunction, the Debtor will be prejudiced in its own defense and potentially subject to collateral estoppel if any rulings are made or judgments entered.

### B.   The Balance of Hardships Favors the Debtor

37.   Mr. Bollea misses the point when he contends that the Debtor would suffer no harm without the injunction because it is in the Debtor's best interest to pursue an appeal in the Bollea Litigation. Opp. ¶ 60. Pursuing an appeal need not entail allowing execution of a judgment, which, as discussed above, would force Mr. Denton into personal bankruptcy and thus harm the Company in connection with its asset sale. At the same time, if the Motion is granted, Mr. Bollea will be in no different position than he would be if the injunction were not issued and Mr. Denton were forced to file for personal bankruptcy.

38.   Mr. Bollea goes on to inaptly state in this section: "Notably, Judgment Debtors could have avoided this Motion – at least with respect to the Bollea Litigation – and possibly Debtor's bankruptcy by abiding by their own proposal to pledge Messrs. Denton's and

Daulerio's shares in GMGI as security to stay execution of the judgment pending appeal.  Mr.

Bollea and the Florida court accepted the Judgment Debtors' proposal but, as discussed above,

imposed reasonable conditions on the pledge . . . ."  Opp. ¶ 61.  It goes without saying that

claiming to accept a proposal, "but" first imposing "conditions" upon it, is <u>not</u>, in fact, accepting

the proposal.  As explained in detail below, the conditions imposed by Mr. Bollea were far from

reasonable, applied to Gawker Media as well, and, in fact, forced the Debtors to file these

chapter 11 proceedings.  Messrs. Denton and Daulerio continue to offer to pledge their shares in

exchange for a stay as originally proposed.

### C.    The Granting of the Injunction Serves the Public Interest

39.    As Mr. Bollea acknowledges (Opp. ¶ 63), courts have found that the "public

interest" element is satisfied where, as here, granting the injunction would promote a successful

reorganization.  <u>See</u> Opening Br. ¶ 61.  Here, the public interest will be further served by an

injunction because an injunction will at least temporarily prevent a billionaire with a personal

vendetta from using the legal system to further his campaign against the Debtors and their

employees.  Indeed, Mr. Bollea has been explicit in revealing his true motive here of forcing Mr.

Denton into personal bankruptcy.  <u>See</u>, <u>e.g.</u>, Opp. ¶ 2 (Mr. Denton "should [not] be entitled to a

stay of execution without either filing for personal bankruptcy protection or complying with

Florida law requiring good and sufficient security"), ¶ 4 (opposing Motion which allegedly "is a

transparent effort to protect Mr. Denton from having to file for personal bankruptcy"), § 3

heading (Mr. Denton should not be "shielded from . . . possible personal bankruptcy").

40.    Moreover, there is no merit whatsoever to Mr. Bollea's claim the Debtors made

"blatant misrepresentations to the Court."  Opp. ¶ 66.  Mr. Bollea's counsel has repeatedly tried

to distract the Court from the real issues by claiming fraud — fraud by the Company and fraud

by its attorneys, fraud upon this Court in bringing the temporary restraining order application,

and fraud upon the Florida court in filing for bankruptcy.  At the June 15 hearing in this case,

Mr. Bollea insisted upon bringing a sanctions motion in the Florida court notwithstanding this

Court's temporary restraining order.  <u>See</u> Vogt. Opp. Decl., Ex. F (Dkt. 32-6) at 76:18-24.  At

the June 30 discovery conference, Mr. Bollea insisted on taking discovery in connection with

fraud allegedly committed on this Court.  In response, the Court repeatedly told Mr. Bollea's

counsel that his latest allegations of fraud were irrelevant to this Motion, and denied discovery

on the issue.  <u>See</u> June 30 Hr'g Tr. 8:20-10:7.

41.    Nevertheless, Mr. Bollea spends significant time in his opposition again arguing

fraud.  Opp. ¶¶ 5, 6, 16-25, 61, 66-67.  And, despite warnings from the Court not to stray from

the relevant issues (June 30 Hr'g Tr. 22:20-21), his counsel likewise spent time in the recent

depositions asking questions on the issue.  The Debtors wish neither to indulge Mr. Bollea's

counsel nor burden this Court with briefing on an issue the Court already has stated is irrelevant

to the Motion.  But given Mr. Bollea's statements, Debtors are compelled to at least briefly set

the record straight for the Court on the temporary restraining order application.

42.    On June 7, the Florida trial court entered judgment against Gawker Media, Mr.

Denton, and Mr. Daulerio.  Two days later, the defendants filed a motion to stay execution

pending appeal.  <u>See</u> Winograd Reply Decl. Ex. D.  In that motion, Mr. Denton requested that he

be allowed to pledge his GMGI shares and options as security in lieu of a bond that he was

unable to post. <u>Id</u>. at 8.  At the hearing on the motion the next day, Mr. Daulerio likewise offered

to pledge his shares as security.  <u>See</u> Vogt. Opp. Decl., Ex. D (Dkt. 32-4) at 7:20-8:4.  Also at the

hearing, Mr. Bollea's counsel for the first time presented a counter-proposal whereby Mr. Bollea

would accept the individual defendants' proposal to pledge their shares in lieu of a bond, but

only so long as the court imposed other "*extremely strict conditions*" on all three defendants —

the Debtor and Messrs. Denton and Daulerio. <u>Id</u>. at 26:16-17 (emphasis added). Mr. Bollea's

counsel then handed up a proposed order it had prepared prior to the hearing but had not shared

with the defendants' counsel. <u>See id</u>. at 34:6-15, 37:18. (The proposed order, which was not

submitted with Mr. Bollea's opposition here, is attached as Ex. E to the Winograd Reply Decl.).

43.     The five-page proposed order called for a stay pending appeal with a pledge of

stock in lieu of bonds, but included onerous conditions, including, for example, that (i) Mr.

Bollea may immediately perfect his rights as a judgment creditor and to establish and perfect his

judgment lien and priority as a creditor of all three defendants, including the Debtor, (ii) without

prior court approval, the Debtor (and the other defendants) may not dissipate any assets that may

otherwise be subject to execution by Mr. Bollea other than to meet ordinary legal or business

expenses and the cost of legal representation, which would have allowed Mr. Bollea's counsel to

challenge the Company's day-to-day business affairs in the Florida court, and (iii) Mr. Bollea

may take various party and non-party discovery, including without regard to standard Florida

procedural requirements. <u>See</u> Winograd Reply Decl. Ex. E at 3-4.

44.     After a brief recess, the court asked Mr. Bollea's counsel to submit a revised

proposed order modified only to add the pledge of Mr. Daulerio's shares, and indicated that it

would sign that revised proposed order once submitted. <u>See</u> Vogt. Opp. Decl., Ex. D (Dkt. 32-4)

at 37:19-20, 46:3-10, 46:21-47:19, 48:1-50:4, 50:25-53:6. The court then rejected Gawker

Media's multiple requests for a brief stay of the additional conditions (the last as short as two

hours) to allow for appellate review. <u>See id</u>. at 54:6-55:10. As a result, Gawker Media

determined it had no choice but to immediately file for bankruptcy, which it did.

45.     And that is precisely what Gawker Media has told this Court. Just before Gawker

Media presented its application for a temporary restraining order, it filed a motion in the chapter

11 case that included a declaration explaining: "At a [Florida] hearing this morning, the state court ruled that it would enter an order proposed by the plaintiffs that would permit the plaintiffs to begin the process of executing on the judgment by securing liens on the Debtor's property. Accordingly, the Debtor was forced to file a petition for relief under the Bankruptcy Code on an emergency basis." Debtor's Mot. for Waiver and Extension of Time (Ch. 11 Dkt. 2), Ex. B ¶ 6. The same was explained by Gawker Media's counsel both on the record at the status conference on June 15 and off the record when requesting the temporary restraining order. See June 15 Hr'g Tr. 13:24-14:13 ("The [Florida] judge was going to enter a stay order, but the stay order was not acceptable. The order had various provisions in it which we need not discuss, but ultimately, the judgment would have allowed, we believe, them to start executing on assets . . . which is why we came to your Court once we had learned of that potential.").

46.     According to Mr. Bollea, however, three statements in Gawker Media's temporary restraining order papers that discussed Gawker Media's predicament were false because, at bottom, both Mr. Bollea and the Court had "agreed to the Judgment Debtors' proposal that the execution be stayed in exchange for Mr. Denton's and Mr. Daulerio's pledged shares." Opp. ¶ 19, see also Opp. ¶¶ 6, 19-24, 61. But this is a false statement. Claiming to "agree" to a proposal while imposing a number of additional, onerous conditions is not "agreeing to the proposal." As a result of those conditions, which the Florida court said it would order, Gawker Media determined it had no choice but to file for bankruptcy. And it has accurately represented that to the Court.

*       *       *

47.     In sum, Debtors have far exceeded the standard necessary to obtain the injunctive relief they request through the Motion.  For each of the reasons set forth above, the requested injunction should be issued.

## II.     IN THE ALTERNATIVE, THE COURT SHOULD EXTEND THE AUTOMATIC STAY PURSUANT TO SECTION 362(A) OF THE BANKRUPTCY CODE.

48.     Mr. Bollea bases his argument as to why the automatic stay should not be extended on the "unusual circumstances" standard set forth in the Fourth Circuit's 1986 decision in A.H. Robins v. Piccinin, 788 F.2d 994 (4th Cir. 1986).  See Opp. ¶¶ 72-77.  But that standard is different than the "adverse economic consequences" standard articulated by the Second Circuit in its 2003 decision in Queenie.  See Robert Plan Corp. v. Liberty Mut. Ins. Co., 2010 WL 1193151, at *3 (E.D.N.Y. Mar. 23, 2010) (distinguishing between the "adverse economic consequences" standard in the Second Circuit under Queenie and the "unusual circumstances" standard in the Fourth Circuit under A.H. Robins).  Accordingly, Mr. Bollea's argument is inapposite.  As set forth in the Debtor's opening memorandum, the Queenie standard is met here. See Opening Br. ¶¶ 71-72.

49.     In any event, as this Court stated in a decision issued before Queenie, "[u]nder Robins, 'unusual circumstances' exist where there is such an identity of interest between the debtor and the non-debtor defendant that the debtor is the true, real party in interest, and a judgment against the third party will, in effect, be a judgment or a finding against the debtor."  In re Bidermann Indus. U.S.A., Inc., 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996) (Bernstein, J.).  On the other hand, "unusual circumstances do not exist where the debtor's insider is independently liable, the right to indemnity is not absolute, **and** the continuation of the suit will not interfere with the bankruptcy."  Id. (emphasis added).  As In re Bidermann demonstrates, all three of those elements must be present to avoid extension of the automatic stay under the "unusual

-19-

circumstances" standard.  Yet here, none of them is present:  (i) Mr. Denton is not independently

liable, but rather is jointly and severally liable with the Debtor; (ii) Mr. Denton and the other

Individual Defendants have an absolute right to indemnification; and (iii) allowing the Actions to

continue would severely interfere with the Debtors' asset sale and preservation of the estate for

the benefit of its creditors.

## CONCLUSION

50.    For the foregoing reasons, the Debtor respectfully requests that the Motion be

granted.

Dated: July 11, 2016
       New York, New York

*/s/ Gregg M. Galardi*
Gregg M. Galardi
David B. Hennes
Michael S. Winograd
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090
gregg.galardi@ropesgray.com
david.hennes@ropesgray.com
michael.winograd@ropesgray.com

*Proposed Counsel to the Debtors
and Debtors in Possession*
